IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 4:16-CV-469 |
| | § | |
| MAURA TRACY HEALEY, Attorney | § | |
| General of Massachusetts, in her | § | |
| official capacity, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**EXXONMOBIL'S COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

Exxon Mobil Corporation ("ExxonMobil") brings this action for declaratory and injunctive relief against Maura Healey, the Attorney General of Massachusetts. ExxonMobil seeks an injunction barring the enforcement of a civil investigative demand to ExxonMobil, and a declaration that the civil investigative demand violates ExxonMobil's rights under state and federal law. For its Complaint, ExxonMobil alleges as follows based on present knowledge and information and belief:

**INTRODUCTION**

1.      Frustrated by the federal government's perceived inaction, a coalition of state attorneys general with a goal to end the world's reliance on fossil fuels announced their "collective efforts to deal with the problem of climate change" at a joint press conference, held on March 29, 2016, with former Vice President and private citizen Al Gore as the featured speaker. The attorneys general declared that they planned to "creatively" and "aggressively" use the powers of their respective offices on behalf of the

coalition to force ExxonMobil[1] and other energy companies to comply with the coalition's preferred policy responses to climate change.  As the statements of the Attorney General of Massachusetts and others made unmistakably clear, the press conference was a politically motivated event urged on by activists.[2]

2.      The press conference was the culmination of years of planning.  Since at least 2012, climate change activists and plaintiffs' attorneys have contemplated different means of obtaining the confidential records of fossil fuel companies, including the use of law enforcement power to obtain records that otherwise would be beyond their grasp.[3] At a 2012 workshop entitled "Climate Accountability, Public Opinion, and Legal Strategies," the attendees discussed at considerable length "Strategies to Win Access to Internal Documents" of companies like ExxonMobil.[4]  They concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[5]

3.      Members of this group of activists and attorneys were on call at the March press conference.  During a private session with the attorneys general, a climate change activist and a private environmental lawyer, who has previously sued ExxonMobil, made

---

[1]   ExxonMobil was formed as a result of a merger between Exxon and Mobil on November 30, 1999.
      For ease of discussion, we refer to the predecessor entities as ExxonMobil throughout the Complaint.
[2]   A transcript of the AGs United for Clean Power Press Conference, held on March 29, 2016, was
      prepared by counsel based on a video recording of the event, which is available at
      http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-
      attorneys-general-across.  A copy of this transcript is attached as Exhibit A and is incorporated by
      reference.  *See* Ex. A at App. 1-21.  All citations in the format "Ex. _" refer to exhibits to the
      Declaration of Justin Anderson, dated June 14, 2016, attached hereto.
[3]   Ex. N at App. 125.
[4]   *Id.* at App. 119-20, 125, 145-49.
[5]   *Id.* at App. 125.

presentations on the "imperative of taking action now on climate change" and on "climate change litigation."[6]

4.     The attorneys general recognized that the involvement of these individuals—especially a private attorney likely to seek fees from any private litigation made possible by an attorney general-led investigation of ExxonMobil—could expose the special interests behind their investigations.  When that same attorney asked the New York Attorney General's office what he should tell a reporter if asked about his involvement, the chief of that office's environmental unit told him not to confirm his attendance at the conference.[7]

5.     Statements made by Attorney General Healey and others at the press conference confirmed that the civil investigative demand ("CID") that was thereafter issued and served on ExxonMobil was the product of the activists' misguided enterprise.

6.     The Attorney General of New York announced that the attorneys general had joined together to address "th[e] most pressing issue of our time," namely, the need to "preserve our planet and reduce the carbon emissions that threaten all of the people we represent."[8]  Although the federal government had not acted, he promised that the assembled "group of state actors [intended] to send the message that [they were] prepared to step into this [legislative] breach."[9]  To that end, the New York Attorney General reminded the press that his office "had served a subpoena on ExxonMobil," to investigate "theories relating to consumer and securities fraud."[10]

---

[6]     Ex. I at App. 76-85.
[7]     Ex. P at App. 155.
[8]     Ex. A at App. 2.
[9]     *Id.* at App. 4.
[10]    *Id.*

7.     The Attorney General of the United States Virgin Islands, Claude Walker, pledged to do something "transformational" to end "rel[iance] on fossil fuel," beginning with "an investigation into a company" that manufactures a "product" he believes is "destroying this earth."[11]   Attorney General Walker's "transformational" use of his office's powers includes the issuance of a subpoena signed by a member of his staff but mailed to ExxonMobil in Irving, Texas, by Cohen Milstein, a Washington, D.C., law firm that touts itself as a "pioneer in plaintiff class action lawsuits" and "the most effective law firm in the United States for lawsuits with a strong social and political component."

8.     Attorney General Healey similarly pledged "quick, aggressive action" by her office to "address climate change and to work for a better future."[12]   She then announced that, in the service of those goals, her office also had commenced an investigation of ExxonMobil and that she already knew what the outcome of the just-launched investigation would be:  It would reveal "a troubling disconnect between what Exxon knew" and what it "chose to share with investors and with the American public."[13]   Three weeks later, she served the CID on ExxonMobil.

9.     The Massachusetts Attorney General's CID purports to investigate whether ExxonMobil committed consumer or securities fraud by misrepresenting its knowledge of climate change in marketing materials and communications with investors.

10.     Its allegations, however, are nothing more than a weak pretext for an unlawful exercise of government power to further political objectives.  The statute that purportedly gives rise to the investigation has a limitations period of four years.  Mass. Gen. Law ch. 93A, § 2; Mass. Gen. Law ch. 260, § 5A.  For more than a decade,

---

[11]   *Id.* at App. 16-17.
[12]   Ex. A at App. 14.
[13]   *Id.*

however, ExxonMobil has widely and publicly confirmed that it "recognize[s] that the risk of climate change and its potential impacts on society and ecosystems may prove to be significant."[14]

11.    Despite the limitations period and ExxonMobil's longstanding public recognition of the risks of climate change, the CID nevertheless demands that ExxonMobil produce effectively every document about climate change it has generated or received in the last 40 years, thereby imposing a breathtaking burden on ExxonMobil, which would need to collect and review millions of documents to comply with the CID.

12.    Worse still, the CID targets ExxonMobil's communications with the Attorney General's political opponents in the climate change debate—*i.e.*, organizations and individuals who hold views about climate change, and the proper policy responses to it, with which, based on her statements at the press conference,  Attorney General Healey disagrees.  The organizations identified by the CID each have been derided as so-called "climate deniers," meaning that they have expressed skepticism about the science of climate change or Attorney General Healey's preferred modes of addressing the problem.

13.    The statements by the attorneys general at the press conference, their meetings with climate activists and a plaintiffs' attorney, and the remarkably broad scope of the CID unmask the investigation launched by the Massachusetts Attorney General for what it is: a pretextual use of law enforcement power to deter ExxonMobil from participating in ongoing public deliberations about climate change and to fish through decades of ExxonMobil's documents in the hope of finding some ammunition to enhance the Massachusetts Attorney General's position in the policy debate concerning how to

---

[14]   Ex. S at App. 183; *see also* Ex. T at App. 193 ("Because the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant, strategies that address the risk need to be developed and implemented.").

respond to climate change.  Attorney General Healey is abusing the power of government to silence a speaker she disfavors.

14.     Through her actions, Attorney General Healey has deprived and will continue to deprive ExxonMobil of its rights under the United States Constitution, the Texas Constitution, and the common law.  ExxonMobil therefore seeks a declaration that the CID violates ExxonMobil's rights under Article One of the United States Constitution; the First, Fourth, and Fourteenth Amendments to the United States Constitution; Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution; and constitutes an abuse of process under the common law.  ExxonMobil also seeks an injunction barring enforcement of the CID.   Absent an injunction, ExxonMobil will suffer imminent and irreparable harm for which there is no adequate remedy at law.

## PARTIES

15.     ExxonMobil is a public, shareholder-owned energy company incorporated in New Jersey with principal offices in the State of Texas.  ExxonMobil is headquartered and maintains all of its central operations in Texas.

16.     Defendant Maura Healey is the Attorney General of Massachusetts.  She is sued in her official capacity.

## JURISDICTION AND VENUE

17.     This court has subject matter jurisdiction over this action pursuant to Sections 1331 and 1367 of Title 28 of the United States Code.  Plaintiff alleges violations of its constitutional rights in violation of 28 U.S.C. § 1983.  Because those claims arise under the laws of the United States, this Court has original jurisdiction over them.  28 U.S.C. § 1331.  Plaintiff also alleges related state law claims that derive from the same

nucleus of operative facts.  Each of Plaintiff's state law claims—like its federal claims—is premised on Attorney General Healey's statements at the press conference, her service of the CID, and the CID's demands.  This Court therefore has supplemental jurisdiction over those claims.  28 U.S.C. § 1367(a).

18.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events giving rise to the claims occurred in the Northern District of Texas.  Specifically, the CID requires ExxonMobil to collect and review a substantial number of records stored or maintained in the Northern District of Texas.

## FACTS

### A.    The "Green 20" Coalition of Attorneys General Announces a Plan to Use Law Enforcement Tools to Achieve Political Goals.

19.    On March 29, 2016, the Attorney General of New York, Eric Schneiderman, hosted a press conference in New York City dubbed "AGs United for Clean Power."  The purpose of the conference was to discuss the coalition's plans to take "progressive action on climate change," including investigating ExxonMobil.[15]  Former Vice President Al Gore was the event's featured speaker, and attorneys general or staff members from over a dozen other states were in attendance.  Attorney General Healey attended and participated in the press conference.

20.    The attorneys general, calling themselves the "Green 20" (a reference to the number of participating attorneys general), explained that their mission was to "com[e] up with creative ways to enforce laws being flouted by the fossil fuel

_____

[15]    Ex. MM at App. 327.

industry."[16]   Expressing dissatisfaction with the perceived "gridlock in Washington" regarding climate change legislation, Attorney General Schneiderman said that the coalition had to work "creatively" and "aggressively" to advance that agenda.[17]

21.     Attorney General Schneiderman announced that the assembled "group of state actors [intended] to send the message that [it was] prepared to step into this [legislative] breach."[18]  He continued:

> We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action.  So today, we're sending a message that, at least some of us—actually a lot of us—in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.[19]

22.     Attorney General Schneiderman's comments left no doubt that the purpose of the "coordination" was not to investigate alleged violations of law, but "to deal with th[e] most pressing issue of our time," namely, the need to "preserve our planet and reduce the carbon emissions that threaten all of the people we represent."[20]

23.     Attorney General Schneiderman declared that the debate about climate change and the range of permissible policy responses to it was over:  "[W]e are here for a very simple reason.  We have heard the scientists.  We know what's happening to the planet.  There is no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the

---

[16]   Ex. A at App. 3.
[17]   *Id.* at App. 3-4.
[18]   *Id.* at App. 4.
[19]   *Id.* at App. 5.
[20]   *Id.* at App. 2.

8

American public that really need to be cleared up."[21]   Attorney General Schneiderman reminded the press that his office "had served a subpoena on ExxonMobil," to investigate "theories relating to consumer and securities fraud."[22]

24.     Having explained the reason for the conference, Attorney General Schneiderman then introduced former Vice President Al Gore.

25.     Attorney General Schneiderman explained that "there is no one who has done more for this cause" than Gore, who recently had been "traveling internationally, raising the alarm," and "training climate change activists."[23]   Again, "the cause" to which Attorney General Schneiderman referred was not preventing consumer or securities fraud.   Instead, the shared goal of the attorneys general and the former Vice President was to end "our addiction to fossil fuels and our degradation of the planet."[24]

26.     In an effort to legitimize what the attorneys general were doing, Gore cited perceived inaction by the federal government to justify action by the Green 20.   He observed that "our democracy's been hacked . . . but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level."[25]

27.     Gore went on to condemn those who question the viability of renewable energy sources, faulting them for "slow[ing] down this renewable revolution" by "trying to convince people that renewable energy is not a viable option."   He then accused the fossil fuel industry of "using [its] combined political and lobbying efforts to put taxes on

---

[21]   *Id.* at App. 3.
[22]   *Id.* at App. 4.
[23]   *Id.* at App. 6.
[24]   *Id.*
[25]   *Id.* at App. 10.

solar panels and jigger with the laws" and said "[w]e do not have 40 years to continue suffering the consequences of the fraud."[26]

28.     When it was his turn to speak, Virgin Islands Attorney General Claude Walker began by hailing Vice President Gore as one of his "heroes."  Attorney General Walker announced that his office had "launched an investigation into a company that we believe must provide us with information about what they knew about climate change and when they knew it."[27]   That thinly veiled reference to ExxonMobil was later confirmed in a press release naming ExxonMobil as the target of his investigation.[28]

29.     Continuing the theme of the press conference, Attorney General Walker admitted that his investigation of ExxonMobil was really aimed at changing public policy, not investigating actual violations of existing law:

> It could be David and Goliath, the Virgin Islands against a huge corporation, but we will not stop until we get to the bottom of this and make it clear to our residents as well as the American people that we have to do something transformational.   We cannot continue to rely on fossil fuel.  Vice President Gore has made that clear.[29]

30.     For Attorney General Walker, the public policy debate on climate change is settled: "We have to look at renewable energy.  That's the only solution."[30]

31.     As for the energy companies like ExxonMobil, Attorney General Walker accused them of producing a "product [that] is destroying this earth."[31]   He complained

---

[26]   *Id.* at App. 8-10.
[27]   *Id.* at App. 16.
[28]   Ex. C at App. 53-55.
[29]   Ex. A at App. 17.
[30]   *Id.*
[31]   *Id.*

that, "as the polar caps melt," those "companies [] are looking at that as an opportunity to go and drill, to go and get more oil.  Why?  How selfish can you be?"[32]

32.     During her turn at the podium, Attorney General Healey also began by lauding Gore "who, today, I think, put most eloquently just how important this is, this commitment that we make."[33]

33.     The Attorney General then articulated her view that "there's nothing we need to worry about more than climate change," and that the attorneys general "have a moral obligation to act" to alleviate the threat to "the very existence of our planet."[34]

34.     Attorney General Healey therefore pledged to take "quick, aggressive action" to "address climate change and to work for a better future."[35]  In the service of that goal, she announced that her office was investigating ExxonMobil.  Remarkably, she also announced, in advance, the findings of her investigation weeks before she even issued the CID:

> Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable.  That's why I, too, have joined in investigating the practices of ExxonMobil.  We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public.[36]

Attorney General Healey's comments unambiguously reflected her pre-ordained determination that ExxonMobil had engaged in unlawful deception in connection with the debate over climate change policy.

---

[32]   *Id.*
[33]   *Id.* at App. 13.
[34]   *Id.*
[35]   *Id.* at App. 14.
[36]   *Id.* at App. 13.

35.     The political motivations articulated by Attorney General Healey and the other press conference attendees struck a discordant note with those who rightfully expect government attorneys to conduct themselves in a neutral and unbiased manner.   One reporter reacted by asking whether the press conference and the investigations were nothing more than "publicity stunt[s]."[37]

**B.     The Attorneys General of Other States Condemn the Green 20's Investigations.**

36.     The press conference drew a swift and sharp rebuke from other state attorneys general who criticized the Green 20 for using the power of law enforcement as a tool to muzzle dissent and discussions about climate change.   The attorneys general of Alabama and Oklahoma stated that "scientific and political debate" "should not be silenced with threats of criminal prosecution by those who believe that their position is the only correct one and that all dissenting voices must therefore be intimidated and coerced into silence."[38]   They emphasized that "[i]t is inappropriate for State Attorneys General to use the power of their office to attempt to silence core political speech on one of the major policy debates of our time."[39]

37.     The Louisiana Attorney General similarly observed that "[i]t is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[40]   Likewise, the Kansas Attorney General questioned the "unprecedented" and "strictly partisan nature of announcing state 'law enforcement' operations in the presence of a former vice president of the United State[s] who,

---

[37]   *Id.* at App. 18.
[38]   Ex. D at App. 57.
[39]   *Id.*
[40]   Ex. E at App. 59.

presumably [as a private citizen], has no role in the enforcement of the 17 states' securities or consumer protection laws."[41]  The West Virginia Attorney General criticized the attorneys general for "abusing the powers of their office" and stated that the desire to "eliminate fossil fuels . . . should not be driving any legal activity" and that it was improper to "use the power of the office of attorney general to silence [] critics."[42]

38.     More recently, the Committee on Science, Space, and Technology of the United States House of Representatives launched an inquiry into the investigations undertaken by the Green 20.[43]  That committee was "concerned that these efforts [of the Green 20] to silence speech are based on political theater rather than legal or scientific arguments, and that they run counter to an attorney general's duty to serve as the guardian of the legal rights of the citizens and to assert, protect, and defend the rights of the people."[44]  Perceiving a need to provide "oversight" of what it described as "a coordinated attempt to attack the First Amendment rights of American citizens," the Committee requested the production of certain records and information from the attorneys general.[45]  The activists and the attorneys general have thus far refused to cooperate with the inquiry.[46]

39.     Several senators similarly have urged United States Attorney General Loretta Lynch to confirm that the Department of Justice is not and will not investigate United States citizens or corporations on the basis of their views on climate change.[47] The senators observed that the Green 20's investigations "provide disturbing

---

[41]   Ex. F at App. 61.
[42]   Ex. G at App. 64-66.
[43]   Ex. H at App. 69-74.
[44]   *Id.* at App. 69 (internal quotation marks omitted).
[45]   *Id.* at App. 72.
[46]   *See, e.g.*, Ex. Z at App. 235-36; Ex. AA at App. 238-40.
[47]   *See* Ex. BB at App. 243-245.

confirmation that government officials at all levels are threatening to wield the sword of law enforcement to silence debate on climate change."[48]  The letter concluded by asking Attorney General Lynch to explain the steps she is taking "to prevent state law enforcement officers from unconstitutionally harassing private entities or individuals simply for disagreeing with the prevailing climate change orthodoxy."[49]

### C.   In Closed-Door Meetings, the Green 20 Privately Meet with Climate Activists and Plaintiffs' Lawyers.

40.     The impropriety of the statements made by Attorney General Healey and the other members of the Green 20 at the press conference are surpassed only by what they said behind closed doors.

41.     In advance of the conference, the chief of the Massachusetts Attorney General's Office's Energy & Environment Bureau indicated that the office sought to "learn the status of states' investigations/plans" and explore avenues for "coordination."  The bureau chief also noted that the office was taking actions to "advanc[e] clean energy."[50]

42.     During the morning of the press conference, the attorneys general attended two presentations.  Those presentations were not announced publicly, and they were not open to the press or general public.  The identity of the presenters and the titles of the presentations, however, were later released by the State of Vermont in response to a request under that state's Freedom of Information Act.

---

[48]   *Id.* at App. 244.
[49]   *Id.*
[50]   Ex. J at App. 158-59.

43.     The first presenter was Peter Frumhoff, the director of science and policy for the Union of Concerned Scientists.[51]  His subject was the "imperative of taking action now on climate change."[52]

44.     According to the Union of Concerned Scientists, those who do not share its views about climate change and responsive policy make it "difficult to achieve meaningful solutions to global warming."[53]  It accuses "[m]edia pundits, partisan think tanks, and special interest groups" of being "contrarians," who "downplay and distort the evidence of climate change, demand policies that allow industries to continue polluting, and attempt to undercut existing pollution standards."[54]

45.     Frumhoff has been targeting ExxonMobil since at least 2007.  In that year, Frumhoff contributed to a publication issued by the Union of Concerned Scientists, titled "Smoke, Mirrors, and Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science,"[55] which brainstormed strategies for "putting the brakes" on ExxonMobil's alleged "disinformation campaign."[56]

46.     Matthew Pawa of Pawa Law Group, P.C.[57] hosted the second presentation on the topic of "climate change litigation."[58]  The Pawa Law Group, which boasts of its "role in launching global warming litigation,"[59] previously sued ExxonMobil and sought to hold it liable for causing global warming.  That suit was dismissed because, as the court properly held, regulating global warming emissions is "a political rather than a legal

---

[51]   Ex. J at App. 87.
[52]   Ex. I at App. 77.
[53]   Ex. K at App. 95-95.
[54]   *Id.*
[55]   Ex. LL at 319.
[56]   *Id.* at 322.
[57]   Ex. L at App. 109-110.
[58]   Ex. I at App. 77.
[59]   Ex. M at App. 112.

issue that needs to be resolved by Congress and the executive branch rather than the courts."[60]

47.     Frumhoff and Pawa have sought for years to initiate and promote legal actions against fossil fuel companies in the service of their political agenda and for private profit.   In 2012, for example, Frumhoff hosted and Pawa presented at a conference entitled "Climate Accountability, Public Opinion, and Legal Strategies."[61] The conference's goal was to consider "the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation."[62]

48.     The 2012 conference's attendees discussed at considerable length "Strategies to Win Access to Internal Documents" of companies like ExxonMobil.[63] Even then, "lawyers at the workshop" suggested that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[64]

49.     Indeed, that conference's attendees were "nearly unanimous" regarding "the importance of legal actions, both in wresting potentially useful internal documents from the fossil fuel industry and, more broadly, in maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming."[65]

50.     As recently as January 2016, Pawa and a group of climate activists met to discuss the "[g]oals of an Exxon campaign."   The goals included:

---

[60]   Ex. N at App. 126; *see also Native Village of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 857-58 (9th Cir. 2012).
[61]   Ex. N at App. 117-18, 146.
[62]   *Id.* at App. 118.
[63]   *Id.* at App. 125.
[64]   *Id.*
[65]   *Id.* at App. 141.

To establish in public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm. To delegitimize them as a political actor. To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc. To call into question climate advantages of fracking, compared to coal. To drive divestment from Exxon. To drive Exxon & climate into center of 2016 election cycle.[66]

51.     The Green 20 press conference thus represented the culmination of Frumhoff and Pawa's collective efforts to enlist state law enforcement officers in their quest to enact their preferred policy responses to global warming and obtain documents for private lawsuits.

52.     The attorneys general in attendance at the press conference understood that the participation of Frumhoff and Pawa, if reported, could expose the private, financial, and political interests behind the announced investigations. In an apparent attempt to improperly shield their communications from public scrutiny, the attorneys general drafted—and may have executed—a common interest agreement in connection with the Green 20 conference.[67] In addition, the day after the conference, a reporter from *The Wall Street Journal* called Pawa.[68] In response, Pawa asked the New York Attorney General's Office, "[w]hat should I say if she asks if I attended?"[69] The environmental bureau chief at the office, in an effort to conceal from the press and public the closed-door meetings, responded, "[m]y ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event."[70]

---

[66]   *See* Ex. OO at App. 336; *see also* Ex. O at App. 151-53.
[67]   Ex. NN at App. 333-34.
[68]   *See* Ex. P at App. 155.
[69]   *Id.*
[70]   *Id.*

53.     The press conference, the closed-door meetings with activists, and the activists' long-standing desire to expose ExxonMobil's "internal documents" as part of a campaign to put "pressure on the industry," inducing it to support "legislative and regulatory responses to global warming,"[71] form the partisan backdrop against which the CID must be considered.  The thoroughly political goals of the activists—which the Massachusetts Attorney General adopted as her own at the press conference—are reflected in the CID itself.

**D.      The CID Demands 40 Years' of ExxonMobil's Records, Even Though ExxonMobil Could Not Have Violated the Statute Purportedly Under Investigation.**

54.     Three weeks after the press conference, on April 19, 2016, the Massachusetts Attorney General's Office served the CID on ExxonMobil's registered agent in Suffolk County, Massachusetts.

55.     According to the CID, there is "a pending investigation concerning [ExxonMobil's] potential violations of Mass. Gen. Law ch. 93A, § 2."[72]  That statute prohibits "unfair or deceptive acts or practices" in "trade or commerce"[73] and has a four-year statute of limitations.[74]   The CID specifies two types of transactions under investigation: ExxonMobil's (i) "marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth," and (ii) "marketing and/or sale of securities" to Massachusetts investors.[75]  The requested documents pertain largely to information related to climate change in the possession of ExxonMobil and located at its principal place of business in Texas.

---

[71]   Ex. N at App. 141.
[72]   Ex. B at App. 23.
[73]   Mass. Gen. Law ch. 93A, §2(a).
[74]   Mass. Gen. Law ch. 260, § 5A.
[75]   Ex. B at App. 23.

56.     ExxonMobil could not have committed the possible offenses that the CID purports to investigate for at least two reasons.

57.     First, at no point during the past five years—more than one year before the limitations period began—has ExxonMobil (i) sold fossil fuel derived products to consumers in Massachusetts, or (ii) owned or operated a single retail store or gas station in the Commonwealth.[76]

58.     Second, ExxonMobil has not sold any form of equity to the general public in Massachusetts since at least 2010, which is also well beyond the limitations period.[77] In the past decade, ExxonMobil has sold debt only to underwriters outside the Commonwealth, and ExxonMobil did not market those offerings to Massachusetts investors.[78]

59.     The CID's focus on events, activities, and records outside of Massachusetts is demonstrated by the items it demands ExxonMobil search for and produce.  For example, the CID demands documents that relate to or support 11 specific statements.[79]  None of those statements were made in Massachusetts.[80]  The CID also seeks ExxonMobil's communications with 12 named organizations,[81] but only one of these organizations has an office in Massachusetts and ExxonMobil's communications with the other 11 organizations likely occurred outside of Massachusetts.  Finally, the

---

[76]   Any service station that sells fossil fuel derived products under an "Exxon" or "Mobil" banner is owned and operated independently.  In addition, distribution facilities in Massachusetts, including Everett Terminal, have not sold products to consumers during the limitations period.

[77]   Ex. GG at App. 292.

[78]   *Id.*  This is subject to one exception.  During the limitations period, ExxonMobil has sold short-term, fixed-rate notes, which mature in 270 days or less, to institutional investors in Massachusetts, in specially exempted commercial paper transactions.  *See* Mass. Gen. Laws ch. 110A, § 402(a)(10); *see also* 15 U. S. C. § 77c(a)(3).

[79]   Ex. B at App. 36-37 (Request Nos. 8-11).

[80]   *Id.*

[81]   *Id.* at App. 35 (Request No. 5).

CID requests all documents and communications related to ExxonMobil's publicly issued reports, press releases, and Securities and Exchange Commission ("SEC") filings, which were issued outside of Massachusetts,[82] and all documents and communications related to ExxonMobil's climate change research, which also occurred outside of Massachusetts.[83]

60.   Even if ExxonMobil had engaged in some theoretically relevant conduct in Massachusetts, ExxonMobil has made no statements in the past four years that could give rise to fraud as alleged in the CID.   For more than a decade, ExxonMobil has publicly acknowledged that climate change presents significant risks that could affect its business.   For example, ExxonMobil's *2006 Corporate Citizenship Report* recognized that "the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant" and reasoned that "strategies that address the risk need to be developed and implemented."[84]   In addition, in 2002, ExxonMobil, along with three other companies, helped launch the Global Climate and Energy Project at Stanford University, which has a mission of "conduct[ing] fundamental research on technologies that will permit the development of global energy systems with significantly lower greenhouse gas emissions."[85]

61.   ExxonMobil has also discussed these risks in its public SEC filings.   For example, in its 2006 10-K, ExxonMobil stated that "laws and regulations related to. . . risks of global climate change" "have been, and may in the future" continue to impact its operations.[86]   Similarly, in its 2015 10-K, ExxonMobil noted that the "risk of climate

---

[82]   *Id.* at App. 38-40 (Request Nos. 15-16, 19, 22).
[83]   *Id.* at App. 34-35, 37-40 (Request Nos. 1-4, 14, 17, 22).
[84]   Exxon Mobil Corp., *2006 Corporate Citizenship Report* 15 (2007).
[85]   Stanford University Global Climate & Energy Project, *About Us, available at* https://gcep.stanford.edu /about/index.html (last visited Apr. 12, 2016).
[86]   Exxon Mobil Corp., Annual Report (Form 10-K) 2-3 (Feb. 28, 2007).

change" and "current and pending greenhouse gas regulations" may increase its "compliance costs."[87]  Long before the limitations period of Mass. Gen. Law ch. 93A, § 2, ExxonMobil disclosed and acknowledged the risks that supposedly gave rise to the Massachusetts Attorney General's investigation.

62.     Resting uneasily with the absence of any factual basis for investigating ExxonMobil's alleged fraud is the heavy burden imposed by the CID.  Spanning 25 pages and containing 38 broadly worded document requests, the CID unreasonably demands production of essentially any and all communications and documents relating to climate change that ExxonMobil has produced or received over the last 40 years.  For example, the CID requests all documents and communications "concerning Exxon's development, planning, implementation, review, and analysis of research efforts to study $CO_2$ emissions . . . and the effects of these emissions on the Climate" since 1976 and all documents and communications concerning "any research, study, and/or evaluation by ExxonMobil and/or any other fossil fuel company regarding the Climate Change Radiative Forcing Effect of" methane since 2010.[88]  It also requests all documents and communications concerning papers and presentations given by ExxonMobil scientists since 1976[89] and demands production of ExxonMobil's climate change related speeches, public reports, press releases, and SEC filings over the last 20 years.[90]  Moreover, it fails to reasonably describe several categories of documents by, for example, requesting

---

[87]     Exxon Mobil Corp., Annual Report (Form 10-K) 3 (Feb. 24, 2016).
[88]     Ex. B at App. 34, 39 (Request Nos. 1, 17).
[89]     Id. at App. 36 (Request Nos. 2-4).
[90]     Id. at App. 36 (Request No. 8 (all documents since 1997)); id. at App. 39-40 (Request No. 22 (all documents since 2006)); id. at App. 36-39 (Request Nos. 9-12, 14-16, 19 (all documents since 2010)). The CID also demands the testimony of ExxonMobil officers, directors, or managing agents who can testify about a variety of subjects, including "[a]ll the topics covered" in the CID.  Id. at App. 43 (Schedule B).

documents related to ExxonMobil's "awareness," "internal considerations," and "decision making" with respect to certain climate change matters.[91]

**E.    The CID Targets Organizations that Have Been Derided by the Press as "Climate Deniers."**

63.    The CID's narrower requests, however, are in some instances more troubling than its overly broad ones.  They appear to target groups simply because they hold views with which Attorney General Healey disagrees.  All 12 of the organizations that ExxonMobil is directed to produce its communications with have been identified by environmental advocacy groups as opposing policies in favor of addressing climate change or disputing the science in support of climate change.[92]

**F.    ExxonMobil's Efforts to Protect its Rights.**

64.    On April 13, 2016, ExxonMobil brought a declaratory judgment action in a Tarrant County district court against Attorney General Walker and the private attorneys to whom he had delegated his investigative power.  ExxonMobil sought a declaration that Attorney General Walker's subpoena was illegal and unenforceable, because it violated several of ExxonMobil's rights under the United States and Texas constitutions, and was an abuse of process under common law.[93]

65.    On May 16, 2016, the Attorneys General of Texas and Alabama intervened in that action in an effort to protect the constitutional rights of their citizens.[94] The plea filed by the Texas and Alabama Attorneys General criticized Attorney General Walker and his private attorneys for undertaking an investigation "driven by ideology,

---

[91]    *See id.* at App. 35-36, 39 (Request Nos. 7-8, 18).
[92]    *See, e.g.*, Ex. JJ at App. 306-308.
[93]    Pl's Original Pet. for Declaratory Relief at 22–26, *Exxon Mobil Corp.* v. *Walker*, No. 4:16-cv-00364-K, ECF No. 1-5 (April 13, 2016).
[94]    Ex. W at App. 214-220.

and not law."[95]  The Texas Attorney General called Attorney General Walker's purported investigation "a fishing expedition of the worst kind" and recognized it as "an effort to punish Exxon for daring to hold an opinion on climate change that differs from that of radical environmentalists."[96]  The Alabama Attorney General echoed those sentiments, stating that the pending action in Texas "is more than just a free speech case.  It is a battle over whether a government official has a right to launch a criminal investigation against anyone who doesn't share his radical views."[97]

66.     Two days later, Attorney General Walker and the other defendants removed that case to this Court.[98]  In response, ExxonMobil moved to remand the proceedings to state court because, under the reasoning of a recent decision by the Fifth Circuit, ExxonMobil's suit against Attorney General Walker is not ripe in federal court because ExxonMobil faces no sanctions for refusing to comply with Attorney General Walker's subpoena until he moves to enforce it.[99]

67.     Unlike Attorney General Walker's subpoena, ExxonMobil faces immediate sanctions if it fails or refuses to comply with Attorney General Healey's CID. Noncompliance with the CID results in the assessment of a "civil penalty."[100]  And if ExxonMobil does not respond to the CID, it risks waiving any objections to it.  This suit is therefore ripe for adjudication in federal court.

---

[95]   *Id.* at App. 215.
[96]   Ex. X at App. 222.
[97]   Ex. Y at App. 226.
[98]   *See* Notice of Removal, *Exxon Mobil Corp.* v. *Walker*, No. 4:16-cv-00364-K, ECF No. 1 (May 18, 2016).
[99]   *See* Memorandum of Law in Supp. of Mot. to Remand, *Exxon Mobil Corp.* v. *Walker*, No. 4:16-cv-00364-K, ECF No. 12 (May 23, 2016).
[100]   Mass. Gen. Law ch. 93A § 7.

68.     June 16, 2016 is the deadline under Massachusetts law (as extended on consent) for objecting to the CID.  Under Massachusetts law, ExxonMobil must respond to the CID in a Massachusetts court, because otherwise it risks waiving its objections.

69.     Accordingly, ExxonMobil expects to appear specially in Massachusetts to file a protective motion.  ExxonMobil plans to file that motion for the sole purpose of preserving its rights, and to avoid an argument that it has waived its objections.[101] Because Massachusetts lacks personal jurisdiction over ExxonMobil, ExxonMobil will appear specially and assert its objections subject to its argument regarding personal jurisdiction.  ExxonMobil will also ask the Massachusetts court to stay its consideration of ExxonMobil's objections because ExxonMobil believes that this Court should resolve the enforceability of the CID in the first instance.

## THE MASSACHUSETTS ATTORNEY GENERAL'S CID VIOLATES EXXONMOBIL'S RIGHTS

70.     The facts recited above demonstrate the pretextual nature of the stated reasons for Attorney General Healey's investigation.  The statements made by the Massachusetts Attorney General at the press conference reveal the political purpose of the investigation: to change the political calculus surrounding the debate about policy responses to climate change by (1) targeting the speech of the Massachusetts Attorney General's political opponents, and (2) exposing ExxonMobil documents that may be politically useful to climate activists.

71.     The pretextual character of the CID is brought into sharp relief when the scope of the CID—which demands 40 years of records—is contrasted with the four-year limitations period of the statute that purportedly authorizes the investigation.

---

[101]     *See Attorney General* v. *Bodimetric Profiles*, 533 N.E.2d 1364, 1365 (Mass. 1989).

72.    The CID's demands for millions of documents that span four decades are not justified by any legitimate law enforcement objective.   The CID purports to investigate ExxonMobil's deception of Massachusetts consumers and investors in trade or commerce.   But ExxonMobil could not have deceived Massachusetts consumers or investors during the statutory period.   Accordingly, the CID's demands for millions of documents, which concern only out-of-state activities, are not relevant to any action that Attorney General Healey is authorized to bring.

73.    Neither Attorney General Healey nor any other public official may use the power of the state to prescribe what shall be orthodox in matters of public concern.   By deploying the law enforcement authority of the Massachusetts Attorney General's Office to target one side of a political debate, her actions violated the First Amendment.

74.    It follows from the political character of the CID and its remarkably broad scope that the CID also violates the Fourth Amendment.   Its burdensome demands for irrelevant records violate the Fourth Amendment's reasonableness requirement, as well as its prohibition on fishing expeditions.

75.    The Massachusetts Attorney General's investigation likewise fails to meet the requirements of due process.   She has publicly declared not only that she believes ExxonMobil and other fossil fuel companies pose an existential risk to the planet, but also that she knows how the investigation will end: with a finding that ExxonMobil violated the law.[102]   Moreover, Attorney General Healey publicly announced the improper purpose of her investigation: to silence ExxonMobil's voice in the public debate regarding climate change.   The improper political bias that inspired the Massachusetts

---

[102]   *Supra* ¶¶ 32-34.

investigation disqualifies Attorney General Healey from serving as the disinterested prosecutor required by the Constitution.

76.     In the rush to fill what another attorney general described as a "[legislative] breach" regarding climate change, Attorney General Healey also has impermissibly trod on exclusively federal turf.   Her Office's investigation regulates speech that occurs almost entirely outside of Massachusetts.   Where a state seeks to regulate out-of-state speech, as the Massachusetts Attorney General's Office did here by issuing the CID, the state improperly encroaches on Congress's exclusive authority to regulate interstate commerce and violates the Dormant Commerce Clause.

77.     Finally, the CID constitutes an abuse of process, because it was issued for the improper purposes described above.

## EXXONMOBIL HAS BEEN INJURED BY THE CID

78.     The Massachusetts CID has injured, is injuring, and will continue to injure ExxonMobil.

79.     ExxonMobil is an active participant in the policy debate about potential responses to climate change.   It has engaged in that debate for decades, participating in the Intergovernmental Panel on Climate Change since its inception and contributing to every report issued by the organization since 1995.   Since 2009, ExxonMobil has publicly advocated for a carbon tax as its preferred method to regulate carbon emissions.   Proponents of a carbon tax on greenhouse gas emissions argue that increasing taxes on carbon can "level the playing field among different sources of energy."[103]   While the Massachusetts Attorney General and the other members of the Green 20 are entitled to disagree with ExxonMobil's position, no member of that coalition is entitled to silence

_____

[103]   Ex. FF at App. 259.

26

or seek to intimidate one side of that discussion (or the debate about any other important public issue) through the issuance of overbroad and burdensome subpoenas.  ExxonMobil intends—and has a Constitutional right—to continue to advance its perspective in the national discussions over how to respond to climate change.  Its right to do so should not be violated through this exercise of government power.

80.     As a result of the improper and politically motivated investigation launched by the Massachusetts Attorney General, ExxonMobil has suffered, now suffers, and will continue to suffer violations of its rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and under Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.  Attorney General Healey's actions also violate Article One of the United States Constitution and constitute an abuse of process under common law.

81.     Acting under the laws, customs, and usages of Massachusetts, Attorney General Healey has subjected ExxonMobil, and is causing ExxonMobil to be subjected, to the deprivation of rights, privileges, and immunities secured by the United States Constitution and the Texas Constitution.  ExxonMobil's rights are made enforceable against Attorney General Healey, who is acting under the color of law, by Article One, Section Eight of the United States Constitution, and the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution, all within the meaning and contemplation of 42 U.S.C. § 1983, and by Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.

82.     Absent relief, Attorney General Healey will continue to deprive ExxonMobil of these rights, privileges, and immunities.

83.     In addition, ExxonMobil is imminently threatened with further injury that will occur if it is forced to choose between conforming its constitutionally protected speech to Attorney General Healey's political views or exercising its rights and risking sanctions and prosecution.

84.     The CID also imminently threatens ongoing injury to ExxonMobil because it subjects ExxonMobil to an unreasonable search in violation of the Fourth Amendment.  Complying with this unreasonably burdensome and unwarranted fishing expedition would require ExxonMobil to collect, review, and produce millions of documents, and would cost millions of dollars.

85.     If ExxonMobil's request for injunctive relief is not granted, and Attorney General Healey is permitted to enforce the CID, then ExxonMobil will suffer these imminent and irreparable harms.  ExxonMobil has no adequate remedy at law for the violation of its constitutional rights.

## CAUSES OF ACTION

**A.     First Cause of Action: Violation of ExxonMobil's First and Fourteenth Amendment Rights**

86.     ExxonMobil repeats and realleges paragraphs 1 through 85 above as if fully set forth herein.

87.     The CID's focus on one side of a policy debate in an apparent effort to silence, intimidate, and deter those possessing a particular viewpoint from participating in that debate contravenes, and any effort to enforce the subpoena would further contravene, the rights provided to ExxonMobil by the First Amendment to the United States Constitution, made applicable to the Commonwealth of Massachusetts by the Fourteenth Amendment, and by Section Eight of Article One of the Texas Constitution.

88.    The CID is an impermissible viewpoint-based restriction on speech, and it burdens ExxonMobil's political speech.  Attorney General Healey issued the CID based on her disagreement with ExxonMobil regarding how the United States should respond to climate change.  And even if the CID had not been issued for that illegal purpose, it would still violate the First Amendment, because it burdens ExxonMobil's political speech, and its demands are not substantially related to any compelling governmental interest.

**B.     Second Cause of Action: Violation of ExxonMobil's Fourth and Fourteenth Amendment Rights**

89.    ExxonMobil repeats and realleges paragraphs 1 through 85 above as if fully set forth herein.

90.    The issuance of the CID contravenes, and any effort to enforce the subpoena would further contravene, the rights provided to ExxonMobil by the Fourth Amendment to the United States Constitution, made applicable to the Commonwealth of Massachusetts by the Fourteenth Amendment, and by Section Nine of Article One of the Texas Constitution to be secure in its papers and effects against unreasonable searches and seizures.

91.    The CID is an unreasonable search and seizure because it constitutes an abusive fishing expedition into ExxonMobil's climate change research over the past 40 years, without any basis for believing that ExxonMobil violated Massachusetts law.  Its overbroad and irrelevant requests impose an undue burden on ExxonMobil and violate the Fourth Amendment's reasonableness requirement, which mandates that a subpoena be limited in scope, relevant in purpose, and specific in directive.

**C.      Third Cause of Action: Violation of ExxonMobil's Fourteenth Amendment Rights**

92.      ExxonMobil repeats and realleges paragraphs 1 through 85 above as if fully set forth herein.

93.      Attorney General Healey's investigation of ExxonMobil contravenes the rights provided to ExxonMobil by the Fourteenth Amendment to the United States Constitution and by Section Nineteen of Article One of the Texas Constitution not to be deprived of life, liberty, or property without due process of law.

94.      The CID deprives ExxonMobil of due process of law by violating the requirement that a prosecutor be disinterested.  Attorney General Healey's statements at the Green 20 press conference make clear that she is biased against ExxonMobil.

**D.      Fourth Cause of Action: Violation of ExxonMobil's Rights Under the Dormant Commerce Clause**

95.      ExxonMobil repeats and realleges paragraphs 1 through 85 above as if fully set forth herein.

96.      Article I, Section 8 of the United States Constitution grants Congress exclusive authority to regulate interstate commerce and thus prohibits the States from doing so.  The issuance of the CID contravenes, and any effort to enforce the CID would further contravene, the rights provided to ExxonMobil under the Dormant Commerce Clause.

97.      The CID effectively regulates ExxonMobil's out-of-state speech while only purporting to investigate ExxonMobil's marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth and its marketing and/or sale of securities to investors in the Commonwealth.

98.     The CID demands documents that relate to (1) statements ExxonMobil made outside the Commonwealth, and (2) ExxonMobil's communications with organizations residing outside the Commonwealth.  It therefore has the practical effect of primarily burdening interstate commerce.

**E.      Fifth Cause of Action: Abuse of Process Claim**

99.     ExxonMobil repeats and realleges paragraphs 1 through 86 above as if fully set forth herein.

100.    Attorney General Healey committed an abuse of process under common law by (1) issuing the CID in the absence of a belief that the documents sought are relevant to ExxonMobil's trade or commerce in the Commonwealth, as required by the authorizing statute; (2) having an ulterior motive for issuing and serving the CID, namely, an intent to prevent ExxonMobil from exercising its right to express views with which she disagrees; and (3) causing injury to ExxonMobil's reputation and violating it constitutional rights.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that Attorney General Healey be summoned to appear and answer and that this Court award the following relief:

1.      A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the issuance of the CID violates ExxonMobil's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution; violates ExxonMobil's rights under Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution; and violates the Dormant Commerce Clause of the United States Constitution;

2.      A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the issuance of the CID constitutes an abuse of process, in violation of common law;

3.      A permanent injunction prohibiting enforcement of the CID;

4.      Such other injunctive relief to which Plaintiff is entitled; and

5.      All costs of court together with any and all such other and further relief as

this Court may deem proper.

Dated:  June 15, 2016


EXXON MOBIL CORPORATION

By:  /s/ Patrick J. Conlon
Patrick J. Conlon
(*pro hac vice* pending)
State Bar No. 24054300
Daniel E. Bolia
State Bar No. 24064919
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002
(832) 624-6336



/s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
(*pro hac vice* pending)
twells@paulweiss.com
Michele Hirshman
(*pro hac vice* pending)
Daniel J. Toal
(*pro hac vice* pending)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice* pending)
janderson@paulweiss.com
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300
Fax: (202) 223-7420


*Counsel for Exxon Mobil Corporation*

/s/ Ralph H. Duggins
Ralph H. Duggins
State Bar No. 06183700
rduggins@canteyhanger.com
Philip A. Vickers
State Bar No. 24051699
pvickers@canteyhanger.com
Alix D. Allison
State Bar. No. 24086261
aallison@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807



/s/ Nina Cortell
Nina Cortell
State Bar No. 04844500
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411