IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ERIC TRADD SCHNEIDERMAN, | § | NO. 4:16-CV-469-K |
| Attorney General of New York, in his | § | |
| official capacity, and MAURA TRACY | § | |
| HEALEY, Attorney General of | § | |
| Massachusetts, in her official capacity, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## EXXONMOBIL'S FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Exxon Mobil Corporation ("ExxonMobil") brings this action seeking declaratory and injunctive relief against Eric Tradd Schneiderman, the Attorney General of New York, in addition to Maura Tracy Healey, the Attorney General of Massachusetts. Attorneys General Schneiderman and Healey have joined together with each other as well as others known and unknown to conduct improper and politically motivated investigations of ExxonMobil in a coordinated effort to silence and intimidate one side of the public policy debate on how to address climate change. ExxonMobil seeks an injunction barring the enforcement of a subpoena issued by Attorney General Schneiderman and a civil investigative demand ("CID") issued by Attorney General Healey to ExxonMobil, and a declaration that the subpoena and CID violate ExxonMobil's rights under federal and state law. As demonstrated in this amended pleading, the same claims and arguments asserted against Attorney General Healey apply

with equal force against Attorney General Schneiderman. For its First Amended Complaint, ExxonMobil alleges as follows based on present knowledge and information and belief:

## INTRODUCTION

1. Frustrated by the federal government's apparent inaction on climate change, Attorney General Schneiderman assembled a coalition of state attorneys general, including Attorney General Healey, to use law enforcement powers as a means of promoting a shared political agenda. According to an agreement executed by its members, this coalition embraced two goals.[1] First, it sought to "limit[] climate change" by pressing for a reduction in the use of fossil fuels.[2] Second, the coalition explicitly advocated for restrictions on speech and debate to accomplish that political agenda, listing as an objective "ensuring the dissemination of accurate information about climate change."[3] The coalition's agreement was concealed from the public until third parties recently obtained it from one coalition member under public records laws. Other coalition members continue to resist similar demands for transparency.

2. The coalition first publicly surfaced when Attorney General Schneiderman hosted a press conference in New York City on March 29, 2016,[4] with former Vice President and private citizen Al Gore as the featured speaker.[5] Attorney General Schneiderman pledged that the coalition would "deal with the problem of climate

---

[1]   *See* Paragraphs 52 to 53 below; *see also* Ex. R at App. 171–74.
[2]   Ex. V at App. 196.
[3]   *Id.*
[4]   *See* Paragraphs 27 to 39 below.
[5]   A transcript of the AGs United for Clean Power Press Conference, held on March 29, 2016, was prepared by counsel based on a video recording of the event, which is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across. A copy of this transcript is attached as Exhibit B and is incorporated by reference.

change" by using law enforcement powers "creatively" and "aggressively" to force ExxonMobil[6] and other energy companies to support the coalition's preferred policy responses to climate change.[7]  Considering climate change to be the "most pressing issue of our time," Attorney General Schneiderman said the coalition was "prepared to step into this [legislative] breach."[8]

3. Attorney General Healey similarly pledged "quick, aggressive action" by her office to "address climate change and to work for a better future."[9]  She announced an investigation of ExxonMobil that she had already determined would reveal a "troubling disconnect between what Exxon knew" and what it "chose to share with investors and with the American public."[10]  The statements of Attorney General Schneiderman, Attorney General Healey, Mr. Gore and others made clear that the press conference was a purely political event.

4. It was also the result of years of planning and lobbying by private interests.[11]  For nearly a decade, climate change activists and certain plaintiffs' attorneys have sought to obtain the confidential records of energy companies as a means of pressuring those companies to change their policy positions.  A 2012 workshop examined ways to obtain the internal documents of companies like ExxonMobil for the purpose of "maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming."[12]  The attendees at that

---

[6]  ExxonMobil was formed as a result of a merger between Exxon and Mobil on November 30, 1999. For ease of discussion, we refer to the predecessor entities as ExxonMobil throughout the Complaint.

[7]  Ex. B at App. 9 –10.

[8]  *Id.* at App. 9, 11.

[9]  *Id.* at App. 21.

[10]  *Id.* at App. 20.

[11]  *See* Paragraphs 40 to 51 below.

[12]  Ex. C at App. 56.

workshop concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[13]

5.      In the months leading up to the press conference, these activists and attorneys met at the offices of the Rockefeller Family Fund in New York to discuss the "[g]oals of an Exxon campaign," which included to "delegitimize [it] as a political actor" and to "force officials to disassociate themselves from Exxon."[14]

6.      The leadership of this group of activists and attorneys attended a meeting with "sympathetic state attorney[s] general" prior to the March 29 press conference. While this Court and the public have not been told what was discussed, a copy of the agenda for the meeting includes presentations on the "imperative of taking action now on climate change" and on "climate change litigation."[15]

7.      Members of the coalition recognized that the behind-the-scenes involvement of these individuals—especially a private attorney likely to seek fees from any private litigation made possible by an attorney general-led investigation of ExxonMobil—could expose the special interests behind their so-called investigations and the bias underlying their deployment of law enforcement resources for partisan ends. When that same private attorney asked Attorney General Schneiderman's office what he should tell a reporter if asked about his involvement, Lemuel Srolovic, Chief of the Environmental Protection Bureau, asked the private attorney not to confirm his attendance at the conference.[16]

---

[13]  *Id.* at 40.
[14]  Ex. D at App. 67.
[15]  Ex. E at App. 70.
[16]  Ex. F  at App. 80.

8.     The investigations launched by Attorneys General Schneiderman and Healey amount to nothing more than an unlawful exercise of government power to further political objectives.  The shifting justifications they have presented for their investigations are pretexts that have become more and more transparent over time.[17] Invoking state laws with limitations periods no longer than six years, the Attorneys General claim to be investigating whether ExxonMobil committed consumer or securities fraud by misrepresenting its knowledge of climate change.

9.     But for more than a decade, ExxonMobil has widely and publicly confirmed[18] that it "recognize[s] that the risk of climate change and its potential impacts on society and ecosystems may prove to be significant."[19]  ExxonMobil has also publicly advocated a tax on carbon emissions since 2009.[20]  Moreover, in conducting its business, ExxonMobil addresses the potential for future climate change policy by estimating a proxy cost of carbon, which seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels.[21]  This cost, which in some regions may approach $80 per ton by 2040, has been included in ExxonMobil's Outlook for Energy for several years.[22]  Further, ExxonMobil requires all of its business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.[23]  Despite the applicable limitations periods and ExxonMobil's longstanding

---

[17]    *See* Paragraphs 74 to 76 below.
[18]    *See* Paragraphs 63 to 64 below.
[19]    Ex. G  at App. 93; *see also* Ex. H at App. 103 ("Because the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant, strategies that address the risk need to be developed and implemented.").
[20]    Ex. T at App. 182.
[21]    Ex. T at App. 190.
[22]    *Id.*
[23]    *Id.*

public recognition of the risks associated with climate change, the subpoena and the CID seek documents going back nearly four decades, seeking anything having to do with the issue.

10.     Worse still, the New York Attorney General's subpoena and the Massachusetts Attorney General's CID target ExxonMobil's communications with those who the Attorneys General perceive to have different political viewpoints in the climate change debate.  The subpoena seeks ExxonMobil's communications with oil and gas trade associations and industry groups that advocate on energy policy, and the CID demands ExxonMobil's communications with a list of organizations labeled by the coalition as so-called "climate deniers," *i.e.*, those who have expressed skepticism about the science of climate change or the coalition's preferred policies regarding climate change.[24]  The CID also identifies statements made by ExxonMobil about the tradeoffs inherent in climate change policy and demands that ExxonMobil produce records supporting those disfavored statements.

11.     Recent events have fully unmasked the pretextual nature of these investigations and the improper bias and unconstitutional objectives animating them.[25] When Attorney General Schneiderman launched his investigation, he claimed to be investigating ExxonMobil's scientific research in the 1970s and 1980s.  Subject to the assertion of privilege, including First Amendment privileges, ExxonMobil initially provided documents to Attorney General Schneiderman with the expectation that his office would conduct a neutral, even-handed investigation.  As events unfolded over the

---

[24]     *See* Paragraphs 66 and 73 below.
[25]     *See* Paragraphs 74 to 76 below.

ensuing months—including the politicized press conference in March and the secret agreement's coming to light over the summer—that expectation has evaporated.

12.     Within the last month, and well after ExxonMobil commenced this action, Attorney General Schneiderman continued his practice of providing unprecedented briefings to the press on the status of his "investigation" of ExxonMobil and announced his expectation that a "massive securities fraud" will be uncovered. During one of those briefings, Attorney General Schneiderman conceded that he has abandoned his original inquiry into ExxonMobil's historical scientific research and is now pursuing a new theory of investor fraud. That shift further demonstrates that Attorney General Schneiderman is simply searching for a legal theory—any legal theory—to continue his efforts to pressure ExxonMobil and intimidate one side of a public policy debate.[26]

13.     It is now indisputable that the subpoena and the CID were issued in bad faith to deter ExxonMobil from participating in ongoing public deliberations about climate change and to fish through decades of ExxonMobil's documents in the hope of finding some ammunition to enhance the coalition's, and its climate activist confederates', position in the policy debate over climate change. Through their actions, Attorneys General Schneiderman and Healey have deprived and will continue to deprive ExxonMobil of its rights under the United States Constitution, the Texas Constitution, and the common law.

14.     ExxonMobil therefore seeks a declaration that the subpoena and the CID violate its rights under Articles One and Six of the United States Constitution; the First, Fourth, and Fourteenth Amendments to the United States Constitution; Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution; and constitutes an abuse of

---

[26] *See* Paragraphs 74 to 81 below.

process under the common law.  ExxonMobil also seeks an injunction barring further enforcement of the subpoena and the CID.  Absent an injunction, ExxonMobil will suffer imminent and irreparable harm for which there is no adequate remedy at law.

## PARTIES

15.    ExxonMobil is a public, shareholder-owned energy company incorporated in New Jersey with principal offices in the State of Texas.  ExxonMobil is headquartered and maintains all of its central operations in Texas.

16.    Defendant Eric Tradd Schneiderman is the Attorney General of New York.  He is sued in his official capacity.

17.    Defendant Maura Tracy Healey is the Attorney General of Massachusetts.  She is sued in her official capacity.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to Sections 1331 and 1367 of Title 28 of the United States Code.  Plaintiff alleges violations of its constitutional rights in violation of Sections 1983 and 1985 of Title 42 of the United States Code.  Because those claims arise under the laws of the United States, this Court has original jurisdiction over them.  28 U.S.C. § 1331.  Plaintiff also alleges related state law claims that derive from the same nucleus of operative facts.  Each of Plaintiff's state law claims—like its federal claims—is premised on statements by Attorneys General Schneiderman and Healey at the press conference and during the course of their investigations, their issuance of the subpoena and the CID, the demands made therein, and their intention to muzzle ExxonMobil's speech in Texas.  This Court therefore has supplemental jurisdiction over those claims.  28 U.S.C. § 1367(a).

19.     Venue is proper within this District pursuant to Section 1391(b) of Title 28 of the United States Code because all or a substantial part of the events giving rise to the claims occurred in the Northern District of Texas.   The subpoena was emailed to ExxonMobil in Texas, and both the subpoena and CID target and seek to suppress speech emanating from Texas.   They also require ExxonMobil to collect and review a substantial number of records stored or maintained in the Northern District of Texas.

## FACTS

**A.     Attorney General Schneiderman Opens His Investigation of ExxonMobil with a Press Leak Followed by a Television Interview.**

20.     In   November   2015,   ExxonMobil   received   Attorney   General Schneiderman's subpoena at its corporate headquarters in Irving, Texas.[27]   Within hours, the press was reporting on the subpoena's issuance and its contents.   An article in *The New York Times* reported that the subpoena "demand[ed] extensive financial records, emails and other documents" and that the "focus" of the investigation was on "the company's own long running scientific research" on climate change.[28]   The article identified as sources "people with knowledge of the investigation," all of whom "spoke on the condition of anonymity saying they were not authorized to speak publicly about investigations."[29]   To state the obvious, ExxonMobil did not alert *The New York Times* or any other media to the subpoena's existence or its contents.

21.     This press leak was unsettling.   It is customary for law enforcement officials to maintain confidentiality of their investigations, both to protect the integrity of the investigative process and to avoid unfair prejudice to those under investigation.   But

---

[27]     Ex. I at App. 108.
[28]     Ex. A at App. 2.
[29]     *Id.* at App. 2–3.

Attorney General Schneiderman's investigation of ExxonMobil has been conducted with a marked disregard for traditional concerns about confidentiality or unfair prejudice. Before ExxonMobil had even accepted service of the subpoena, it had received multiple media inquiries about the subpoena and could read about the investigation in online news accounts.[30]

22.     Within a week of issuing the subpoena, Attorney General Schneiderman appeared on a *PBS NewsHour* segment, entitled "Has Exxon Mobil misle[d] the public about its climate change research?"[31]   During that appearance, Attorney General Schneiderman described the focus of his investigation on ExxonMobil's purported decision to "shift[] [its] point of view" and "change[] tactics" on climate change after "being at the leadership of doing good scientific work" on the issue "[i]n the 1980s."[32] Attorney General Schneiderman said his probe extended to ExxonMobil's "funding [of] organizations."[33]  While he did not refer to them expressly as his political adversaries, he derided them as "climate change deniers" and "climate denial organizations."[34]  Those organizations included the "American Enterprise Institute, . . . the American Legislative Exchange Council, . . . [and the] American Petroleum Institute."[35]

23.     Renewable energy was another focus of the interview.  Attorney General Schneiderman said he was "concerned about" ExxonMobil's purported "overestimating the costs of switching to renewable energy," but he did not explain how any supposed error in that estimate could conceivably constitute a fraud or mislead any consumer.[36]

---

[30]   Ex. A at App. 2–7; Ex. J at App. 110–112.
[31]   Ex. K at App. 114.
[32]   *Id.* at App. 115.
[33]   *Id.* at App. 116.
[34]   *Id.* at App. 116, 118.
[35]   *Id.* at App. 116.
[36]   *Id.*. at App. 117.

24.     Attorney General Schneiderman did not discuss ExxonMobil's oil and gas reserves or its assets at all during this interview.

25.     Later that month at an event sponsored by *Politico* in New York, Attorney General Schneiderman said that ExxonMobil appeared to be "doing very good work in the 1980s on climate research" but that its "corporate strategy seemed to shift" later.[37] Attorney General Schneiderman claimed that the company had funded organizations that he labeled "aggressive climate deniers," again specifically naming his perceived political opponents at the American Enterprise Institute, the American Legislative Exchange Council, and the American Petroleum Institute.[38]   Attorney General Schneiderman admitted that his "investigation" of ExxonMobil was merely "one aspect" of his office's efforts to "take action on climate change," commenting that society's failure to address climate change would be "viewed poorly by history."[39]

26.     After this initial flurry of statements to the press, relative quiet followed, and ExxonMobil attempted in good faith to produce records demanded by the subpoena. It provided Attorney General Schneiderman with documents related to its historical research on global warming and climate change.

**B.      The "Green 20" Coalition Plans to Use Law Enforcement Tools for Political Goals.**

27.     The playing field changed on March 29, 2016, when Attorney General Schneiderman hosted a press conference in New York City.   Calling themselves the "AGs United For Clean Power" and the "Green 20," Attorneys General Schneiderman and Healey were joined by other state attorneys general and Al Gore to announce their

---

[37]   Ex. L at App. 123.
[38]   *Id.*
[39]   *Id.* at App. 124.

plan to take "progressive action to address climate change" by investigating ExxonMobil.[40] Attorneys general or staff members from over a dozen other states were in attendance, as was Claude Walker, the Attorney General of the United States Virgin Islands.

28. Expressing dissatisfaction with the supposed "gridlock in Washington" regarding climate change legislation, Attorney General Schneiderman said that the coalition had to work "creatively" and "aggressively" to respond to "th[e] most pressing issue of our time," namely, the need to "preserve our planet and reduce the carbon emissions that threaten all of the people we represent."[41]

29. Attorney General Healey agreed, opining that "there's nothing we need to worry about more than climate change."[42] She considered herself to have "a moral obligation to act" to remedy what she described as a threat to "the very existence of our planet," and she vowed to take "quick, aggressive action" to "address climate change and to work for a better future."[43]

30. Echoing those themes, Attorney General Walker stated that "the American people . . . have to do something transformational" because "[w]e cannot continue to rely on fossil fuel."[44] In private communications with other members of the Green 20 coalition, Attorney General Walker expressed his hope that the coalition's efforts would "identify[] other potential litigation targets" and "increase our leverage" against

---

[40] Ex. M at App 127.
[41] Ex. B at App. 9–11.
[42] *Id.* at App. 20.
[43] *Id.* at App. 20–21.
[44] Ex. B at App. 24.

ExxonMobil to replicate or improve on an $800 million settlement he had previously obtained against another energy company.[45]

31.    For the Green 20, the public policy debate on climate change was over and dissent was intolerable.  Attorney General Schneiderman declared that he had "heard the scientists" and "kn[e]w what's happening to the planet."[46]  To him, there was "no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up."[47]  Clearing up that "confusion"—what the First Amendment safeguards as protected political speech—was an express objective of the Green 20.

32.    According to Attorney General Healey, "[p]art of the problem has been one of public perception," causing "many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts."[48]  She promised that those who "deceived" the public—by disagreeing with her about climate change— "should be, must be, held accountable."[49]  Mr. Gore agreed, denouncing those he accused of "deceiving the American people . . . about the reality of the climate crisis and the dangers it poses to all of us."[50]

33.    The attorneys general embraced the renewable energy industry, in which Mr. Gore is a prominent investor and promoter, as the only legitimate response to climate change.  Attorney General Schneiderman said, "We have to change conduct" to "mov[e] more rapidly towards renewables."[51]  Attorney General Healey promised to "speed our

---

[45]    Ex. N at App. 131, 134.
[46]    Ex. B at App. 10.
[47]    *Id.*
[48]    *Id.* at App. 20.
[49]    *Id.*
[50]    *Id.* at App. 14.
[51]    *Id.* at App. 27–28.

transition to a clean energy future"[52]  According to Attorney General Walker, "[w]e have to look at renewable energy.  That's the only solution."[53]  Mr. Gore urged the coalition of state attorneys general to investigate his business competitors for "slow[ing] down this renewable revolution" by "trying to convince people that renewable energy is not a viable option."[54]

34.    The assembled attorneys general had nothing but praise for Mr. Gore, whose financial interests aligned with their political agenda.   Attorney General Schneiderman enthused that "there is no one who has done more for this cause" than Mr. Gore, who recently had been "traveling internationally, raising the alarm," and "training climate change activists."[55]  Equally embracing the public support of Mr. Gore, Attorney General Healey praised him for explaining so "eloquently just how important this is, this commitment that we make," and she thanked him for his "inspiration" and "affirmation."[56]   Virgin Islands Attorney General Walker hailed the former Vice President as one of his "heroes."[57]

35.    In an effort to legitimize what the attorneys general were doing, Mr. Gore cited perceived inaction by the federal government as the justification for action by the Green 20.  He observed that "our democracy's been hacked . . . but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level."[58]  Reading from the same script, Attorney General Schneiderman pledged that the Green 20 would "step into th[e] [legislative]

---

[52]   *Id.* at App. 21.
[53]   *Id.* at App. 24.
[54]   *Id.* at App. 17.
[55]   *Id.* at App. 13.
[56]   *Id.* at App. 20.
[57]   *Id.* at App. 23.
[58]   *Id.* at App. 17.

breach" created by this alleged federal inaction.[59]  He then showed that his subpoena was a tool for achieving his political goals:

> We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action.  So today, we're sending a message that, at least some of us—actually a lot of us—in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.[60]

36.     Attorney General Schneiderman linked the coalition's political efforts to his investigation of ExxonMobil, reminding the audience that he "had served a subpoena on ExxonMobil" to investigate "theories relating to consumer and securities fraud."[61]  He also suggested that ExxonMobil faced a presumption of guilt in his office, arguing that ExxonMobil had been "using the best climate models" to determine "how fast the sea level is rising" and to "drill[] in places in the Arctic where they couldn't drill 20 years ago" while telling "the public for years that there were no 'competent models,' . . . to project climate patterns, including those in the Arctic."[62]    Attorney General Schneiderman went on to suggest there was something illegal in ExxonMobil's alleged support for "organizations that put out propaganda denying that we can predict or measure the effects of fossil fuel on our climate, or even denying that climate change was happening."[63]

37.     Attorney General Healey was equally explicit in her prejudgment of ExxonMobil.  She stated that there was a "troubling disconnect between what Exxon

---

[59]   *Id.* at App. 11.
[60]   *Id.* at App. 12.
[61]   *Id.* at App. 11.
[62]   *Id.*
[63]   *Id.*

knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public."[64] Those conclusions were announced weeks before she even issued the CID to ExxonMobil.

38.    The political motivations articulated by Attorneys General Schneiderman, Healey, and Walker, Mr. Gore, and the other press conference attendees struck a discordant note with those who rightfully expect government attorneys to conduct themselves in a neutral and unbiased manner.    The overtly political tone of the conference even prompted one reporter to ask whether the press conference and the investigations were "publicity stunt[s]."[65]

39.    Even some members of the coalition were apprehensive about the expressly political focus of its ringleader.    Attorney General Schneiderman's office circulated a draft set of "Principles" for the "Climate Coalition of Attorneys General" that included a "[p]ledge" to "work together" to enforce laws "that require progressive action on climate change."[66]    Recognizing the overtly political nature of that pledge, an employee of the Vermont Attorney General's Office wrote: "We are thinking that use of the term 'progressive' in the pledge might alienate some. How about 'affirmative,' 'aggressive,' 'forceful' or something similar?"[67]

**C.    In Closed-Door Meetings, the Green 20 Meet with Private Interests.**

40.    The impropriety of the statements made by Attorneys General Schneiderman and Healey and the other members of the Green 20 at the press conference is surpassed only by what is currently known about what they said behind closed doors.

---

[64]    *Id.* at App. 20.
[65]    *Id.* at App. 25.
[66]    Ex. M at App. 127.
[67]    *Id.* at App. 126.

41.     During the morning of the press conference, the attorneys general attended two presentations. Those presentations were not announced publicly, and they were not open to the press or general public. The identity of the presenters and the titles of the presentations, however, were later released by the State of Vermont in response to a request by a third party under that state's Freedom of Information Act.

42.     The first presenter was Peter Frumhoff, the Director of Science and Policy for the Union of Concerned Scientists.[68] His subject was the "imperative of taking action now on climate change."[69]

43.     According to the Union of Concerned Scientists, those who do not share its views about climate change and responsive policy make it "difficult to achieve meaningful solutions to global warming."[70] It accuses "[m]edia pundits, partisan think tanks, and special interest groups" of being "contrarians," who "downplay and distort the evidence of climate change, demand policies that allow industries to continue polluting, and attempt to undercut existing pollution standards."[71]

44.     Frumhoff has been targeting ExxonMobil since at least 2007. In that year, Frumhoff contributed to a publication issued by the Union of Concerned Scientists, titled "Smoke, Mirrors, and Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science."[72] This essay brainstormed strategies for "[p]utting the [b]rakes" on ExxonMobil's alleged "[d]isinformation [c]ampaign" on climate change.[73]

---

[68]   Ex. O at App. 138.
[69]   Ex. E at App. 70.
[70]   Ex. P at App. 146.
[71]   *Id.* at App. 146–47.
[72]   Ex. Q at App. 160, 163.
[73]   *Id.* at App. 166.

45.    Matthew Pawa of Pawa Law Group, P.C., hosted the second presentation on the topic of "climate change litigation."[74]  The Pawa Law Group, which boasts of its "role in launching global warming litigation,"[75] previously sued ExxonMobil and sought to hold it liable for causing global warming.  That suit was dismissed because, as the court properly held, regulating greenhouse gas emissions is "a political rather than a legal issue that needs to be resolved by Congress and the executive branch rather than the courts."[76]

46.    Frumhoff and Pawa have sought for years to initiate and promote litigation against fossil fuel companies in the service of their political agenda and for private profit. In 2012, for example, Frumhoff organized and Pawa presented at a workshop entitled "Climate Accountability, Public Opinion, and Legal Strategies."[77]  The workshop's goal was to consider "the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation."[78]

47.    The 2012 workshop's attendees discussed at considerable length "Strategies to Win Access to Internal Documents" of fossil fuel companies like ExxonMobil.[79]  Even then, "lawyers at the workshop" suggested that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[80]  The conference's attendees were "nearly unanimous" regarding "the importance of legal actions, both in wresting potentially useful internal documents from the fossil fuel industry and, more broadly, *in maintaining pressure on the industry*

---

[74]    Ex. E at App. 70.
[75]    Ex. S at App. 176.
[76]    Ex. C at App. 41; *see also Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 871–77 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012).
[77]    Ex. C at App. 30–31, 61, 63.
[78]    *Id.* at App. 32–33.
[79]    *Id*. at App. 40–41.
[80]    *Id.* at App. 40.

*that could eventually lead to its support for legislative and regulatory responses to global warming.*"[81]

48. In January 2016, Pawa and a group of climate activists met at the Rockefeller Family Fund offices to discuss the "[g]oals of an Exxon campaign."[82] The goals included:

- To establish in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm.

- To delegitimize [ExxonMobil] as a political actor.

- To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc.

- To drive divestment from Exxon.

- To drive Exxon & climate into [the] center of [the] 2016 election cycle.[83]

49. The investigations by the New York and Massachusetts Attorneys General and the Green 20 press conference represented the culmination of Frumhoff and Pawa's collective efforts to enlist state law enforcement officers to join them in a quest to silence political opponents, enact preferred policy responses to climate change, and obtain documents for private lawsuits.

50. The attorneys general in attendance at the press conference understood that the participation of Frumhoff and Pawa, if reported, could expose the private, financial, and political interests behind the announced investigations. The day after the

---

[81]   *Id.* at App. 56 (emphasis added).
[82]   Ex. D at App. 67.
[83]   *Id.*; *see also* Ex. U at App. 192–94.

conference, a reporter from *The Wall Street Journal* contacted Pawa.[84] Before responding, Pawa dutifully asked Lemuel Srolovic, Chief of Attorney General Schneiderman's Environmental Protection Bureau, "[w]hat should I say if she asks if I attended?"[85] Mr. Srolovic—the Assistant Attorney General who had sent the New York subpoena to ExxonMobil in November 2015—encouraged Pawa to conceal from the press and the public the closed-door meetings. He responded, "[m]y ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event."[86]

51. The press conference, the closed-door meetings with activists, and the activists' long-standing desire to obtain ExxonMobil's "internal documents" as part of a campaign to put "pressure on the industry," inducing it to support "legislative and regulatory responses to global warming,"[87] form the partisan backdrop against which the New York and Massachusetts investigations must be considered.

**D.    The Green 20 Attempt to Conceal their Misuse of Power from the Public.**

52. Recognizing the need to avoid public scrutiny, Attorneys General Schneiderman, Healey, and fifteen others entered into an agreement pledging to conceal their activities and communications in furtherance of their political agenda from the public. In April and May of 2016, the Green 20 executed a so-called "Climate Change Coalition Common Interest Agreement," which memorialized the twin goals of this illicit enterprise.[88] The first goal listed in the agreement, "limiting climate change," reflected the coalition's focus on politics, not law enforcement.[89] The second goal, "ensuring the dissemination of accurate information about climate change," confirmed the coalition's

---

84    Ex. F at App. 80.
85      *Id.*
86    *Id.*
87    Ex. C at App. 40, 56.
88    Ex. V at App. 196–214.
89    *Id.* at App. 196.

willingness to violate First Amendment rights to carry out its agenda.[90]  They appointed themselves as arbiters of what information is "accurate" as regards climate change and stood ready to use the full arsenal of law enforcement tools at their disposal against those who did not toe their party line.

53.    To conceal communications concerning this unconstitutional enterprise from public disclosure, the signatories agreed to maintain the confidentiality of their communications by pledging that, "unless required by law," the parties "shall . . . refuse to disclose" any "(1) information shared in organizing a meeting of the Parties on March 29, 2016, (2) information shared at and after the March 29 meeting . . . and (3) information shared after the execution of this Agreement."[91]  The common interest agreement stifles not only public debate about the motivations and legality of the Green 20, but also prevents the public from learning of the political genesis of the Green 20.

**E.    The Attorneys General of Other States Condemn the Green 20's Investigations.**

54.    The overtly political nature of the March 29 press conference drew a swift and sharp rebuke from other state attorneys general who criticized the Green 20 for using the power of law enforcement as a tool to muzzle dissent and discussions about climate change.  The attorneys general of Alabama and Oklahoma stated that "scientific and political debate" "should not be silenced with threats of criminal prosecution by those who believe that their position is the only correct one and that all dissenting voices must therefore be intimidated and coerced into silence."[92]  They emphasized that "[i]t is

---

[90]    *Id.*
[91]    *Id.* at App. 196–97
[92]    Ex. X at App. 225.

inappropriate for State Attorneys General to use the power of their office to attempt to silence core political speech on one of the major policy debates of our time."[93]

55.     The Louisiana Attorney General similarly observed that "[i]t is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[94]     Likewise, the Kansas Attorney General questioned the "'unprecedented'" and "strictly partisan nature of announcing state 'law enforcement' operations in the presence of a former vice president of the United State[s] who, presumably [as a private citizen], has no role in the enforcement of the 17 states' securities or consumer protection laws."[95]  The West Virginia Attorney General criticized the attorneys general for "abusing the powers of their office" and stated that the desire to "eliminate fossil fuels . . . should not be driving any legal activity" and that it was improper to "use the power of the office of attorney general to silence [] critics."[96]

56.     In addition, on June 15, 2016, attorneys general from thirteen states wrote a letter to their "Fellow Attorneys General," in which they explained that the Green 20's effort "to police the global warming debate through the power of the subpoena is a grave mistake" because "[u]sing law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[97]  The thirteen attorneys further described the Green 20's investigations as "far from routine" because (i) they "target[] a particular type of market participant," namely fossil fuel companies; (ii) the Green 20 had aligned itself "with the competitors of [its] investigative targets";

---

[93]  *Id.*
[94]  Ex. Y at App. 227.
[95]  Ex. QQ at App. 435.
[96]  Ex. RR at App. 438–39.
[97]  Ex. SS at App. 444.

and (iii) "the investigation implicates an ongoing public policy debate."[98]  In conclusion, they asked their fellow attorneys general to "[s]top policing viewpoints."[99]

57.    The actions of Defendants and their Green 20 allies caught the eye of Congress.  The Committee on Science, Space, and Technology of the United States House of Representatives launched an inquiry into the investigations undertaken by the Green 20.[100]  That committee was "concerned that these efforts [of the Green 20] to silence speech are based on political theater rather than legal or scientific arguments, and that they run counter to an attorney general's duty to serve as the guardian of the legal rights of the citizens and to assert, protect, and defend the rights of the people."[101]  Perceiving a need to provide "oversight" of what it described as "a coordinated attempt to attack the First Amendment rights of American citizens," the Committee requested the production of certain records and information from the attorneys general.[102]  The attorneys general have thus far refused to voluntarily cooperate with the inquiry.[103]

58.    After Attorney General Schneiderman refused to turn over documents requested by the House Committee and criticized its "unfounded claims about the NYOAG's motives,"[104] the House Committee issued subpoenas to Attorney General Schneiderman, Attorney General Healey, and eight environmental organizations in order to "obtain documents related to coordinated efforts to deprive companies, nonprofit organizations, scientists and scholars of their First Amendment rights."[105]  It further

---

[98]   *Id.*
[99]   *Id.* at App. 447.
[100]  Ex. Z at App. 229.
[101]  *Id.* (internal quotation marks omitted).
[102]  *Id.* at App. 232.
[103]  *See, e.g.*, Ex. TT at App. 449; Ex. UU at App. 453.
[104]  Ex. AA at App. 237.
[105]  Ex. BB at App. 240.

criticized the attorneys general for "hav[ing] appointed themselves to decide what is valid and what is invalid regarding climate change."[106]

59.     Several senators have urged United States Attorney General Loretta Lynch to confirm that the Department of Justice is not investigating, and will not investigate, United States citizens or corporations on the basis of their views on climate change.[107] The senators observed that the Green 20's investigations "provide disturbing confirmation that government officials at all levels are threatening to wield the sword of law enforcement to silence debate on climate change."[108] The letter concluded by asking Attorney General Lynch to explain the steps she is taking "to prevent state law enforcement officers from unconstitutionally harassing private entities or individuals simply for disagreeing with the prevailing climate change orthodoxy."[109]

**F.      The Subpoena and the CID Reflect the Improper Political Objectives of the Green 20 Coalition.**

60.     The twin goals of the Green 20—advancing a political agenda and trammeling constitutional rights in the process—are fully reflected in the subpoena and the CID.

### The New York Subpoena

61.     Attorney General Schneiderman is authorized to issue a subpoena only if (i) there is "some factual basis shown to support the subpoena";[110] and (ii) the information sought "bear[s] a reasonable relation to the subject matter under investigation and the public purpose to be served."[111] Neither standard is met here.

---

[106] *Id.*
[107] Ex. DD at App. 248.
[108] *Id.*
[109] *Id.*
[110] *Napatco, Inc.* v. *Lefkowitz*, 43 N.Y.2d 884, 885–86 (1978).
[111] *Myerson* v. *Lentini Bros. Moving & Storage Co.*, 33 N.Y.2d 250, 256 (1973).

62.     The New York subpoena purports to investigate whether ExxonMobil violated New York State Executive Law Article 5, Section 63(12), General Business Law Article 22-A or 23-A and "any related violation, or any matter which the Attorney General deems pertinent thereto."[112]  These statutes have at most a six-year limitations period.[113]

63.     During the six-year limitations period, however, ExxonMobil made no statements that could give rise to fraud as alleged in the subpoena.  For more than a decade, ExxonMobil has publicly acknowledged that climate change presents significant risks that could affect its business.  For example, ExxonMobil's *2006 Corporate Citizenship Report* recognized that "the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant" and reasoned that "strategies that address the risk need to be developed and implemented."[114]  In addition, in 2002, ExxonMobil, along with three other companies, helped launch the Global Climate and Energy Project at Stanford University, which has a mission of "conduct[ing] fundamental research on technologies that will permit the development of global energy systems with significantly lower greenhouse gas emissions."[115]

64.     ExxonMobil has also discussed these risks in its public SEC filings.  For example, in its 2006 10-K, ExxonMobil stated that "laws and regulations related to . . . risks of global climate change" "have been, and may in the future" continue to impact its operations.[116]  Similarly, in its 2015 10-K, ExxonMobil noted that the "risk of climate

---

[112]  Ex. EE at App. 251.
[113]  *See, e.g.*, *State ex rel. Spitzer* v. *Daicel Chem. Indus., Ltd.*,840 N.Y.S.2d 8, 11–12 (1st Dep't 2007); *Podraza* v. *Carriero*, 630 N.Y.S.2d 163, 169 (4th Dep't 1995); *State* v. *Bronxville Glen I Assocs.*, 581 N.Y.S.2d 189, 190 (1st Dep't 1992).
[114]  Ex. H at App. 103.
[115]  Ex. FF at App. 270.
[116]  Ex. GG at App. 277–78.

change" and "current and pending greenhouse gas regulations" may increase its "compliance costs."[117] Long before the six-year statute of limitations period, ExxonMobil disclosed and acknowledged the risks that supposedly gave rise to Attorney General Schneiderman's investigation.

65. Notwithstanding that six-year limitations period and the absence of any conduct within that timeframe that could give rise to a statutory violation, the document requests in the subpoena span 39 years and extend to nearly every document ExxonMobil has ever created that in any way concerns climate change. For example, the subpoena demands "[a]ll Documents and Communications" from 1977 to the present, "[c]oncerning any research, analysis, assessment, evaluation, modelling or other consideration performed by You, on Your behalf, or with funding provided by You Concerning the causes of Climate Change."[118]

66. The subpoena includes 10 other similarly sweeping requests, such as (i) a demand for all documents and communications that ExxonMobil has produced since 1977 relating to "the impacts of Climate Change"; and (ii) exemplars of all "advertisements, flyers, promotional materials, and informational materials of any type" that ExxonMobil has produced in the last 11 years concerning climate change.[119] Other requests target Attorney General Schneiderman's perceived political opponents in the climate change debate by demanding ExxonMobil's communications with trade associations and industry groups that seek to promote oil and gas interests.[120]

---

[117] Ex. HH at App. 284.
[118] Ex. II at App. 257–58 (Request No. 1).
[119] *Id.* at App. 258–59 (Request Nos. 2, 8).
[120] *Id.* at App. 258 (Request No. 6).

67.     In response to some of these requests, ExxonMobil asserted First Amendment privileges, including in connection with ExxonMobil scientists' participation in non-profit research organizations.

68.     Moreover, almost all of the sweeping demands in the subpoena reach far beyond conduct bearing any connection to the State of New York. Ten of the eleven document requests make blanket demands for all of ExxonMobil's documents or communications on a broad topic, with no attempt to restrict the scope of production to documents or communications having any connection to New York.[121] Only two of the requests even mention New York.[122] And, while the subpoena seeks ExxonMobil's communications with five named organizations, only one of them is based in New York.[123]

**The Massachusetts CID**

69.     The CID was served by Attorney General Healey on ExxonMobil's registered agent in Suffolk County, Massachusetts, on April 19, 2016. According to the CID, there is "a pending investigation concerning [ExxonMobil's] potential violations of [Mass. Gen. Laws] ch. 93A, § 2."[124] That statute prohibits "unfair or deceptive acts or practices" in "trade or commerce"[125] and has a four-year statute of limitations.[126] The CID specifies two types of transactions under investigation: ExxonMobil's (i) "marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth," and (ii) "marketing and/or sale of securities" to Massachusetts

---

[121]  *Id.* at App. 258–59 (Request Nos. 1, 10).
[122]  *Id.* at App. 259 (Request Nos. 9, 11).
[123]  *Id.* at App. 258 (Request No. 6).
[124]  *Id.* at App. 286.
[125]  Mass. Gen. Laws ch. 93A, §2(a).
[126]  Mass. Gen. Laws ch. 260, § 5A.

investors.[127]   The requested documents pertain largely to information related to climate change in the possession of ExxonMobil in Texas where it is headquartered and maintains its principal place of business.

70.   ExxonMobil could not have committed the possible offenses that the CID purports to investigate for at least two reasons.   First, at no point during the past five years—more than one year before the limitations period began—has ExxonMobil (i) sold fossil fuel derived products to consumers in Massachusetts, or (ii) owned or operated a single retail store or gas station in the Commonwealth.[128]   Second, ExxonMobil has not sold any form of equity to the general public in Massachusetts since at least 2011, which is also well beyond the limitations period.[129]   In the past decade, ExxonMobil has sold debt only to underwriters outside the Commonwealth, and ExxonMobil did not market those offerings to Massachusetts investors.[130]

71.   The CID's focus on events, activities, and records outside of Massachusetts is demonstrated by the items it demands that ExxonMobil search for and produce.   For example, the CID demands documents that relate to or support 11 specific statements.[131]   None of those statements were made in Massachusetts.[132]   The CID also seeks ExxonMobil's communications with 12 named organizations,[133] but only one of these organizations has an office in Massachusetts and ExxonMobil's communications

---

[127]   Ex. II at App. 86.
[128]   Any service station that sells fossil fuel derived products under an "Exxon" or "Mobil" banner is owned and operated independently.   In addition, distribution facilities in Massachusetts, including Everett Terminal, have not sold products to consumers during the limitations period.
[129]   Ex. JJ at App. 317.
[130]   *Id.*   This is subject to one exception.   During the limitations period, ExxonMobil has sold short-term, fixed-rate notes, which mature in 270 days or less, to institutional investors in Massachusetts, in specially exempted commercial paper transactions.   *Id.*; *see* Mass. Gen. Laws ch. 110A, § 402(a)(10); *see also* 15 U. S. C. § 77c(a)(3).
[131]   Ex. II at App. 299–300 (Request Nos. 8–11).
[132]   *Id.* (Request Nos. 8–11).
[133]   *Id.* at App. 298 (Request No. 5).

with the other 11 organizations likely occurred outside of Massachusetts. Finally, the CID requests all documents and communications related to ExxonMobil's publicly issued reports, press releases, and Securities and Exchange Commission ("SEC") filings, which were issued outside of Massachusetts,[134] and all documents and communications related to ExxonMobil's climate change research, which also occurred outside of Massachusetts.[135]

72. The absence of any factual basis for investigating ExxonMobil's alleged fraud is glaring, particularly in light of the heavy burden imposed by the CID. Spanning 25 pages and containing 38 broadly worded document requests, the CID unreasonably demands production of essentially any and all communications and documents relating to climate change that ExxonMobil has produced or received over the last 40 years. For example, the CID requests all documents and communications "concerning Exxon's development, planning, implementation, review, and analysis of research efforts to study $CO_2$ emissions . . . and the effects of these emissions on the Climate" since 1976 and all documents and communications concerning "any research, study, and/or evaluation by ExxonMobil and/or any other fossil fuel company regarding the Climate Change Radiative Forcing Effect of" methane since 2010.[136] It also requests all documents and communications concerning papers and presentations given by ExxonMobil scientists since 1976[137] and demands production of ExxonMobil's climate change related speeches, public reports, press releases, and SEC filings over the last 20 years.[138] Moreover, it fails

---

[134] *Id.* at App. 301–03 (Request Nos. 15–16, 19, 22).
[135] *Id.* at App. 297–98, 300–03 (Request Nos. 1–4, 14, 17, 22).
[136] *Id.* at App. 297, 302 (Request Nos. 1, 17).
[137] *Id.* at App. 297–98. (Request Nos. 2–4).
[138] *Id.* at App. 299 (Request No. 8 (all documents since April 1, 1997)); *id.* at App. 302–03 (Request No. 22 (all documents since 2006)); *id.* at App. 299–302 (Request Nos. 9–12, 14–16, 19 (all documents since 2010)). The CID also demands the testimony of ExxonMobil officers, directors, or managing

to reasonably describe several categories of documents by, for example, requesting documents related to ExxonMobil's "awareness," "internal consideration," and "decision making" with respect to certain climate change matters.[139]

73. The CID's narrower requests, however, are in some instances more troubling than its overly broad ones. They appear to target groups simply because they hold views with which Attorney General Healey disagrees. All 12 of the organizations that ExxonMobil is directed to produce its communications with have been identified by environmental advocacy groups as opposing policies in favor of addressing climate change or disputing the science in support of climate change.[140] The CID also targets statements that are not in accord with the Green 20's preferred views on climate change. These include statements of pure opinion on policy, such as the suggestion that "[i]ssues such as global poverty [are] more pressing than climate change, and billions of people without access to energy would benefit from oil and gas supplies."[141]

## G. Attorney General Schneiderman Shifts Investigative Theories in a Search for Leverage over ExxonMobil in a Public Policy Debate.

74. After receiving Attorney General Schneiderman's subpoena, ExxonMobil made a good-faith effort to comply with his request for information about its climate change research in the 1970s and 1980s. ExxonMobil provided his office with well over one million pages of documents, at substantial cost to the Company, with the expectation that a fair and impartial investigation would be conducted. Less than a month ago, and well after ExxonMobil commenced this action against Attorney General Healey, the

---

agents who can testify about a variety of subjects, including "[a]ll topics covered" in the CID. *Id.* at App. 306 (Schedule B).

[139] *Id.* at App. 298–99, 302 (Request Nos. 7–8, 18).

[140] *See, e.g.*, Ex. VV at App. 455–57.

[141] *See, e.g.*, Ex. II at App. 299–300 (Request No. 9).

spokesman for Attorney General Schneiderman stated that ExxonMobil's "historic climate change research" was no longer "the focus of this investigation."[142]

75. Rather than close the investigation, however, Attorney General Schneiderman simply unveiled another theory. As he explained in a lengthy interview published in *The New York Times*, Attorney General Schneiderman now focused on the so-called "stranded assets theory." His office intended to examine whether ExxonMobil had overstated its oil and gas reserves and assets by not accounting for "global efforts to address climate change" that might require it in the future "to leave enormous amounts of oil reserves in the ground"—*i.e.*, cause the assets to be "stranded."[143] Without offering—or possessing—any supporting evidence whatsoever, Attorney General Schneiderman inappropriately opined that there "may be massive securities fraud" at ExxonMobil based on its estimation of proved reserves and the valuation of its assets.[144]

76. Attorney General Schneiderman has directed ExxonMobil to begin producing documents on its estimation of oil and gas reserves, and ExxonMobil has engaged in a dialogue with his office about that request. It is now apparent that Attorney General Schneiderman is simply searching for a legal theory, however flimsy, that will allow him to pressure ExxonMobil on the policy debate over climate change. With the filing of this lawsuit, ExxonMobil is challenging what has now been revealed as a manifestly improper investigation being conducted in bad faith.

---

[142] Ex. KK at App. 321.
[143] Ex. MM at App. 351.
[144] *Id.*

**H.    An Investigation of ExxonMobil's Reporting of Oil and Gas Reserves and Assets Is a Thinly Veiled Pretext.**

77.    Attorney General Schneiderman's decision to investigate ExxonMobil's reserves estimates under a stranded asset theory is particularly egregious because it cannot be reconciled with binding regulations issued by the SEC, which apply strict guidelines to the estimation of proved reserves.

78.    Those regulations prohibit companies like ExxonMobil from considering the impact of future regulations when estimating reserves.  To the contrary, they require ExxonMobil to calculate its proved reserves in light of "*existing* economic conditions, operating methods, and *government regulations*."[145]  The SEC adopted that definition of proved reserves as part of its efforts to provide investors with a "comprehensive understanding of oil and gas reserves, which should help investors evaluate the relative value of oil and gas companies."[146]  The SEC's definition of proved oil and gas reserves thus reflects its reasoned judgment about how best to supply investors with information about the relative value of energy companies, as well as its balancing of competing priorities, such as the agency's desire for comprehensive disclosures, that are not unduly burdensome, and which investors can easily compare.  Attorney General Schneiderman's theory of "massive securities fraud" in ExxonMobil's reported reserves cannot be reconciled with binding SEC regulations about how those reserves must be reported.

79.    The same rationale applies to Attorney General Schneiderman's purported investigation of the impairment of ExxonMobil's assets.   The SEC recognizes as authoritative the accounting standards issued by the Financial Accounting Standards

---

[145]    *Modernization of Oil & Gas Reporting*, SEC Release No. 78, File No. S7-15-08, 2008 WL 5423153, at *66 (Dec. 31, 2008) (emphasis added).

[146]    *Id.* at *1.

Board ("FASB").[147]   The FASB's  rules concerning the impairment of assets require ExxonMobil to "incorporate [its] own assumptions" about future events when deciding whether its assets are impaired.[148]   Contravening those rules, the Attorney General's theory requires that ExxonMobil adopt his assumptions about the likelihood of possible future climate change regulations and then incorporate those assumptions into its determination of whether an asset has been impaired.  Attorney General Schneiderman cannot hold ExxonMobil liable for complying with federal law.

80.   Attorney General Healey's investigation also purports to encompass the same unsound theory of fraud.[149]   The decision to embrace this theory speaks volumes about the pretextual nature of the investigations being conducted by Attorneys General Schneiderman and Healey.   To read the relevant SEC rules is to understand why ExxonMobil may not account for future climate change regulations when calculating its proved reserves.  And to read the applicable accounting standards is to understand why it is impermissible for the Attorneys General to impose their assumptions about the financial impact of possible future climate change regulations on companies that are required to develop their own independent assumptions.  The Attorneys General's claims that they are conducting a bona fide investigation premised on ExxonMobil's supposed failure to account for the Attorneys Generals' expectations regarding the financial impact of future regulations thus cannot be taken seriously.  Their true objectives are clear: to

---

[147]   *See* Commission Statement of Policy Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, 68 Fed. Reg. 23,333–401 (May 1, 2003).

[148]   *See* FASB Accounting Standards Codification 360-10-35-30; *see also* Statement of Financial Accounting Standards No. 144 ¶ 17.

[149]   Ex. NN at App. 367, 372; Opp'n. of Att'y Gen. Maura Healey to Pl. Exxon Mobil Corp.'s Mot. for Prelim. Inj. at 8, *ExxonMobil* v. *Healey*, No. 4:16-cv-00469-K (N.D. Tex. Aug. 8, 2016) (Dkt. No. 43) ("If substantial portions of Exxon's vast fossil fuel reserves are unable to be burned due to carbon dioxide emissions limits put in place to stabilize global average temperature, those assets—valued in the billions—will be stranded, placing shareholder value at risk.").

fish indiscriminately through ExxonMobil's records with the hope of finding some violation of some law that one of them might be empowered to enforce, or otherwise to harass ExxonMobil into endorsing the Green 20's policy views regarding how the United States should respond to climate change.

81.    The desire of Attorneys General Schneiderman and Healey to impose liability on ExxonMobil for complying with SEC disclosure requirements, and the accounting methodologies incorporated in them, would create a direct conflict with federal law. Even if the New York or Massachusetts Attorneys General were to seek only to layer additional disclosure requirements beyond those imposed by the SEC, this would frustrate, and pose an obstacle to, Congress's and the SEC's efforts to create a uniform market for securities and provide consistent metrics by which investors can measure oil and gas companies on a relative basis.

## I.    ExxonMobil Files Suit to Protect its Rights.

82.    ExxonMobil has challenged members of the Green 20 for violating its constitutional rights. Attorney General Walker issued a subpoena to ExxonMobil on March 15, 2016.[150]    ExxonMobil responded by seeking a declaratory judgment that Attorney General Walker's subpoena was illegal and unenforceable because it violated ExxonMobil's rights under the United States and Texas constitutions.[151]

---

[150]    Ex. WW at App. 459–77.
[151]    Ex. LL at App. 323–49.

83.     The Attorneys General of Texas and Alabama intervened in that action in an effort to protect the constitutional rights of their citizens. They criticized Attorney General Walker for undertaking an investigation "driven by ideology, and not law."[152] The Texas Attorney General called Attorney General Walker's purported investigation "a fishing expedition of the worst kind" and recognized it as "an effort to punish Exxon for daring to hold an opinion on climate change that differs from that of radical environmentalists."[153] The Alabama Attorney General echoed those sentiments, stating that the pending action in Texas "is more than just a free speech case. It is a battle over whether a government official has a right to launch a criminal investigation against anyone who doesn't share his radical views."[154]

84.     On June 30, 2016, Attorney General Walker and ExxonMobil entered into a joint stipulation of dismissal, whereby the Attorney General agreed to withdraw his subpoena and ExxonMobil agreed to withdraw its litigation challenging the subpoena.

85.     ExxonMobil commenced this action on June 15, 2016, seeking a preliminary injunction from this Court that would bar Attorney General Healey from enforcing the CID. In an attempt to defend Attorney General Healey's constitutionally infirm CID, Attorney General Schneiderman, along with other attorneys general, filed an amicus brief on August 8, 2016.[155] They argued that Attorney General Healey has a

---

[152] Ex. OO at App. 395.
[153] Ex. CC at App. 244–45.
[154] Ex. W at App. 216.
[155] Mem. of Law for *Amici Curiae* States of Maryland, New York, Illinois, Iowa, Maine, Minnesota, Mississippi, New Mexico, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia and the U.S. Virgin Islands in Support of Def.'s Mot. to Dismiss and in Opp'n. to Pl.'s Motion for a Prelim. Inj. at 1, *Exxon Mobil Corp.* v. *Healey*, No. 4:16-CV-469-K (N.D. Tex. Aug. 8, 2016) (Dkt. No. 47).

"compelling interest in the traditional authority" of her office "to investigate and combat violations of state law."[156]

86.     Recognizing that there was nothing "traditional" about Attorney General Healey's use of state power, attorneys general from eleven states filed an amicus brief in support of ExxonMobil's preliminary injunction motion.[157] "As chief legal officers" of their respective states, they explained that their investigative power "does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates."[158] As a result, they noted that "[u]sing law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[159] They concluded, "Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeats that unfortunate history. That the statements and workings of the 'AG's United for Clean Power' are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough."[160]

87.     ExxonMobil's motion for a preliminary injunction against Attorney General Healey has been briefed and argued and is now submitted before this Court.

### THE SUBPOENA AND CID VIOLATE EXXONMOBIL'S RIGHTS

88.     The facts recited above demonstrate the pretextual nature of the stated reasons for the investigations conducted by Attorneys General Schneiderman and Healey.

---

[156] *Id.*
[157] Br. of Texas, Louisiana, South Carolina, Alabama, Michigan, Arizona, Wisconsin, Nebraska, Oklahoma, Utah, and Nevada as *Amici Curiae* in Supp. of Pl.'s Mot. for Prelim. Inj. at Attachment 2, *Exxon Mobil Corp.* v. *Healey*, No. 4:16-CV-469-K (N.D. Tex. Sept. 8, 2016) (Dkt. No. 63).
[158] *Id.* at 1.
[159] *Id*.
[160] *Id.* at 9.

The statements Attorneys General Schneiderman and Healey made at the press conference and after, the climate change coalition common interest agreement, and recently released emails reveal the improper purpose of the investigations: to change the political calculus surrounding the debate about policy responses to climate change by (1) targeting speech that the Attorneys General perceive to support political perspectives on climate change that differ from their own, and (2) exposing ExxonMobil's documents that may be politically useful to climate activists.

89.     The pretextual character of the investigations is brought into sharp relief when the scope of the subpoena and the CID—which demand nearly 40 years of records—are contrasted with the, at most, six-year limitations periods of the statutes that purportedly authorize the investigations.

90.     Neither Attorney General Schneiderman nor Attorney General Healey (nor, indeed, any other public official) may use the power of the state to prescribe what shall be orthodox in matters of public concern.  By deploying the law enforcement authority of their offices to target one side of a political debate, their actions violated— and continue to violate—the First Amendment.

91.     It follows from the political character of the subpoena and the CID and their remarkably broad scope that they also violate the Fourth Amendment.  Their burdensome demands for irrelevant records violate the Fourth Amendment's reasonableness requirement, as well as its prohibition on fishing expeditions.  Indeed, the evolving justifications for the New York and Massachusetts inquiries confirm that they are investigations driven by the identity of the target, not any good faith belief that a law was broken.

92.     The investigations also fail to meet the requirements of due process. Attorneys General Schneiderman and Healey have publicly declared not only that they believe ExxonMobil and other fossil fuel companies pose an existential risk to the planet, but also the improper purpose of their investigations: to silence ExxonMobil's voice in the public debate regarding climate change and to pressure ExxonMobil to support polices the Attorneys General favor.  Even worse, Attorney General Schneiderman has publicly accused ExxonMobil of engaging in a "massive securities fraud" without any basis whatsoever, and Attorney General Healey declared, before her investigation even began, that she knew how it would end: with a finding that ExxonMobil violated the law.[161]   The improper political bias that inspired the New York and Massachusetts investigations disqualifies Attorneys General Schneiderman and Healey from serving as the disinterested prosecutors required by the Constitution.

93.     In the rush to fill what Attorney General Schneiderman described as a "[legislative] breach" in Congress regarding climate change, both he and Attorney General Healey have also openly and intentionally infringed on Congress's powers to regulate interstate commerce.  Their investigations seek to regulate speech and conduct that occur almost entirely outside of New York and Massachusetts.  Where a state seeks to regulate and burden out-of-state speech, as the subpoena and the CID do here, the state improperly encroaches on Congress's exclusive authority to regulate interstate commerce and violates the Dormant Commerce Clause.

94.     Attorneys General Schneiderman and Healey's new focus on ExxonMobil's reporting of proved reserves and assets is equally impermissible.  They seek to hold ExxonMobil liable for not taking into account possible future regulations

---

[161]   Ex. B at App. 20–21.

concerning climate change and carbon emissions when estimating proved reserves and reporting assets. But that theory cannot be reconciled with the SEC's requirement that ExxonMobil calculate its proved reserves based only on "existing" regulations, not future regulations. This facet of the investigation, therefore, impermissibly conflicts with, and poses an obstacle to, the goals and purposes of federal law. That conflict is also present in the Attorneys General's investigation of how ExxonMobil determines under binding accounting rules whether an asset has become impaired.

95.     The subpoena and the CID also constitute an abuse of process because they were issued for the improper purposes described above.

96.     ExxonMobil asserts the claims herein based on the facts available to it in the public record from, among other things, press accounts and freedom of information requests made by third parties. ExxonMobil anticipates that discovery from Attorneys General Schneiderman and Healey, as well as third parties, will reveal substantial additional evidence in support of its claims.

## EXXONMOBIL HAS BEEN INJURED BY THE SUBPOENA AND THE CID

97.     The subpoena and the CID have injured, are injuring, and will continue to injure ExxonMobil.

98.     ExxonMobil is an active participant in the policy debate about potential responses to climate change. It has engaged in that debate for decades, participating in the Intergovernmental Panel on Climate Change since its inception and contributing to every report issued by the organization since 1995. Since 2009, ExxonMobil has publicly advocated for a carbon tax as its preferred method to regulate carbon emissions. Proponents of a carbon tax on greenhouse gas emissions argue that increasing

taxes on carbon can "level the playing field among different sources of energy."[162] While Attorneys General Schneiderman and Healey and the other members of the Green 20 are entitled to disagree with ExxonMobil's position, no member of that coalition is entitled to silence or seek to intimidate one side of that discussion (or the debate about any other important public issue) through the issuance of baseless and burdensome subpoenas. ExxonMobil intends—and has a constitutional right—to continue to advance its perspective in the national discussions over how best to respond to climate change. Its right to do so should not be violated through this exercise of government power.

99.     As a result of the improper and politically motivated investigations launched by Attorneys General Schneiderman and Healey, ExxonMobil has suffered, now suffers, and will continue to suffer violations of its rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and under Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution. Attorneys General Schneiderman's and Healey's actions also violate Articles One and Six of the United States Constitution and constitute an abuse of process under common law.

100.    Acting under the laws, customs, and usages of New York and Massachusetts, Attorneys General Schneiderman and Healey have subjected ExxonMobil, and are causing ExxonMobil to be subjected, to the deprivation of rights, privileges, and immunities secured by the United States Constitution and the Texas Constitution. ExxonMobil's rights are made enforceable against Attorneys General Schneiderman and Healey, who are acting under the color of law, by Article One, Section Eight of the United States Constitution, and the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution, all within the meaning and

---

[162]   Ex. PP at App. 402.

contemplation of 42 U.S.C. § 1983, and by Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.

101. Absent relief, Attorneys General Schneiderman and Healey will continue to deprive ExxonMobil of these rights, privileges, and immunities.

102. In addition, ExxonMobil is threatened with further imminent injury that will occur if it is forced to choose between conforming its constitutionally protected speech to Attorneys General Schneiderman and Healey's shared political views or exercising its rights and risking sanctions and prosecution.

103. The subpoena and the CID also threaten ongoing imminent injury to ExxonMobil because they subject ExxonMobil to an unreasonable search in violation of the Fourth Amendment. Complying with this unreasonably burdensome and unwarranted fishing expeditions would require ExxonMobil to collect, review, and produce millions more documents, and would cost millions of dollars.

104. If ExxonMobil's request for injunctive relief is not granted, and Attorneys General Schneiderman and Healey are permitted to persist in their investigations, then ExxonMobil will suffer these imminent and irreparable harms. ExxonMobil has no adequate remedy at law for the violation of its constitutional rights.

## CAUSES OF ACTION

**A.    First Cause of Action: Conspiracy**

105. ExxonMobil repeats and realleges paragraphs 1 through 104 above as if fully set forth herein.

106. The facts set forth herein demonstrate that, acting under color of state law, Attorneys General Schneiderman and Healey have agreed with each other, and with others known and unknown, to deprive ExxonMobil of rights secured by the law to all,

including those guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.

107.    In furtherance of these objectives, Attorneys General Schneiderman and Healey have, among other things, issued the unlawful subpoena and CID and entered the common interest agreement described above at paragraphs 52–53.  The subpoena and CID were issued without having a good faith basis for conducting any investigation, and with the ulterior motive of preventing ExxonMobil from enjoying and exercising its rights protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.

108.    ExxonMobil has been damaged, and has been deprived of its rights under the United States and Texas Constitutions, as a proximate result of the unlawful conspiracy entered into by Attorneys General Schneiderman and Healey.  The conduct of Attorneys General Schneiderman and Healey therefore violates both 42 U.S.C. § 1985 and the Texas common law.

**B.    Second Cause of Action: Violation of ExxonMobil's First and Fourteenth Amendment Rights**

109.    ExxonMobil repeats and realleges paragraphs 1 through 104 above as if fully set forth herein.

110.    The focus of the subpoena and the CID on one side of a policy debate—in an apparent effort to silence, intimidate, and deter those possessing a particular viewpoint from participating in that debate—contravenes, and any effort to enforce the subpoena or CID would further contravene, the rights provided to ExxonMobil by the First

Amendment to the United States Constitution, made applicable to the State of New York and the Commonwealth of Massachusetts by the Fourteenth Amendment, and by Section Eight of Article One of the Texas Constitution.

111.    The subpoena and the CID are impermissible viewpoint-based restrictions on speech, and they burden ExxonMobil's political speech.    Attorneys General Schneiderman and Healey issued the subpoena and the CID based on their disagreement with ExxonMobil regarding how the United States should respond to the risks of climate change.    And even if the subpoena and the CID had not been issued for that illegal purpose, they would still violate the First Amendment, because they burden ExxonMobil's political speech without being substantially related to any compelling governmental interest.

**C.    Third Cause of Action: Violation of ExxonMobil's Fourth and Fourteenth Amendment Rights**

112.    ExxonMobil repeats and realleges paragraphs 1 through 104 above as if fully set forth herein.

113.    The issuance of the subpoena and the CID contravenes, and any effort to enforce the subpoena would further contravene, the rights provided to ExxonMobil by the Fourth Amendment to the United States Constitution, made applicable to the State of New York and the Commonwealth of Massachusetts by the Fourteenth Amendment, and by Section Nine of Article One of the Texas Constitution, to be secure in its papers and effects against unreasonable searches and seizures.

114.    The subpoena and CID are each unreasonable searches and seizures because each of them constitutes an abusive fishing expedition into 40 years of ExxonMobil's records, without any legitimate basis for believing that ExxonMobil

violated New York or Massachusetts law. Their overbroad and irrelevant requests impose an undue burden on ExxonMobil and violate the Fourth Amendment's reasonableness requirement, which mandates that a subpoena be limited in scope, relevant in purpose, and specific in directive.

**D.     Fourth Cause of Action: Violation of ExxonMobil's Fourteenth Amendment Rights**

115.    ExxonMobil repeats and realleges paragraphs 1 through 104 above as if fully set forth herein.

116.    The investigations conducted by Attorneys General Schneiderman and Healey contravene the rights provided to ExxonMobil by the Fourteenth Amendment to the United States Constitution and by Section Nineteen of Article One of the Texas Constitution not to be deprived of life, liberty, or property without due process of law.

117.    The subpoena and CID deprive ExxonMobil of due process of law by violating the requirement that a prosecutor be disinterested. The statements by Attorneys General Schneiderman and Healey at the Green 20 press conference and elsewhere make clear that they are biased against ExxonMobil.

**E.     Fifth Cause of Action: Violation of ExxonMobil's Rights Under the Dormant Commerce Clause**

118.    ExxonMobil repeats and realleges paragraphs 1 through 104 above as if fully set forth herein.

119.    Article I, Section 8 of the United States Constitution grants Congress exclusive authority to regulate interstate commerce and thus prohibits the States from doing so. The issuance of the subpoena and the CID contravenes, and any effort to enforce the subpoena and the CID would further contravene, the rights provided to ExxonMobil under the Dormant Commerce Clause.

120.    The subpoena and the CID effectively regulate ExxonMobil's out-of-state speech while only purporting to investigate ExxonMobil's marketing and/or sale of energy and other fossil fuel derived products to consumers in New York and Massachusetts and its marketing and/or sale of securities to investors in New York and Massachusetts.

121.    The subpoena and the CID demand documents that relate to (1) statements ExxonMobil made outside New York and Massachusetts, and (2) ExxonMobil's communications with organizations residing outside New York and Massachusetts. The subpoena and CID therefore have the practical effect of primarily burdening interstate commerce.

**F.    Sixth Cause of Action: Federal Preemption**

122.    ExxonMobil repeats and realleges paragraphs 1 through 104 above as if fully set forth herein.

123.    Article VI, Clause 2 of the United States Constitution provides that the laws of the United States "shall be the supreme law of the land." Any state law that imposes disclosure requirements inconsistent with federal law is preempted under the Supremacy Clause.

124.    Federal law requires ExxonMobil to calculate and report its proved oil and gas reserves based on "existing economic conditions, operating methods, and government regulations." This requirement reflects the SEC's reasoned judgment about how best to supply investors with information about the relative value of oil and gas companies, as well as its balancing of competing priorities, such as the agency's desire for comprehensive disclosures, that are not unduly burdensome, and which investors can easily compare. Similarly, accounting standards recognized as authoritative by the SEC

require ExxonMobil to use its own assumptions about future events when determining whether assets are impaired, not the assumptions of the Attorneys General. Attorneys General Schneiderman and Healey have stated that they seek to impose liability on ExxonMobil for failing to account for what they believe will be the financial impact of as-yet-unknown "carbon dioxide emissions limits put in place to stabilize global average temperature" in estimating and reporting ExxonMobil's proven reserves and valuing its assets. The Attorneys General therefore would seek to punish ExxonMobil for complying with federal law and the accounting standards embedded therein.

125. Even if the New York or Massachusetts Attorneys General were to seek only to layer additional disclosure requirements concerning oil and gas reserves and asset valuations beyond those imposed by the SEC, this would frustrate, and pose an obstacle to, Congress's and the SEC's efforts to create a uniform market for securities and provide consistent metrics by which investors can measure oil and gas companies on a relative basis.

126. Because these investigations under New York and Massachusetts law create a conflict with, and pose an obstacle to, federal law, the application of New York and Massachusetts law to this case is preempted.

G.    **Seventh Cause of Action: Abuse of Process**

127. ExxonMobil repeats and realleges paragraphs 1 through 104 above as if fully set forth herein.

128. Attorneys General Schneiderman and Healey committed an abuse of process under common law by (1) issuing the subpoena and the CID to ExxonMobil without having a good faith basis for conducting an investigation; (2) having an ulterior motive for issuing and serving the subpoena and the CID, namely, an intent to prevent

ExxonMobil from exercising its right to express views with which they disagree; and (3) causing injury to ExxonMobil's reputation and violating its constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that Attorneys General Schneiderman and Healey be summoned to appear and answer and that this Court award the following relief:

1. A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the subpoena and the CID violate ExxonMobil's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution; violate ExxonMobil's rights under Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution; and violate the Dormant Commerce Clause and the Supremacy Clause of the United States Constitution;

2. A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the issuance of the subpoena and the CID constitute an abuse of process, in violation of common law;

3. A preliminary and permanent injunction prohibiting enforcement of the subpoena and of the CID;

4. Such other injunctive relief to which Plaintiff is entitled; and

5. All costs of court together with any and all such other and further relief as this Court may deem proper.

Dated: October 17, 2016


EXXON MOBIL CORPORATION

By: /s/ Patrick J. Conlon
Patrick J. Conlon
(*pro hac vice*)
State Bar No. 24054300
patrick.j.conlon@exxonmobil.com
Daniel E. Bolia
State Bar No. 24064919
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

/s/ Nina Cortell
Nina Cortell
State Bar No. 04844500
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411


/s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
(*pro hac vice*)
twells@paulweiss.com
Michele Hirshman
(*pro hac vice*)
mhirshman@paulweiss.com
Daniel J. Toal
(*pro hac vice*)
dtoal@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

/s/ Ralph H. Duggins
Ralph H. Duggins
State Bar No. 06183700
rduggins@canteyhanger.com
Philip A. Vickers
State Bar No. 24051699
pvickers@canteyhanger.com
Alix D. Allison
State Bar. No. 24086261
aallison@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807


Justin Anderson
(*pro hac vice*)
janderson@paulweiss.com
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300
Fax: (202) 223-7420

*Counsel for Exxon Mobil Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2016, a copy of the foregoing instrument was served on the following party via the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure:

Maura Healey
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108-1518
Phone: (617) 727-2200

/s/ Ralph H. Duggins
Ralph H. Duggins