**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

| | |
|---|---|
| EXXON MOBIL CORPORATION, | |
| *Plaintiff,* | |
| v. | No. 1:17-cv-02301-VEC |
| ERIC TRADD SCHNEIDERMAN, Attorney General of New York, in his official capacity, and MAURA TRACY HEALEY, Attorney General of Massachusetts, in her official capacity, | |
| *Defendants.* | |

**BRIEF OF TEXAS, LOUISIANA, SOUTH CAROLINA, ALABAMA, MICHIGAN, ARIZONA, WISCONSIN, NEBRASKA, OKLAHOMA, UTAH, AND ARKANSAS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S REQUEST TO LIFT THE STAY OF DISCOVERY AND IN OPPOSITION TO DEFENDANTS' REQUESTS FOR DISMISSAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

INTEREST OF *AMICI CURIAE* .......................................................................... 1

ARGUMENT ........................................................................................................... 2

    I.    Attorneys general are to act impartially. ...................................................... 3

          A.    Attorneys general may not employ legal power to suppress a viewpoint in a policy debate. ................................................................. 4

               1.    Defendants are targeting critics. .................................................. 5

               2.    Defendants are abusing their power. ........................................... 8

          B.    Climate change is the subject of legitimate international debate. ............................................................................................ 10

    II.    Politicized investigations undermine public confidence. ............................. 13

    III.  Bad faith gives the Court jurisdiction to resolve the dispute. ..................... 14

CONCLUSION...................................................................................................... 18

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

*Abrams v. United States,*
    250 U.S. 616 (1919) .................................................................. 6

*AFL-CIO v. FEC,*
    333 F.3d 168 (D.C. Cir. 2003) ................................................. 9

*Ballard v. Wilson,*
    856 F.2d 1568 (5th Cir. 1988) .............................................. 15

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) .................................................................. 6

*Berger v. United States,*
    295 U.S. 78 (1935) .................................................................. 2

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .................................................................... 9

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) ................................................................ 4

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ................................................................ 5

*City of Lakewood v. Plain Dealer Pub. Co.,*
    486 U.S. 750 (1988) ................................................................ 6

*Connick v. Myers,*
    461 U.S. 138 (1983) ................................................................ 5

*Cornelius v. NAACP,*
    473 U.S. 788 (1985) ............................................................. 4, 5

*Cullen v. Fliegner,*
    18 F.3d 96 (2d Cir. 1994) ............................................. 15, 16, 17

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) .............................................................. 11

*Diamond "D" Const. Corp. v. McGowan,*
    282 F.3d 191 (2d Cir. 2002) ........................................ 14, 15, 16

*Donaldson v. Read Magazine, Inc.*,
    333 U.S. 178 (1948) ......................................................................... 3

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985) ....................................................................... 10

*Elrod v. Burns*,
    427 U.S. 347 (1976) ......................................................................... 4

*Fed. Trade Comm'n v. Am. Tobacco Co.*,
    264 U.S. 298 (1924) ......................................................................... 9

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978) ....................................................................... 10

*Hill v. Colorado*,
    530 U.S. 703 (2000) ......................................................................... 5

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*,
    14 F. Supp. 3d 99 (E.D.N.Y. 2014)................................................. 10

*Huffman v. Pursue, Ltd.*,
    420 U.S. 59 (1975) ......................................................................... 14

*Johnson v. United States*,
    333 U.S. 10 (1948) ......................................................................... 13

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ......................................................................... 5

*Kugler v. Helfant*,
    421 U.S. 117 (1975) ....................................................................... 14

*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) ........................................................... 9

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y.*
    *Harbor*, 667 F.2d 267, 271 (2d Cir. 1981)...................................... 9

*Illinois ex rel. Madigan v. Telemarketing Assocs.*,
    538 U.S. 600 (2003) ......................................................................... 3

*Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
    429 U.S. 167 (1976) ......................................................................... 7

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004)............................................................... 4

*Members of the City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ................................................................ 4

*Mills v. Alabama,*
    384 U.S. 214 (1966) ................................................................ 4

*N.Y. Progress & Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) .................................................... 4

*NAACP v. Ala. ex rel. Patterson,*
    357 U.S. 449 (1958) ................................................................ 9

*Near v. Minnesota,*
    283 U.S. 697 (1931) ................................................................ 6

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ................................................................ 5

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,*
    477 U.S. 619 (1986) .............................................................. 14

*Okla. Press Publ'g Co. v. Walling,*
    327 U.S. 186 (1946) ................................................................ 8

*Pebble Ltd. P'ship v. EPA,*
    310 F.R.D. 575 (D. Alaska 2015) .......................................... 10

*Perez v. Ledesma,*
    401 U.S. 82 (1971) ................................................................ 14

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2009) ................................................ 9

*Police Dep't of Chi. v. Mosley,*
    408 U.S. 92 (1972) .................................................................. 4

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .......................................................... 17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................................ 4

*Schlagler v. Phillips,*
    166 F.3d 439 (2d Cir. 1999) .................................................. 16

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ................................................................ 6

*Smith v. Cty. of Suffolk,*
   776 F.3d 114 (2d Cir. 2015)................................................................. 16

*Stanford v. Texas,*
   379 U.S. 476 (1965) ........................................................................ 9

*Texas v. Johnson,*
   491 U.S. 397 (1989) ........................................................................ 4

*Underwager v. Salter,*
   22 F.3d 730 (7th Cir. 1994) ............................................................. 11

*United States v. Costa,*
   356 F. Supp. 606 (D.D.C. 1973)....................................................... 13

*United States v. Kokinda,*
   497 U.S. 720 (1990) ........................................................................ 7

*White v. Lee,*
   227 F.3d 1214 (9th Cir. 2000) ......................................................... 5

*Younger v. Harris,*
   401 U.S. 37 (1971) ................................................................. 14, 15

**State Cases**

*Gaidon v. Guardian Life Ins. Co. of Am.,*
   750 N.E.2d 1078 (N.Y. 2001)......................................................... 10

**State Statutes**

MASS. GEN. LAWS Chapter 93A, § 2............................................................ 10

MASS. GEN. LAWS Chapter 260, § 5A........................................................... 10

TEX. BUS. & COM. CODE § 17.46 ................................................................. 3

TEX. BUS. & COM. CODE § 17.47 .............................................................. 3, 16

TEX. BUS. & COM. CODE § 17.60 .............................................................. 3, 16

TEX. BUS. & COM. CODE § 17.61 .............................................................. 3, 16

**Rules**

N.Y. C.P.L.R. 214.................................................................................... 10

MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982)............................... 2

## Other Authorities

Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016), *video available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across ............................................................................................ 3

Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, NONGOVERNMENTAL INTERNATIONAL PANEL ON CLIMATE CHANGE (NIPCC) (Heartland Inst.), 2016, *available at* http://climatechangereconsidered.org/ ............................................................ 11

Karl Popper, THE LOGIC OF SCIENTIFIC DISCOVERY 44, 47 (1959) ............................. 11

Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at 3 (Global Warming Policy Foundation 2015), *available at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf ....................... 11, 12

Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* Daily Caller (Apr. 4, 2016), *available at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt ...................................................... 13

Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available at* http://www.ago.state.al.us/news/852.pdf ................................................................................ 1, 2, 13

Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016), *available at* https://www.ag.state.la.us/Article/2207/5 ........................................................ 13

Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across ...................................................... 3

Scott Pruitt & Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available at* http://www.nationalreview.com/article/435470/climate-change-attorneys-general ................................................ 11

## INTEREST OF *AMICI CURIAE*

Exxon Mobil Corporation ("Plaintiff") is challenging the validity of a Civil Investigative Demand ("CID"), a state civil administrative subpoena, issued by the Attorney General of Massachusetts, and a subpoena issued by the Attorney General of New York (collectively, "Defendants"). Defendants issued these instruments to investigate Plaintiff's supposed violations of consumer protection laws through marketing and selling of fossil fuel-derived products and securities. Plaintiff seeks relief from complying with the CID and subpoena, claiming bad faith and violations of its constitutional rights.

*Amici* possess sovereign authority to investigate violations of law. Their chief legal officers have long used that power—including the issuance of CIDs or subpoenas—to identify and remedy unlawful conduct. This power, however, does not include the right to engage in unrestrained, pretextual investigative excursions to promote one side of an international public policy debate, or chill the expression of viewpoints in those debates.

Several attorneys general expressed their concerns about Defendants' tactics in an open letter last year.[1] The letter condemns the actions of Defendants and others, stating the "effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake."[2] The signatories, representing a wide range of viewpoints on climate change, "agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy

---

[1] Open Letter from Attorneys General (Luther Strange, Alabama; Bill Schuette, Michigan; Ken Paxton, Texas; Craig Richards, Alaska; Doug Peterson, Nebraska; Sean Reyes, Utah; Mark Brnovich, Arizona; Adam Laxalt, Nevada; Brad Schimel, Wisconsin; Leslie Rutledge, Arkansas; Scott Pruitt, Oklahoma; Jeff Landry, Louisiana; Alan Wilson, South Carolina) dated June 15, 2016, *available at* http://www.ago.state.al.us/news/852.pdf.

[2] *Id.* at 3.

debate undermines the trust invested in our offices and threatens free speech."[3] As most recognize, "vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response, it will affect people, communities, and businesses that all have a right to participate in this debate."[4] Defendants should "stop policing viewpoints."[5]

*Amici* are concerned about the unconstitutional abuse of investigative power. Their inherent interest in preserving their roles as evenhanded enforcers of the law creates direct and vital interests in the issues before the Court.

## ARGUMENT

Attorneys general have a constitutional duty to act dispassionately. As the Supreme Court explained, attorneys representing the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it should win a case but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This distinctive role is also expressed in the Model Code of Professional Responsibility: "The responsibility of a public prosecutor differs from that of the usual advocate; his [or her] duty is to seek justice, not merely to convict." MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (1982).

Here, Defendants are not using their power in an impartial manner. Rather, they are embracing one side of a multi-faceted and robust policy debate, and simultaneously seeking to censor opposing viewpoints. This is bad faith.

---

[3] *Id.* at 3.

[4] *Id.* at 5.

[5] *Id.* at 6.

## I.     Attorneys general are to act impartially.

Defendants' investigation is the product of a cultural movement "committed to aggressively protecting and building upon the recent progress the United States has made in combatting climate change."[6] The common interest agreement of the powers aligned on this axis of ideology underscores the partiality of their endeavor, as they seek to "limit climate change and ensur[e] the dissemination of *accurate* information about climate change." ECF No. 57 at 3 (emphasis added).[7] In other words, Defendants' tactics are part of an "aggressive approach" to silence dissenting viewpoints by policing the "truth" about climate change in the marketplace of ideas.[8]

While *amici* have authority to conduct investigations regarding consumer protection, fraud, and deceptive trade practices, inquiries must be supported by a "reasonable belief" that there has been, or is about to be, unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. *See*, *e.g.*, TEX. BUS. & COM. CODE §§ 17.46, 17.47, 17.60, 17.61. And while the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established," *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948), "[s]imply labeling an action one for 'fraud,' of course, will not carry the day," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003).

---

[6] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

[7] This ideology was on full display at the March 29, 2016 press conference of the so-called "AG's United for Clean Power," characterized as "the beginning of the end of our addiction to fossil fuel and the degradation of our planet." Attorney General Schneiderman, Press Conference, AGs United for Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil), *video available at* http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across. Former Vice President Al Gore alleged that commercial interests (such as the Plaintiff) are "committing fraud in their communications." *Id.*

[8] *Id.*

**A.      Attorneys general may not employ legal power to suppress a viewpoint in a policy debate.**

The authority to investigate fraud does not allow the chilling of constitutional freedom to engage in an ongoing policy debate of international importance. The First Amendment condemns government action that restricts or chills speech because of the message conveyed. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.") (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)).

Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment generally prevents government from proscribing speech, *Cantwell v. Connecticut*, 310 U.S. 296, 309–311 (1940), and expressive conduct, *Texas v. Johnson*, 491 U.S. 397, 406 (1989), for the mere disapproval of the ideas expressed. After all, the "'loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.'" *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The heart of viewpoint discrimination is the government preferring one message to another. *See Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *see also Cornelius v. NAACP*, 473 U.S. 788, 806 (1985) ("government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004).

And these protections extend to private corporations. *Citizens United v. FEC*, 558 U.S. 310, 342–43 (2010).

While Defendants claim interests in consumer protection and prevention of securities fraud as the basis for their actions, proffering what may be on its face "reasonable grounds" for the action does "not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. The actions of Defendants before and after the March 29, 2016 press conference show their investigations and document requests are designed to chill speech about climate change. And yet the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

### 1.    Defendants are targeting critics.

The First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Thus, it stands as a bulwark against government action designed to suppress ideas or information, or to manipulate the public debate through coercion rather than persuasion. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 597–603 (1967).

Defendants' actions chill Plaintiff's (and others') speech on the topic of climate change. *See White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000) (holding that a federal investigation into opponents of a housing project chilled their speech in violation of the First Amendment). Using government power to suppress one side of a policy debate is a prior restraint on speech. Governmentally imposed prior restraints on

speech are tantamount to censorship. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963); *Near v. Minnesota*, 283 U.S. 697, 713 (1931). Labeling a so-called investigation (into an unsettled area of science and public policy) as "fraud" certainly "raise[s] the specter that the Government [is] effectively driv[ing] certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

If our society refuses to tolerate *both* the proponents and critics of ideas vying for acceptance, then the marketplace of ideas becomes a mere oligarchy of indoctrination. As Justice Holmes put it:

> But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

*Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

The record in this case is full of *prima facie* evidence, obtained without discovery, that Defendants marshaled a well-planned effort to silence Plaintiff and other "climate deniers" through the abusive use of CIDs and investigative subpoenas. Prior to transferring this case, Judge Kinkeade identified some of the most salient, undisputed, and disturbing facts:

> Attorney General Healey, Attorney General Schneiderman, several other states' attorneys general, and former Vice President Al Gore spoke at the AGs United for Clean Power press conference. At that press conference the attorneys general spoke about the negative effects of climate change and the importance of taking action in the fight against climate change. Attorney General Schneiderman reminded everyone of his ongoing investigation of Exxon and Attorney General Healey reiterated that companies in the fossil fuel industry, such as Exxon, must be held accountable for deceiving investors and the public. Attorney General Healey stated that there was a troubling disconnect between what Exxon knew about climate change and what Exxon told investors and the public regarding climate change.

Order 12, ECF No. 180. In other words, Defendants declared Plaintiff's (and others')
views on climate change to be "deceiving" or incorrect. That is textbook viewpoint
discrimination and animus toward Plaintiff's (and others') alleged views on climate
change. *See United States v. Kokinda*, 497 U.S. 720, 736 (1990) (plurality) (viewpoint
discrimination involves an "inten[t] to discourage one viewpoint and advance
another") (citations and internal quotation marks omitted); *Madison Joint Sch. Dist.
No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–176 (1976) ("to permit one
side of a debatable public question to have a monopoly in expressing its views . . . is
the antithesis of constitutional guarantees") (footnote omitted).

Judge Kinkeade also described Defendants' "campaign" to "delegitimize Exxon
as a political actor." Order 6. The court wrote that in "January 2016, according to
emails discussing the planning of the meeting, attorneys and activists met at the
offices of the Rockefeller Family Fund in New York City, New York to discuss goals
of an 'Exxon campaign,' which sought 'to delegitimize [Exxon] as a political actor' and
'to force officials to disassociate themselves from Exxon.'" *Id.* According to Judge
Kinkeade:

> In the emails discussing the planning of the meeting at the Rockefeller
> Family Fund provided to the Court (the existence of these remarks is
> not disputed by either Attorney General Healey or Attorney General
> Schneiderman), the goals of the "Exxon campaign" are:
>
> - To establish in the public's mind that Exxon is a corrupt
>   institution that has pushed humanity (and all creation) towards
>   climate chaos and grave harm.
> - To delegitimize Exxon as a political actor. To force officials to
>   disassociate themselves from Exxon, their money, and their
>   historic opposition to climate progress, for example, by refusing
>   campaign donations, refusing to take meetings, calling for a price
>   on carbon, etc.
> - To call into question climate advantages of fracking, compared to
>   coal.
> - To drive divestment from Exxon.
> - To drive Exxon and climate change into the center of the 2016
>   election cycle.

*Id*. at 6–7. Moreover, immediately before the March 29, 2016 AGs United for Clean Power press conference, "Mr. [Matthew] Pawa, an attorney and climate change activist, and Mr. [Peter] Frumhoff, a climate change activist and director of science and policy at the Union of Concerned Scientists, presented to the attorneys general." *Id*. at 7. Moreover, in "2012, Mr. Pawa presented at a workshop organized by Mr. Frumhoff which discussed, among other things related to climate change, 'the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation' and 'strategies to win access to internal documents' of fossil fuel companies." *Id*. The draft agenda of Defendants' meeting with Messrs. Pawa and Frumhoff "stated that the meeting would include presentations on the 'imperative of taking action now on climate change,' presented by Mr. Frumhoff, and 'climate change litigation,' presented by Mr. Pawa." *Id*. at 8.

To conceal the coordinated nature of Defendants' intended censorship, "Mr. Pawa emailed the Office of the New York Attorney General to ask how he should respond if asked by a reporter from *The Wall Street Journal* whether he attended the closed door meeting with the attorneys general. The Office of the New York Attorney General responded by instructing Mr. Pawa 'to not confirm that you attended or otherwise discuss the event.'" *Id*. These actions are the hallmark of an organized campaign to engage in unconstitutional viewpoint discrimination and chill speech.

## 2.    Defendants are abusing their power.

Massachusetts and New York are abusing the power reserved to them under the U.S. Constitution, and under their own laws governing the administration and use of that power. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where subpoenaed materials may be protected by the First Amendment, the requirements

of the Fourth Amendment are applied with "scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 485 (1965). As such, so-called "fishing expeditions," like this one, are proscribed and "[i]t is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Government abuse of subpoena power runs afoul of the First Amendment. "The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation." *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976) (disclosure of campaign contributions); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (disclosure of membership lists)). Thus, the government must have a compelling interest for the disclosure of such information from private parties. *Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 271 (2d Cir. 1981) (citing cases). A First Amendment privilege against disclosures exists where such "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009) (quotation omitted).

For example, subpoenas seeking investigative notes as well as the names of contacts have been held to be an invalid chilling of the free exercise of political speech and association under the First Amendment. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (finding "invalid" under First Amendment "subpoenas demanding that [a] paper . . . disclose its reporters' notes and reveal information about anyone who visited the [Phoenix] New Times's website" because subpoenas would "chill speech"); *Local 1814*, 667 F.2d at 272 (holding disclosure of contributors

would chill speech); *see also Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 582 (D. Alaska 2015) (subpoenas are invalid when they have "the tendency to chill the free exercise of political speech and association which is protected by the First Amendment").

Defendants' tactics—seeking over 40 years of documents—exceed their lawful powers. *See, e.g.*, First Am. Compl. Ex. "EE" at App. 257–58, ECF No. 101-6, and Ex. "II" at App. 297, ECF No. 101-7. Massachusetts is subject to a four-year statute of limitations for the law it purportedly seeks to enforce. MASS. GEN. LAWS ch. 260, § 5A (referring to MASS. GEN. LAWS ch. 93A, § 2). And New York limits the Attorney General's investigatory period to three years. *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 14 F. Supp. 3d 99, 103 (E.D.N.Y. 2014); *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1082 (N.Y. 2001); N.Y. C.P.L.R. 214.

The Constitution safeguards the freedom to engage in open and candid discussions about significant issues. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (opinion of Powell, J.) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). But the mere occurrence of such discussions is threatened by the chill of "investigations" hanging in the air. Thus, Defendants' actions not only seek to silence certain participants in a public debate, but harm everyone, stifling consumers and those seeking information in order to evaluate various viewpoints.

### B.     Climate change is the subject of legitimate international debate.

Defendants falsely presume that the scientific debate regarding climate change is settled, along with the related and equally important debate on how to respond to what science has found. Yet, the most undeniable fact about climate change is that, like so many other areas of science and public policy, the debate remains unsettled, the research far from complete, and the path forward unclear.

"Scientists continue to disagree about the degree and extent of global warming and its connection to the actions of mankind,"[9] as do many others. Moreover, science does not teach the obvious public policy response to its data and findings, it merely provides a starting point.

Modern science helps us better understand our world. It constantly subjects to scrutiny various hypotheses against objective data. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). But since it is almost never possible for all relevant data to be marshaled, scientific theories are always subject to change because of new data, enhanced measurements, or other unforeseen factors. *Cf.* Karl Popper, THE LOGIC OF SCIENTIFIC DISCOVERY 44, 47 (1959). Thus, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

Accordingly, the intersection of science, law, and public policy should be approached with caution and objectivity, and not the finality sought through litigation and legal maneuvers. Disastrous results take root when government invests itself in only one side of a scientific debate since "bad ideas can persist in science for decades, and surrounded by myrmidons of furious defenders they can turn into intolerant dogmas."[10] Unfortunately,

---

[9] Scott Pruitt & Luther Strange, *The Climate-Change Gang*, National Review (May 17, 2016), *available at* http://www.nationalreview.com/article/435470/climate-change-attorneys-general; Craig D. Idso, *Why Scientists Disagree About Global Warming: The NIPCC Report on Scientific Consensus*, NONGOVERNMENTAL INTERNATIONAL PANEL ON CLIMATE CHANGE (NIPCC) (Heartland Inst.), 2016, *available at* http://climatechangereconsidered.org/.

[10] Matt Ridley, *The Climate Wars and the Damage to Science,* GWPF Essay 3 at 3 (Global Warming Policy Foundation 2015), *available at* http://www.thegwpf.com/content/uploads/2015/11/climate-wars.pdf. In addition to being former Science Editor of the Economist, "Matt Ridley is one of the world's foremost science writers. His books have sold over a million copies and been translated into 30 languages. His new book The Evolution of Everything was published in 2015. He is a member of the [Global Warming Policy Foundation]'s Academic Advisory Council. As a landowner, he receives a wayleave income from a coal-mining company." In the words of Ridley,

> I am not a full sceptic of climate change, let alone a 'denier'. I think carbon-dioxide induced warming during this century is likely, though I think it is unlikely to prove rapid and

> [t]his is precisely what has happened with the climate debate and it is at risk of damaging the whole reputation of science. The "bad idea" in this case is not that climate changes, nor that human beings influence climate change; but that the impending change is sufficiently dangerous to require urgent policy responses. In the 1970s, when global temperatures were cooling, some scientists could not resist the lure of press attention by arguing that a new ice age was imminent. Others called this nonsense and the World Meteorological Organization rightly refused to endorse the alarm. That's science working as it should. In the 1980s, as temperatures began to rise again, some of the same scientists dusted off the greenhouse effect and began to argue that runaway warming was now likely. At first, the science establishment reacted skeptically and a diversity of views was aired. It's hard to recall now just how much you were allowed to question the claims in those days.[11]

Even the premise that "97% of all climate scientists agree on climate change" is pseudo-science. This self-serving conclusion is derived from a poll involving only seventy-nine scientists[12]—hardly a statistically-relevant sample. Moreover, of those seventy-nine scientists, 97% believe that climate change is man-made—not that it is dangerous.[13] "A more recent poll of 1854 members of the American Meteorological Society found the true number is 52 per cent."[14] Indeed,

> there has been a systematic and thorough campaign to rule out the middle ground as heretical: not just wrong, but mistaken, immoral and beyond the pale. That's what the word "denier", with its deliberate connotations of Holocaust denial, is intended to do. For reasons I do not fully understand, journalists have been shamefully happy to go along with this fundamentally religious project. Politicians love this polarizing because it means they can attack a straw man.[15]

---

dangerous. So I don't agree with those who say the warming is all natural, or all driven by the sun, or only an artefact of bad measurement, but nor do I think anything excuses bad scientific practice in support of the carbon dioxide theory, and every time one of these scandals erupts and the scientific establishment asks us to ignore it, I wonder if the extreme sceptics are not on to something. I feel genuinely betrayed by the profession that I have spent so much of my career championing.

*Id.* at 10.

[11] *Id.* at 4.

[12] *Id.* at 7.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 6.

## II.     Politicized investigations undermine public confidence.

The press conference of the "AG's United for Clean Power" demonstrates that Massachusetts and New York commenced their investigations precisely for the reasons the First Amendment forbids.[16] "It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas."[17]

Allowing law enforcement to violate constitutional rights is to "violate the sacred trust of the people." *United States v. Costa*, 356 F. Supp. 606, 609 (D.D.C. 1973). It undermines "the right of the people to be secure in their persons, houses, papers and effects, and would obliterate one of the most fundamental distinctions between our form of government, where officers are *under* the law, and the police-state where they *are* the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948) (emphasis added).

Regrettably, history is embroiled with the exercise of law enforcement soiled with political ends rather than legal ones. Massachusetts and New York now repeat that unfortunate history. That the statements and workings of the "AG's United for Clean Power" are one-sided, and target only certain participants in the climate change debate, speaks loudly enough.[18]

---

[16] *See supra* note 7.

[17] Press Release, Louisiana Department of Justice, Attorney General Jeff Landry Slams Al Gore's Coalition (Mar. 30, 2016), *available at* https://www.ag.state.la.us/Article/2207/5.

[18] "[T]his fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks. If it is possible to minimize the risks of climate change, then the same goes for exaggeration. If minimization is fraud, exaggeration is fraud." *See supra* note 1 at 2. It is also worth noting that "[e]leven of the 17 attorneys general who participated [in the "AG's United for Clean Power" press conference] are the same folks who took part in the 2010 sue-and-settle lawsuit that used federal courts to try to force the adoption of the federal energy regulations that became the EPA's 'Power Plan.'" Michael Batasch, *Kansas AG takes on Al Gore's Alarmism – Won't Join Anti-Exxon "Publicity Stunt,"* The Daily Caller (Apr. 4, 2016), *available at* http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

### III.    Bad faith gives the Court jurisdiction to resolve the dispute.

Defendants seek to evade the jurisdiction of the Court through *Younger* abstention. Defs.' Mot. to Dismiss, ECF No. 125 at 20–22. In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court held that federal courts should abstain from hearing claims brought by a person currently being prosecuted in state court for a matter giving rise to that claim. This doctrine was extended later to state civil proceedings, *Huffman v. Pursue, Ltd.*, 420 U.S. 59 (1975), and administrative proceedings, *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619 (1986). Thus, *Younger* abstention prevents the Court from interfering with (1) an ongoing state proceeding, (2) that raises an important state interest, and (3) that allows the federal plaintiff an adequate opportunity for judicial review of federal constitutional claims. *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002).

But *Younger* abstention has an exception—where the prosecution is in bad faith or part of some pattern of harassment against the person or entity. *Younger*, 401 U.S. at 56. Admittedly, circumstances of legitimate bad faith are rare.

> Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.

*Perez v. Ledesma*, 401 U.S. 82, 85 (1971); *see also Kugler v. Helfant*, 421 U.S. 117, 124–25 (1975). However, in this case, the allegations by Plaintiff, and the *prima facie* evidence of bad faith, are worthy of exploration and may preclude the Court from abstaining. *See* ECF Nos. 9 (20–22), 57 (1–4, 7–8), 60 (17–22), 90 (throughout), 127 (10–12), 144 (throughout), 165 (19–23), 167 (14–17).

To validly invoke the bad faith exception to *Younger*, a court must go beyond the face of a CID or subpoena, as "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it."

*Younger*, 401 U.S. at 54. Here, the mere issuance of a CID or subpoena does not constitute bad faith any more than does the issuance of "thirty-six parking tickets" to a single individual. *Ballard v. Wilson*, 856 F.2d 1568, 1571 (5th Cir. 1988). Indeed, the existence of an instrument, in and of itself, is insufficient to sustain bad faith. In *Ballard*, for example, "there [was] nothing in the record to suggest that the citations result from the bad faith of the city officials instead of [the individual]'s own parking habits." *Id.* Here, however, the Plaintiff has alleged, and placed into evidence, undisputed facts that go beyond the face of the instruments themselves and are *prima facie* evidence of bad faith. If sustained, these facts constitute a nefarious purpose behind the CID and subpoena that negate notions of abstention.

Moreover, "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome." *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994). For example, the exception is met when a proceeding is "'brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution of proceeding is otherwise brought in bad faith or for the purpose to harass.'" *Diamond "D" Const.*, 282 F.3d at 199 (quoting *Cullen*, 18 F.3d at 103–04). And where a district court has already found that Defendants are engaged in a "campaign" to "delegitimize Exxon as a political actor" and "force officials to disassociate themselves from Exxon," Order 6 (quotations omitted), further fact-finding is warranted.

In the Second Circuit, this very kind of improper "subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry [of bad faith]." *Diamond "D" Const.*, 282 F.3d at 199 (citations omitted). To be sure, a "state proceeding that is legitimate in its purpose, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will *not* warrant the application of the bad faith exception." *Id.* (emphasis added). But when "the facts show that the prosecution is in retaliation for past speech or shows a pattern of prosecution to inhibit speech beyond the acts being prosecuted, the

15

exception should apply and abstention may be improper." *Schlagler v. Phillips*, 166 F.3d 439, 443 (2d Cir. 1999). Thus, the federal plaintiff must show that the Massachusetts CID and/or New York subpoena was initiated with and/or is animated by a retaliatory, harassing, or other illegitimate motive, *Diamond "D" Const.*, 282 F.3d at 199, such as animus, *Cullen*, 18 F.3d at 104.[19]

Because attorneys general enjoy broad authority and latitude in issuing civil investigative demands,[20] the exploration of bad faith in the context presented here involves the heavy burden of overcoming that discretion. Indeed, if federal courts were to routinely entertain fact-finding expeditions into allegations of bad faith, it would undercut the broad and necessary authority of government to pursue legitimate investigations of potential violations of law. Moreover, routine resorts to federal courts undermine *Younger's* essence—"concern for comity toward our co-equal sovereigns." *Diamond "D" Const.*, 282 F.3d at 199–200. "This comity and the deference to states it often requires is the cornerstone of our federal system." *Id.* at 200. As such, only in the most extreme circumstances, with clear *prima facie* evidence of improper motivation in hand, should a federal court entertain further exploration into the potential bad faith actions of attorneys general.

This case, however, meets this extremely high burden and may serve as an exception to the rule. Defendants' actions constitute unlawful viewpoint discrimination. Viewpoint discrimination is demonstrated through government animus toward speech, *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015), a

---

[19] In *Cullen*, the Second Circuit held that the bad faith exception to *Younger* applied and the federal court did *not* need to abstain. 18 F.3d at 104. There, a teacher was disciplined after he distributed leaflets opposing the re-election of certain school board members. Because of the specific, articulated facts of past history of personal conflict between Cullen and the school board, and the strictly *ad hominem* manner in which the school board had disciplined him, the court found the disciplinary proceeding was retaliatory in nature and calculated to chill First Amendment expressive activity. *Id.*

[20] *See*, *e.g.*, TEX. BUS. & COM. CODE §§ 17.47, 17.60 17.61.

16

necessary component for the bad faith exception to *Younger*, *Cullen*, 18 F.3d at 104. Although animus is not necessary to prove viewpoint discrimination, it is sufficient. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015).

Defendants' retaliatory animus toward Plaintiff is readily shown through their public statements about going after "climate deniers" and "skeptics."[21] The purpose of Defendants' campaign, by their own admission, is "to delegitimize Exxon as a political actor," and, "to force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example, by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc." This clear, *prima facie* evidence of bad faith shows that Defendants' motive is not to uncover the truth and pursue justice, but rather fulfill an improper agenda unworthy of a sovereign's chief law enforcement official. And because this evidence shows that the basis for the Defendants' actions is illegitimate—and premised on an unconstitutional animus toward a viewpoint about climate change—further analysis of the bad faith exception to *Younger* is warranted. *Cullen*, 18 F.3d at 104.

Permitting the exploration of the bad faith exception to *Younger* in this unique instance does not otherwise undercut the ability of attorneys general to conduct civil administrative investigations. Indeed, general claims of bad faith unsupported by the overwhelming and specific *prima facie* evidence of unconstitutional purposes presented here will not shield the objects of legitimate government investigations from their purposes and ends. But where the express and recorded goal of the government actors is to politically delegitimize an opposing viewpoint, the proper role of government is awry and room for federal court intervention is permitted. The *Younger* bad faith exception applies precisely because this is the unusual case.

---

[21] *See supra* notes 6 and 7.

Defendants' viewpoint-based investigations laced with animus toward the party being investigated, are unconstitutional and an abuse of authority.

## CONCLUSION

*Amici* aver that the Court should grant Plaintiff's requested relief and deny Defendants' requests for dismissal.

Respectfully submitted this the 19th day of April, 2017,

JEFF LANDRY
Attorney General of Louisiana

ALAN WILSON
Attorney General of South Carolina

STEVE MARSHALL
Attorney General of Alabama

BILL SCHUETTE
Attorney General of Michigan

MARK BRNOVICH
Attorney General of Arizona

BRAD SCHIMEL
Attorney General of Wisconsin

DOUG PETERSON
Attorney General of Nebraska

MIKE HUNTER
Attorney General of Oklahoma

SEAN REYES
Attorney General of Utah

LESLIE RUTLEDGE
Attorney General of Arkansas

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant
Attorney General

AUSTIN R. NIMOCKS**
Associate Deputy Attorney General

*/s/ Andrew D. Leonie*
ANDREW D. LEONIE*
Associate Deputy Attorney General
Texas Bar No. 12216500
andrew.leonie@oag.texas.gov

DAVID J. HACKER**
Senior Counsel

JOEL STONEDALE
Counsel

Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
Tel: 512-936-1414
Fax: 512-936-0545

*Application for admission *pro hac vice*
filed.
**Application for admission *pro hac vice*
forthcoming.

*ATTORNEYS FOR AMICI CURIAE*

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which I understand to have caused service on all counsel of record.

*/s/ Andrew D. Leonie III*
Andrew D. Leonie III