Exhibit 2

# Exhibit T



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

### THE PEOPLE OF THE STATE OF NEW YORK
### SUBPOENA FOR PRODUCTION OF INFORMATION AND DOCUMENTS

TO:    **Exxon Mobil Corporation**
       **c/o Patrick J. Conlon, Esq.**
       **Corporate Headquarters**
       **5959 Las Colinas Boulevard**
       **Irving, Texas 75039-2298**

YOU ARE HEREBY COMMANDED, pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to deliver and turn over to Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on *the 22nd day of May, 2017, at 9:30 a.m.*, or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, all documents and information requested in the attached Schedule in accordance with the instructions and definitions contained therein.

PLEASE TAKE NOTICE that the Attorney General deems the documents and information commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

PLEASE TAKE FURTHER NOTICE that Your disobedience of this Subpoena, by failing to produce documents and information on the date, time and place stated above or on any agreed upon adjourned date or time, may subject You to prosecution for a misdemeanor or penalties and other lawful punishment under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

WITNESS, The Honorable Eric T. Schneiderman, Attorney General of the State of New York, this 8th day of May, 2017.

By:    _____

       John Oleske
       Senior Enforcement Counsel
       Office of the Attorney General
       120 Broadway, 26th Floor
       New York, New York 10271
       (212) 416-8660 (telephone)
       (212) 416-6007 (facsimile)

App. 349

## **SCHEDULE**

### **A. General Definitions and Rules of Construction**

1.    "All" means each and every.

2.    "Any" means any and all.

3.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Subpoena all information or Documents that might otherwise be construed to be outside of its scope.

4.    "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing.

5.    "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

6.    "Custodian" means any Person or Entity that, as of the date of this Subpoena, maintained, possessed, or otherwise kept or controlled such Document.

7.    "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, Blackberry or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, work papers, files, desk files, permanent files, temporary files, notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or Communications or meetings, tape recordings, videotapes, disks, other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, notices, summaries, and written or electronic data, including but not limited to data from the Dataflex and Phoenix databases. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in any difference between two or more otherwise identical Documents. In the case of Documents bearing any notation or other marking made by highlighting ink, the term Document means the original version bearing the highlighting ink, which original must be produced as opposed to any copy thereof.

8.    "Entity" means without limitation any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or other firm or similar body, or any unit, division, agency, department, or similar subdivision thereof.

2

App. 350

9. "Identify" or "Identity," as applied to any Document, means the provision in writing of information sufficiently particular to enable the Attorney General to request the Document's production through subpoena or otherwise, including but not limited to: (a) document control number or Bates number, if applicable, (b) Document type (letter, memorandum, etc.); (c) Document subject matter; (d) Document date; and (e) Document author(s), addressee(s) and recipient(s). In lieu of identifying a Document, the Attorney General will accept production of the Document, together with designation of the Document's Custodian, and identification of each Person You believe to have received a copy of the Document.

10. "Identify" or "Identity," as applied to any Entity, means the provision in writing of such Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof, and any address(es) and any telephone number(s) thereof.

11. "Identify" or "Identity," as applied to any natural person, means and includes the provision in writing of the natural person's name, title(s), any aliases, place(s) of employment, telephone number(s), e-mail address(es), mailing addresses and physical address(es), and (if applicable) employment history at Exxon.

12. "OAG" means the New York State Office of the Attorney General.

13. "Person" means any natural person, or any Entity.

14. "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

15. "Subpoena" means this subpoena and any schedules or attachments thereto.

16. The use of the singular form of any word used herein shall include the plural and vice versa. The use of any tense of any verb includes all other tenses of the verb.

17. The references to Communications, Custodians, Documents, Persons, and Entities in this Subpoena encompass all such relevant ones worldwide.

## B. Instructions

1. Preservation of Relevant Documents and Information; Spoliation. You are reminded of Your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence. No agreement, written or otherwise, purporting to modify, limit or otherwise vary the terms of this Subpoena, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish Your aforementioned preservation obligations. Nor shall You act, in reliance upon any such agreement or otherwise, in any manner inconsistent with Your preservation obligations under law. No agreement purporting to modify, limit or otherwise vary Your preservation obligations under law shall be construed as in any way narrowing,

3

App. 351

qualifying, eliminating or otherwise diminishing such aforementioned preservation obligations, nor shall You act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

2. <u>Possession, Custody, and Control.</u> The Subpoena calls for all responsive Documents or information in Your possession, custody or control. This includes, without limitation, Documents or information possessed or held by any of Your officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries (including but not limited to Imperial Oil Limited) or Persons from whom You could request Documents or information. If Documents or information responsive to a request in this Subpoena are in Your control, but not in Your possession or custody, You shall promptly Identify the Person with possession or custody.

3. <u>Documents No Longer in Your Possession.</u> If any Document requested herein was formerly in Your possession, custody or control but is no longer available, or no longer exists, You shall submit a statement in writing under oath that: (a) describes in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4. <u>No Documents Responsive to Subpoena Requests.</u> If there are no Documents responsive to any particular Subpoena request, You shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

5. <u>Format of Production.</u> You shall produce Documents and information responsive to this Subpoena in the format requested by the OAG. Productions in electronic format shall meet the specifications set out in Attachments 1 and 2.

6. <u>Existing Organization of Documents to be Preserved.</u> Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization. Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Likewise, all Documents that are physically attached to each other in Your files shall remain so attached in any production; or if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

App. 352

7.    Manner of Compliance – Custodians, Search Terms, and Technology-Assisted Review.
      Prior consultation with the OAG is required concerning selection of custodians for
      document searches (whether electronic or otherwise) or for use of search term filters,
      predictive coding or other forms of technology-assisted review. The OAG reserves the
      right to approve, disapprove, modify or supplement any proposed list of custodians,
      search terms, and/or review methodology. The selection or use of custodians, search
      term filters, and/or technology-assisted review in no way relieves You of Your obligation
      to fully respond to these requests for Documents or information.

8.    Document Numbering. All Documents responsive to this Subpoena, regardless of
      whether produced or withheld on ground of privilege or other legal doctrine, and
      regardless of whether production is in electronic or paper format, shall be numbered in
      the lower right corner of each page of such Document, without disrupting or altering the
      form, sequence, organization or other order or layout in which such Documents were
      maintained before production. Such number shall comprise a prefix containing the
      producing Person's name or an abbreviation thereof, followed by a unique, sequential,
      identifying document control number.

9.    Privilege Placeholders. For each Document withheld from production on ground of
      privilege or other legal doctrine, regardless of whether a production is electronic or in
      hard copy, You shall insert one or more placeholder page(s) in the production bearing the
      same document control number(s) borne by the Document withheld, in the sequential
      place(s) originally occupied by the Document before it was removed from the production.

10.   Privilege. If You withhold or redact any Document responsive to this Subpoena on
      ground of privilege or other legal doctrine, You shall submit with the Documents
      produced a statement in writing under oath, stating: (a) the document control number(s)
      of the Document withheld or redacted; (b) the type of Document; (c) the date of the
      Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject
      matter of the Document; and (f) the legal ground for withholding or redacting the
      Document. If the legal ground for withholding or redacting the Document is attorney-
      client privilege, You shall indicate the name of the attorney(s) whose legal advice is
      sought or provided in the Document.

11.   Cover Letter, Index, and Identifying Information. Accompanying any production(s)
      made pursuant to this Subpoena, You shall include a cover letter that shall at a minimum
      provide an index containing the following: (a) a description of the type and content of
      each Document produced therewith; (b) the paragraph number(s) of the Subpoena request
      to which each such Document is responsive; (c) the Identity of the Custodian(s) of each
      such Document; and (d) the document control number(s) of each such Document. As
      further set forth in Attachment 2, information must also be included in the metadata and
      load files of each production concerning the identity of each Document's custodian, as
      well as information identifying the particular Document requests and/or information to
      which each document is responsive.

12.   Affidavit of Compliance. A copy of the Affidavit of Compliance provided herewith shall
      be completed and executed by all natural persons supervising or participating in

                                              5

compliance with this Subpoena, and You shall submit such executed Affidavit(s) of Compliance with Your response to this Subpoena.

13. <u>Identification of Persons Preparing Production.</u> In a schedule attached to the Affidavit of Compliance provided herewith, You shall Identify the natural person(s) who prepared or assembled any productions or responses to this Subpoena. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred. You shall further Identify all other natural person(s) able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

14. <u>Your Production Instructions to be Produced.</u> You shall produce a copy of all written or otherwise recorded instructions prepared by You concerning the steps taken to respond to this Subpoena. For any unrecorded instructions given, You shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

15. <u>Continuing Obligation to Produce.</u> This Subpoena imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after Your response is due shall be promptly produced at the place specified in this Subpoena. Documents created after the date of the Subpoena shall also be promptly produced if requested by OAG.

16. <u>No Oral Modifications.</u> No agreement purporting to modify, limit or otherwise vary this Subpoena shall be valid or binding, and You shall not act in reliance upon any such agreement unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

17. <u>Inflation</u>. For All of Your responses to the below Requests for Information that include dollar amounts, provide those amounts in both nominal and real (inflation-adjusted) terms, if applicable.

18. <u>Time Period.</u> Unless otherwise specified, the time period for information, Documents and Communications requested by this Subpoena is from January 1, 2005 through the date of the production.

### C. Particular Definitions

1. "You," "Your," or "Exxon" means Exxon Mobil Corporation, ExxonMobil Oil Corporation, and Any present or former parents, subsidiaries (including but not limited to Imperial Oil Limited), affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or Any affiliates of the foregoing.

2. "Actual GHG Cost" means Any cost, price, fee, or tax on GHG emissions imposed by

App. 354

Any governmental or regulatory body.

3.  "Greenhouse Gases" or "GHGs" means carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride.

4.  "Intensity," as applied to emissions, means any rate, percentage, amount, or formula, whether expressed in mathematical or narrative terms, used to determine the quantity of GHG emissions, actual or projected, to which a Proxy Cost or Actual GHG Cost is applied.

5.  "Project" means Any oil, gas, or other hydrocarbon project, and its associated reserves or resource base, in which Exxon has Any working interest.

6.  "Proxy Cost" means Any implied, imputed, shadow, or proxy cost, price, fee or tax on GHG emissions, including any such cost, price, fee, or tax applied as a proxy for potential policies that might be adopted by Any government or regulatory body over time to help stem GHG emissions.

7.  "PwC" means PricewaterhouseCoopers LLP and Any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or Any affiliates of the foregoing.

8.  "Scope 1," as applied to emissions, means GHG emissions from sources that are owned or controlled by You. Scope 1 emissions include, but are not limited to, emissions caused by the production of electricity, steam, or heat; manufacture or processing of chemicals; or transportation of people, products, or waste; and include fugitive emissions.

9.  Scope 2," as applied to emissions, means GHG emissions associated with the generation of electricity, steam, or heat imported or purchased by You.

10. "Scope 3," as applied to emissions, means GHG emissions caused by Your activities that do not fall under Scope 1 or Scope 2. Scope 3 emissions include, but are not limited to, the use or disposal of products or services generated by You.

11. "Sensitivity Analysis" means Any analysis undertaken to determine the sensitivity of an economic model to variation in certain of its parameters or assumptions.

12. "Trigger" means an event or change in circumstances which indicates that the carrying value of an asset or asset group may not be recoverable.

App. 355

## D. Requests for Information

1. Provide a list that identifies each instance in which Exxon made a decision to approve, defer, or decline the investment, development, funding, expansion, or divestment in or of a Project, with such list separated into two columns:

    (a) Instances where Exxon applied a Proxy Cost to data, projections, forecasts, or models of the cash flow, profit or loss, revenue, capital expenditure, or operating expenditure relating to the relevant Project; and

    (b) Instances where Exxon did not apply a Proxy Cost in such a manner.

    For each such instance, Identify: (i) the name of the Project; (ii) the date of the decision; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s) responsible for making the decision; and (v) the individual(s) responsible for approving the decision.

2. For each instance listed in your response to Request for Information No. 1(a) above, provide the following information (in Excel table format):

    a. The Proxy Cost figure applied by Exxon for each projected year, and the basis, if Any, for that figure;

    b. The Intensity of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, and the basis, if Any, for that figure;

    c. The scope(s) of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, including but not limited to (i) which Greenhouse Gases the Proxy Cost was applied to, and (ii) whether the Proxy Cost was applied to Scope 1, Scope 2, and/or Scope 3 emissions; and the basis, if Any, for the scope(s) selected;

    d. The policies, procedures, or controls, if Any, governing the application of a Proxy Cost to each such investment, development, funding, expansion, or divestment decision;

    e. The percentage and total effect of applying a Proxy Cost to the economics of each such investment, development, funding, expansion, or divestment decision, including but not limited to the impact on cash flow, cash flow rate, profit or loss, revenue, capital expenditure, operating expenditure, and demand for oil, gas, or other hydrocarbons;

    f. Exxon's assumptions as to the percentage and amount of the Proxy Cost, if Any, that Exxon will be able to pass on to purchasers in each projected year, and the basis, if Any, for those assumptions;

8

      g. Exxon's assumptions as to the effects on demand for oil, gas, or other hydrocarbons caused by Any such pass-through to purchasers for each projected year, and the basis, if Any, for those assumptions; and

      h. With respect to Any Proxy Cost Sensitivity Analysis, the same information requested in (a)-(g) above.

      i. Identify Any Actual GHG Cost applicable to the Project at the time of such investment, development, funding, expansion, or divestment decision. To the extent that Any Actual GHG Cost was applicable to the relevant Project, identify the same information requested in (a)-(h) above with respect to such Actual GHG Cost.

3. Provide a list that identifies each instance in which Exxon made a decision as to whether an impairment or write-down as to Any Project should be taken, with such list separated into two columns:

    (a) Instances where Exxon applied a Proxy Cost to data, projections, forecasts, or models of the cash flow, profit or loss, revenue, capital expenditure, or operating expenditure relating to the relevant Project; and

    (b) Instances where Exxon did not apply a Proxy Cost in such a manner.

For each such instance, Identify: (i) the name of the Project; (ii) the date of the decision; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s) responsible for making the decision; and (v) the individual(s) responsible for approving the decision.

4. Provide a list that identifies each instance in which Exxon made a decision as to whether a Trigger for impairment testing or analysis existed as to Any Project, with such list separated into two columns:

    (a) Instances where Exxon applied a Proxy Cost to data, projections, forecasts, or models of the cash flow, profit or loss, revenue, capital expenditure, or operating expenditure relating to the relevant Project; and

    (b) Instances where Exxon did not apply a Proxy Cost in such a manner.

For each such instance, Identify: (i) the name of the Project; (ii) the date of the decision; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s) responsible for making the decision; and (v) the individual(s) responsible for approving the decision.

5. For each instance listed in your responses to Requests for Information Nos. 3(a) or 4(a), above, provide the following information (in Excel table format):

    a. The Proxy Cost figure applied by Exxon for each projected year, and the basis, if Any, for that figure;

9

    b. The Intensity of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, and the basis, if Any, for that figure;

    c. The scope(s) of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, including but not limited to (i) which Greenhouse Gases the Proxy Cost was applied to, and (ii) whether the Proxy Cost was applied to Scope 1, Scope 2, and/or Scope 3 emissions; and the basis, if Any, for the scope(s) selected;

    d. The policies, procedures, or controls, if Any, governing the application of a Proxy Cost to each such impairment or impairment Trigger-related decision;

    e. The percentage and total effect of applying a Proxy Cost to the economics of each such impairment or impairment Trigger-related decision, including but not limited to the impact on cash flow, cash flow rate, profit or loss, revenue, capital expenditure, operating expenditure, and demand for oil, gas, or other hydrocarbons;

    f. Exxon's assumptions as to the percentage and amount of the Proxy Cost, if Any, that Exxon will be able to pass onto purchasers in each projected year, and the basis, if Any, for those assumptions;

    g. Exxon's assumptions as to the effects on demand for oil, gas, or other hydrocarbons caused by Any such pass-through to purchasers for each projected year, and the basis, if Any, for those assumptions; and

    h. With respect to Any Proxy Cost Sensitivity Analysis, the same information requested in (a)-(g) above.

    i. Identify Any differences between Exxon and PwC with respect to (a)-(h) above, and explain Any such differences in detail.

    j. Identify Any Actual GHG Cost applicable to the Project at the time of such impairment or impairment Trigger-related decision. To the extent that Any Actual GHG Cost was applicable to the relevant Project, identify the same information requested in (a)-(i) above with respect to such Actual GHG Cost.

6.    Provide a list that identifies each instance in which Exxon internally estimated its oil, gas, or other hydrocarbon reserves or resource base associated with Any Project (as distinct from the proved reserves calculations mandated by the U.S. Securities and Exchange Commission), with such list separated into two columns:

    (a)    Instances where Exxon applied a Proxy Cost in connection with such estimates;

    (b)    Instances where Exxon did not apply a Proxy Cost in such a manner.

For each such instance, Identify: (i) the name of the Project; (ii) the date of the estimate; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s)

App. 358

responsible for making the estimate; and (v) the individual(s) responsible for approving the estimate.

7.  For each instance listed in your response to Request for Information No. 6(a), provide the following information (in Excel table format):

    a.  The Proxy Cost figure applied by Exxon for each projected year, and the basis, if Any, for that figure;

    b.  The Intensity of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, and the basis, if Any, for that figure;

    c.  The scope(s) of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, including but not limited to (i) which Greenhouse Gases the Proxy Cost was applied to, and (ii) whether the Proxy Cost was applied to Scope 1, Scope 2, and/or Scope 3 emissions; and the basis, if Any, for the scope(s) selected;

    d.  The policies, procedures, or controls, if Any, governing the application of a Proxy Cost to such reserves or resource base estimation;

    e.  The percentage and total effect of applying a Proxy Cost to Exxon's such reserves or resource base estimation, including but not limited to the impact on cash flow, cash flow rate, profit or loss, revenue, capital expenditure, operating expenditure, and demand for oil, gas, or other hydrocarbons;

    f.  Exxon's assumptions as to the percentage and amount of the Proxy Cost, if Any, that Exxon will be able to pass on to purchasers in each projected year, and the basis, if Any, for those assumptions;

    g.  Exxon's assumptions as to the effects on demand for oil, gas, or other hydrocarbons caused by Any such pass-through to purchasers for each projected year, and the basis, if Any, for those assumptions; and

    h.  With respect to Any Proxy Cost Sensitivity Analysis, the same information requested in (a)-(g) above.

    i.  Identify Any Actual GHG Cost applicable to the Project at the time of such reserves or resource base estimation. To the extent that Any Actual GHG Cost was applicable to the relevant Project, identify the same information requested in (a)-(h) above with respect to such Actual GHG Cost.

8.  Identify the individual(s) at Exxon with personal knowledge of the information contained in Your responses to each of the Requests for Information above.

9.  Identify the individuals at Exxon, including Any of its subsidiaries (including but not limited to Imperial Oil Limited), who served as members of the Upstream Reserves Committee, the EMPC Reserves Committee, the EMDC Reserves Committee and the

11

App. 359

IOL Reserves Management Committee (RMC) throughout the Time Period of this Subpoena, and specify which of these committee(s) each of these individuals served on and during what time period they so served.

App. 360

## E. Requests for Documents

1. Produce, or identify by Bates number to the extent already produced, All Documents supporting Your responses to the Requests for Information above, including but not limited to Any such Documents reflecting the actual implementation of a Proxy Cost in spreadsheets or other formats containing calculations or formulas.

2. All Documents and Communications responsive to Request for Documents Nos. 3, 4, or 5 of OAG's November 4, 2015 subpoena to Exxon, covering the period from November 4, 2015 through the date of production under this Subpoena, including, but not limited to, Documents and Communications relating to:

   (a) *2016 Outlook for Energy: A View to 2040*, dated January 25, 2016;
   (b) 2015 Form 10-K, dated February 24, 2016;
   (c) Notice of 2016 Annual Meeting and Proxy Statement, dated April 13, 2016;
   (d) Annual Shareholders Meeting on May 25, 2016;
   (e) *2017 Outlook for Energy: A View to 2040*, dated December 16, 2016;
   (f) 2016 Form 10-K, dated February 22, 2017;
   (g) Notice of 2017 Annual Meeting and Proxy Statement, dated April 13, 2017; and/or;
   (h) *2016 Energy and Carbon Summary*, dated April 13, 2017.

3. All Documents and Communications of each individual listed in response to Request for Information No. 9 that are responsive to Request for Documents Nos. 3, 4, or 5 of OAG's November 4, 2015 subpoena to Exxon, or that are responsive to Request for Documents No. 2 above.

4. All Documents and Communications Concerning the assessment of Exxon's long-lived assets for impairment or write-down, including but not limited to (a) Documents and Communications Concerning the identification or evaluation of Any actual or potential Triggers for impairment testing or analysis, (b) Documents and Communications associated with Exxon's internal audit function, and (c) All policies, procedures, or controls Concerning the assessment of Exxon's long-lived assets for impairment or write-down.

5. All Documents and Communications provided to the U.S. Securities and Exchange Commission pursuant to its investigation of Exxon's practices relating to climate change, reserve calculations, and impairment.

6. All Documents and Communications consisting of or Concerning Exxon's Communications with Any banks, underwriters, research analysts, or other financial firms or institutions Concerning Any of the topics described in this Subpoena or Request for Documents Nos. 3, 4, or 5 of OAG's November 4, 2015 subpoena to Exxon.

App. 361

**ATTACHMENT 1**
**Electronic Document Production Specifications**

Unless otherwise specified and agreed to by the Office of the Attorney General, all responsive documents must be produced in LexisNexis® Concordance® format in accordance with the following instructions. Any questions regarding electronic document production should be directed to the Assistant Attorney General whose telephone number appears on the subpoena.

1.  Concordance Production Components. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 7.

    A.  *Metadata Load File.* A delimited text file that lists in columnar format the required metadata for each produced document.

    B.  *Extracted or OCR Text Files.* Document-level extracted text for each produced document or document-level optical character recognition ("OCR") text where extracted text is not available.

    C.  *Single-Page Image Files.* Individual petrified page images of the produced documents in tagged image format ("TIF"), with page-level Bates number endorsements.

    D.  *Opticon Load File.* A delimited text file that lists the single-page TIF files for each produced document and defines (i) the relative location of the TIF files on the production media and (ii) each document break.

    E.  *Native Files.* Native format versions of produced documents that are not redacted, named by their first Bates number.

2.  Production Folder Structure. The production must be organized according to the following standard folder structure:

    *   data\ (contains production load files)

    *   images\ (contains single-page TIF files, with subfolder organization)

        \0001, \0002, \0003…

    *   native_files\ (contains native files, with subfolder organization)

        \0001, \0002, \0003…

    *   text\ (contains text files, with subfolder organization)

        \0001, \0002, \0003…

3.  De-Duplication. You must perform global de-duplication of stand-alone documents and

14

App. 362

email families against any prior productions pursuant to this or previously related subpoenas.

4.   Paper or Scanned Documents. Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd. The resulting electronic files should be pursued in Concordance format pursuant to these instructions. You must contact the Assistant Attorney General whose telephone number appears on the subpoena to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

5.   Structured Data. Structured data includes but is not limited to relational databases, transactional data, and xml pages. Spreadsheets are not considered structured data. You must first speak to the Assistant Attorney General whose telephone number appears on the subpoena. Spreadsheets are not considered structured data.

6.   Media and Encryption. All document sets over 2 GB must be produced on CD, DVD, or hard-drive media. All production media must be encrypted with a strong password, which must be delivered independently from the production media. Document sets under 2 GB may be delivered electronically. The OAG offers a secure cloud storage option that can be set up to receive media on a one-time basis, or the OAG will download media from the providing party's server.

7.   Production File Requirements.

  A.   *Metadata Load File*

    •   Required file format:

      o   ASCII or UTF-8

      o   Windows formatted CR + LF end of line characters, including full CR + LF on last record in file.

      o   .dat file extension

      o   Field delimiter: (ASCII decimal character 20)

      o   Text Qualifier: þ (ASCII decimal character 254). Date and pure numeric value fields do not require qualifiers.

      o   Multiple value field delimiter: ; (ASCII decimal character 59)

    •   The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 2.

    •   Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.

- *Note:* All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document. For document families, including but not limited to emails and attachments, compound documents, and uncompressed file containers, the metadata load file must also list the Bates range of the entire document family (ATTACHRANGE), beginning with the first Bates number (BEGDOC) of the "parent" document and ending with the last Bates number (ENDDOC) assigned to the last "child" in the document family.

- Date and Time metadata must be provided in separate columns.

- Accepted date formats:

  o mm/dd/yyyy

  o yyyy/mm/dd

  o yyyymmdd

- Accepted time formats:

  o hh:mm:ss (if not in 24-hour format, you must indicate am/pm)

  o hh:mm:ss:mmm

- Accepted FROM, TO, CC, and BCC formats:

  o Fully qualified domain name RF 821 (name@domain.com)

  o Fully qualified domain name RF 822 (Alias <name@domain.com>)

  o Qualified LDAP address (/O=ORG/OU=ORG UNIT/CN=RECIPIENTS/CN=NAME)

B.  ***Extracted or OCR Text Files***

- You must produce individual document-level text files containing the full extracted text for each produced document.

- When extracted text is not available (for instance, for image-only documents) you must provide individual document-level text files containing the document's full OCR text.

- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.

16

App. 364

- Text files must be divided into subfolders containing no more than 500 to 1000 files.

C. **Single-Page Image Files (Petrified Page Images)**

- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files. See Section 7.E below for instructions on producing native versions of documents you are unable to convert.

- Image documents that exist only in non-TIF formats must be converted into TIF files. The original image format must be produced as a native file as described in Section 7.E below.

- For documents produced only in native format, you may provide a single, TIF placeholder that states "Document produced only in native format."

- Each single-page TIF file must be endorsed with a unique Bates number.

- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).

- Required image file format:

   o CCITT Group 4 compression

   o 2-Bit black and white

   o 300 dpi

   o Either .tif or .tiff file extension.

- TIF files must be divided into subfolders containing no more than 500 to 1000 files. Where possible documents should not span multiple subfolders.

D. **Opticon Load File**

- Required file format:

   o ASCII

   o Windows formatted CR + LF end of line characters

   o Field delimiter: , (ASCII decimal character 44)

   o No Text Qualifier

   o .opt file extension

17

App. 365

- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):

  o ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.

  o VOLUME – this value is optional and may be left blank.

  o RELATIVE PATH – the file path to each single-page image file on the production media.

  o DOCUMENT BREAK – defines the first page of a document. The only possible values for this field are "Y" or blank.

  o FOLDER BREAK – defines the first page of a folder. The only possible values for this field are "Y" or blank.

  o BOX BREAK – defines the first page of a box. The only possible values for this field are "Y" or blank.

  o PAGE COUNT – this value is optional and may be left blank.

- *Example*:

  ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2

  ABC00002,,IMAGES\0001\ABC00002.tif,,,,

  ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1

  ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E.    *Native Files*

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.

- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and retain the original file extension.

- For documents produced only in native format, and not additionally as single-page image files, you must assign a single document-level Bates number and optionally provide an image file placeholder that states "Document produced only in native format."

- The relative paths to all native files on the production media must be listed in

18

the NATIVEFILE field of the metadata load file.

- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form. In cases where this cannot be achieved the document's password must be listed in the metadata load file. The password should be placed in the COMMENTS field with the format Password: <PASSWORD>.

- You may be required to supply a software license for proprietary documents produced only in native format.

19

App. 367

| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;... |
|---|---|---|
| NUMATTACH | Number of attachments. | |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC; IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\...\...\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel, Corel WordPerfect... |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date and time that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMECREATED | Time that a document was created. | hh:mm:ss AM/PM or hh:mm:ss |
| DATEMOD | Date and time that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMEMOD | Time that a document was last modified. | hh:mm:ss AM/PM or hh:mm:ss |
| FILESIZE | Original file size in bytes. | |
| PGCOUNT | Number of pages per document. | |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |

App. 368

## AFFIDAVIT OF COMPLIANCE WITH SUBPOENA

State of _____ }

County of _____ }

I, _____, being duly sworn, state as follows:

1. I am employed by Respondent in the position of _____;

2. Respondent's productions and responses to the Subpoena of the Attorney General of the State of New York, dated _____, 20____ (the "Subpoena") were prepared and assembled under my personal supervision;

3. I made or caused to be made a diligent, complete and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena;

4. Respondent's productions and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5. No Documents or information responsive to the Subpoena have been withheld from Respondent's production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6. All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the instructions in the Subpoena;

7. The Documents contained in Respondent's productions and responses to the Subpoena are authentic, genuine and what they purport to be;

24

App. 369

8. Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

9. Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

_____        _____

          Signature of Affiant                              Date

_____

          Printed Name of Affiant

                    *        *        *

Subscribed and sworn to before me this _____ day of _____, 20____.

_____, Notary Public

My commission expires: _____

25

App. 370