# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EXXON MOBIL CORPORATION,

               Plaintiff,

     v.

ERIC TRADD SCHNEIDERMAN, Attorney
General of New York, in his official capacity, and
MAURA TRACY HEALEY, Attorney General of
Massachusetts, in her official capacity,

               Defendants.

No. 17-CV-2301 (VEC) (SN)

---

## EXXONMOBIL'S SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Exxon Mobil Corporation ("ExxonMobil") brings this action seeking declaratory and injunctive relief against Eric Tradd Schneiderman, the Attorney General of New York and Maura Tracy Healey, the Attorney General of Massachusetts. Attorneys General Schneiderman and Healey have joined together with each other, as well as others known and unknown, in an unlawful agreement to impose their viewpoint on climate change by abusing their law enforcement authority under state law. To coerce ExxonMobil into embracing their viewpoint on a matter of public concern, the Attorneys General launched pretextual investigations of ExxonMobil in clear violation of the First Amendment. Attorney General Schneiderman issued multiple subpoenas to ExxonMobil, and Attorney General Healey issued a civil investigative demand ("CID") to ExxonMobil that went so far as to name the groups promoting a viewpoint the Attorneys General oppose. ExxonMobil seeks an injunction barring these unconstitutional investigations and a declaration that they violate ExxonMobil's rights.

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

PARTIES ..............................................................................................................6

JURISDICTION AND VENUE ............................................................................6

FACTS ..................................................................................................................7

    A.    Attorney General Schneiderman Opens His Investigation of ExxonMobil with a Press Leak Followed by a Television Interview. ..................................................................................7

    B.    The Attorneys General Pledge to Use Law Enforcement Tools to Impose Their Viewpoint on Climate Policy. ...........................10

    C.    In Closed-Door Meetings, Private Interests Urge Abusing State Power. .....................................................................................15

    D.    The Attorneys General Attempt to Conceal Their Misuse of Power from the Public. .......................................................................25

    E.    Other State Attorneys General Condemn the Investigations as Unlawful. ....................................................................................29

    F.    The Subpoena and the CID Reflect the Improper Political Objectives of the Green 20 Coalition. ....................................32

    G.    Attorney General Schneiderman Shifts Investigative Theories in a Search for Leverage over ExxonMobil in a Public Policy Debate. .........39

    H.    An Investigation of ExxonMobil's Reporting of Oil and Gas Reserves and Assets Is a Thinly Veiled Pretext. ...................40

    I.    ExxonMobil Files Suit to Protect Its Rights. .........................42

EXXONMOBIL HAS BEEN INJURED BY THE INVESTIGATIONS .....................49

CAUSES OF ACTION ........................................................................................53

    A.    First Cause of Action: Conspiracy.........................................53

    B.    Second Cause of Action: Violation of ExxonMobil's First and Fourteenth Amendment Rights..............................................54

    C.    Third Cause of Action: Violation of ExxonMobil's Fourth and Fourteenth Amendment Rights..............................................55

    D.    Fourth Cause of Action: Violation of ExxonMobil's Fourteenth Amendment Rights ...............................................................55

    E.    Fifth Cause of Action: Violation of ExxonMobil's Rights Under the Dormant Commerce Clause..............................................56

    F.    Sixth Cause of Action: Federal Preemption ..........................57

    G.    Seventh Cause of Action: Abuse of Process...........................58

PRAYER FOR RELIEF .......................................................................................58

## INTRODUCTION

1.      Frustrated by the federal government's apparent inaction on climate change, Attorneys General Schneiderman and Healey (the "Attorneys General") entered into a conspiracy with each other, as well as a coalition of special interests (including investors in alternative energy companies) and other state attorneys general, to abuse law enforcement powers as a means of imposing their viewpoint on climate change. Acting independently and as members of the conspiracy, the Attorneys General have targeted ExxonMobil with pretextual investigations intended to cleanse the public square of alternative viewpoints on a matter of public policy.

2.      The conspiracy first surfaced publicly when Attorney General Schneiderman hosted a press conference in New York City on March 29, 2016,[1] with former Vice President and renewable energy investor Al Gore as a featured speaker.[2] Attorney General Schneiderman declared there was "no dispute" about climate policy, only "confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up."[3] Attorney General Healey pledged that those who purportedly "deceived" the public—by disagreeing with her about climate policy—"should be, must be, held accountable."[4] Claude Walker, the Attorney General of the Virgin Islands, concluded, "We have to look at renewable energy. That's the only solution."[5] All three

---

[1]    *See* Paragraphs 24 to 37 below.

[2]    A transcript of the AGs United for Clean Power Press Conference, held on March 29, 2016, was prepared by counsel based on a video recording of the event, which is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across. A copy of this transcript is attached as Exhibit B and is incorporated by reference.

[3]    Ex. B at App. 10.

[4]    Ex. B at App. 20.

[5]    Ex. B at App. 24.

attorneys general issued burdensome subpoenas or investigatory document demands to ExxonMobil in late 2015 or early 2016 as part of investigations purportedly justified by the thinnest of pretexts.

3.     That press conference and the related investigations were the result of years of planning and lobbying by special interests.[6]  For nearly a decade, climate change activists and certain plaintiffs' attorneys have sought to obtain the confidential records of energy companies as a means of pressuring those companies to change their policy positions.  A 2012 workshop examined ways to obtain the internal documents of companies like ExxonMobil for the purpose of "maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming."[7]  The attendees at that workshop concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[8]

4.     In the years that followed, participants in the 2012 workshop lobbied state attorneys general to launch investigations of energy companies to further political objectives having nothing to do with law enforcement.  In January 2016, those special interests met at the offices of the Rockefeller Family Fund in New York to discuss the "[g]oals of an Exxon campaign," which included to "delegitimize [it] as a political actor" and to "force officials to disassociate themselves from Exxon."[9]  The attendees also brainstormed how to use "AGs" to "get[] discovery" and "creat[e] scandal."[10]

---

[6]    *See* Paragraphs 38 to 61 below.
[7]    Ex. C at App. 56.
[8]    *Id.* at 40.
[9]    Ex. D at App. 67.
[10]   Ex. S1 at App. 480.

5.      Those special interests were also lurking in the background at the Attorneys General's press conference.  Before the state attorneys general took the stage, members of their respective staffs attended presentations on the "imperative of taking action now on climate change" and "climate change litigation" that were delivered by the architects of the 2012 workshop to abuse state law enforcement power to shape public discourse on climate change.[11]

6.      The Attorneys General recognized that the behind-the-scenes involvement of these individuals could expose the special interests promoting their investigations and the bias underlying their deployment of law enforcement resources for partisan ends. When one of the 2012 workshop attendees asked Attorney General Schneiderman's office what he should tell a reporter if asked about his involvement in the press conference, Lemuel Srolovic, Chief of the Environmental Protection Bureau, asked that he not confirm his attendance.[12]

7.      These so-called investigations amount to nothing more than unlawful viewpoint discrimination.  That is why the Attorneys General have lurched from one pretextual justification to another as they struggled to justify their actions.[13]  When Attorney General Schneiderman launched his investigation, he claimed to be investigating ExxonMobil's scientific research in the 1970s and 1980s.[14]  Later, during one of Attorney General Schneiderman's unprecedented press briefings on his "investigation" of ExxonMobil, he conceded that he had abandoned his original inquiry into ExxonMobil's historical scientific research and was instead pursuing a new theory of

---

[11]    Ex. E at App. 70.
[12]    Ex. F at App. 80.
[13]    *See* Paragraphs 92 to 94 below.
[14]    Ex. K at 115; Ex. L at 123.

investor fraud based on proved reserves that he incorrectly believed were at risk of being "stranded."[15]  As it enters its third year, the investigation now purports to focus on asset impairment.[16]  These shifts further demonstrate that Attorney General Schneiderman is simply searching for a legal theory—any legal theory—to continue his efforts to pressure ExxonMobil and intimidate one side of a public policy debate.[17]

8.      The Attorneys General must devise creative legal arguments because during the relevant limitations periods (which do not exceed six years), ExxonMobil has widely and publicly confirmed[18] that it "recognize[s] that the risk of climate change and its potential impacts on society and ecosystems may prove to be significant."[19] ExxonMobil has also publicly supported the Paris accords and advocated for a tax on carbon emissions since 2009.[20]  Moreover, in conducting its business, ExxonMobil addresses the potential for future climate policy by estimating a proxy cost of carbon, which seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels.[21]  This cost, which in some regions may approach $80 per ton by 2040, has been included in ExxonMobil's Outlook for Energy for several years.[22]  Further, ExxonMobil requires all of its business lines to include, where appropriate, an estimate of greenhouse gas-related

---

[15]    Ex.MM at 351.
[16]    Ex. S2 at App. 482.
[17]    *See* Paragraphs 92 to 94 below.
[18]    *See* Paragraph 120 below.
[19]    Ex. G  at App. 93; *see also* Ex. H at App. 103 ("Because the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant, strategies that address the risk need to be developed and implemented.").
[20]    Ex. T at App. 182.
[21]    Ex. T at App. 190.
[22]    *Id.*

emissions costs in their economics when seeking funding for capital investments.[23]   The Attorneys General's proffered theories of fraud rest uneasily with these disclosures.

9.   At bottom, the Attorneys General's investigations have nothing to do with legitimate law enforcement goals and everything to do with an unconstitutional effort to curtail free speech rights based on viewpoint bias.   Regulating debate over public policy, even when styled as clearing up "confusion" and "deception," is not a legitimate law enforcement function.   That is why fifteen other state attorneys general openly criticized Attorneys General Schneiderman, Healey, and Walker for misusing their law enforcement power to pursue a politicized investigation designed to suppress the free exercise of First Amendment rights.[24]

10.   Defending its rights against this improper exercise of state power, ExxonMobil filed a civil rights action against Attorney General Walker in Texas state court and the instant action against the Attorneys General in federal court.   Attorney General Walker withdrew his subpoena shortly after ExxonMobil's challenge was removed to federal court.   The strength of ExxonMobil's prima facie showing against the Attorneys General in the instant action was so powerful that Judge Ed Kinkeade expressed concern that their investigations were means "to further their personal agendas by using the vast power of the government to silence the voices of all those who disagree with them."[25]

11.   Through their official misconduct, the Attorneys General have deprived, and will continue to deprive, ExxonMobil of its rights under the United States

---

[23]   *Id.*

[24]   ECF No. 63; ECF No. 192-3; Ex. Y at App. 227; Ex. QQ at App. 435; Ex. RR at App. 438; Ex. SS at App. 441.

[25]   Order Transferring Case to the Southern District of New York, *Exxon Mobil Corp.* v. *Healey*, No. 4:16-CV-00469 (N.D. Tex. March 29, 2017) (ECF No. 180).

Constitution, the Texas Constitution, and the common law.  ExxonMobil therefore seeks a declaration that the Attorneys General's investigations violate its rights under Articles One and Six of the United States Constitution; the First, Fourth, and Fourteenth Amendments to the United States Constitution; Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution; and that the issuance of the subpoena and CID constitutes an abuse of process under the common law.  ExxonMobil also seeks an injunction barring further continuation of the investigations.  Absent an injunction, ExxonMobil will suffer imminent and irreparable harm for which there is no adequate remedy at law.

## PARTIES

12.     ExxonMobil is a public, shareholder-owned energy company incorporated in New Jersey with principal offices in the State of Texas.  ExxonMobil is headquartered and maintains all of its central operations in Texas.

13.     Defendant Eric Tradd Schneiderman is the Attorney General of New York.  He is sued in his official capacity.

14.     Defendant Maura Tracy Healey is the Attorney General of Massachusetts.  She is sued in her official capacity.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to Sections 1331 and 1367 of Title 28 of the United States Code.  Plaintiff alleges violations of its constitutional rights in violation of Sections 1983 and 1985 of Title 42 of the United States Code.  Because those claims arise under the laws of the United States, this Court has original jurisdiction over them.  28 U.S.C. § 1331.  Plaintiff also alleges related state law claims that derive from the same nucleus of operative facts.  Each of Plaintiff's state

law claims—like its federal claims—is premised on statements by Attorneys General Schneiderman and Healey at the press conference and during the course of their investigations, their issuance of subpoenas and a CID, the demands made therein, and other documentary evidence of their intention to pressure ExxonMobil to change its perceived position on climate policy.  This Court therefore has supplemental jurisdiction over those claims.  28 U.S.C. § 1367(a).

16.    Venue is proper within this District pursuant to Section 1391(b) of Title 28 of the United States Code because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.[26]  The March 29, 2016 press conference in which the Attorneys General described their intent to use law enforcement powers to alter public perception about climate policy was held in this District.

## FACTS

### A.    Attorney General Schneiderman Opens His Investigation of ExxonMobil with a Press Leak Followed by a Television Interview.

17.    In November 2015, ExxonMobil received Attorney General Schneiderman's subpoena at its corporate headquarters in Irving, Texas.[27]  Within hours, the press reported the subpoena's issuance and its contents.  According to an article in *The New York Times*, the subpoena "demand[ed] extensive financial records, emails and other documents," and the "focus" of the investigation was on "the company's own long running scientific research" on climate change.[28]  The article identified as sources "people with knowledge of the investigation," all of whom "spoke on the condition of

---

[26]   This conclusion was reached by Northern District of Texas Judge Ed Kinkeade when he transferred this action to the Southern District of New York.  (ECF. No. 180.)

[27]   Ex. I at App. 108. Shortly after Attorney General Schneiderman issued his first subpoena, his office confirmed, in writing, that "by producing documents in accordance with our discussions prior to the return date as extended, Exxon is not waiving any right to seek to quash or otherwise object to the subpoena." Ex. S55 at App. 1138.

[28]   Ex. A at App. 2.

anonymity saying they were not authorized to speak publicly about investigations."[29]  To state the obvious, ExxonMobil did not alert *The New York Times* or any other media to the subpoena's existence or its contents.

18.    This press leak was unsettling.  It is customary for law enforcement officials to maintain confidentiality of their investigations, both to protect the integrity of the investigative process and to avoid unfair prejudice to those under investigation. Indeed, Attorney General Schneiderman himself has recognized it is inappropriate to "comment on ongoing investigations."[30]    But Attorney General Schneiderman's investigation of ExxonMobil has been conducted with a marked disregard for traditional concerns about confidentiality or unfair prejudice.  Before ExxonMobil had even accepted service of the subpoena, it had received multiple media inquiries about the subpoena and could read about the investigation in online news accounts.[31]

19.    Within a week of issuing the subpoena, Attorney General Schneiderman appeared on a *PBS NewsHour* segment, entitled "Has Exxon Mobil misle[d] the public about its climate change research?"[32]    During that appearance, Attorney General Schneiderman described the focus of his investigation on ExxonMobil's purported decision to "shift[] [its] point of view" and "change[] tactics" on climate change after "being at the leadership of doing good scientific work" on the issue "[i]n the 1980s."[33] Attorney General Schneiderman said his probe extended to ExxonMobil's "funding [of] organizations."[34]  While he did not refer to them expressly as his political adversaries, he

---

[29]    *Id.* at App. 2–3.
[30]    Ex. S62 at App. 1316.
[31]    *See, e.g.,* Ex. A at App. 2–7; Ex. J at App. 110–112.
[32]    Ex. K at App. 114.
[33]    *Id.* at App. 115.
[34]    *Id.* at App. 116.

derided them as "climate change deniers" and "climate denial organizations."[35]   Those organizations included the "American Enterprise Institute, . . . the American Legislative Exchange Council, . . . [and the] American Petroleum Institute."[36]

20.     Renewable energy was another focus of the interview.  Attorney General Schneiderman said he was "concerned about" ExxonMobil's purported "overestimating the costs of switching to renewable energy," but he did not explain how any supposed error in that estimate could conceivably constitute a fraud or mislead any consumer.[37]

21.     Attorney General Schneiderman did not discuss ExxonMobil's oil and gas reserves or its assets at all during this interview.

22.     Later that month at an event sponsored by *Politico* in New York, Attorney General Schneiderman said that ExxonMobil appeared to be "doing very good work in the 1980s on climate research" but its "corporate strategy seemed to shift" later.[38] Attorney General Schneiderman claimed that the company had funded organizations that he labeled "aggressive climate deniers," again specifically naming his perceived political opponents at the American Enterprise Institute, the American Legislative Exchange Council, and the American Petroleum Institute.[39]   Attorney General Schneiderman admitted that his "investigation" of ExxonMobil was merely "one aspect" of his office's efforts to "take action on climate change," commenting that society's failure to address climate change would be "viewed poorly by history."[40]

---

[35] *Id.* at App. 116, 118.
[36] *Id.* at App. 116.
[37] *Id.*. at App. 117.
[38] Ex. L at App. 123.
[39] *Id.*
[40] *Id.* at App. 124.

23.     After this initial flurry of statements to the press, relative quiet followed, and ExxonMobil attempted in good faith to produce records demanded by the subpoena. It provided Attorney General Schneiderman with documents related to its historical research on global warming and climate change.

**B.     The Attorneys General Pledge to Use Law Enforcement Tools to Impose Their Viewpoint on Climate Policy.**

24.     The playing field changed on March 29, 2016, when Attorney General Schneiderman hosted a press conference in New York City.  Calling themselves the "AGs United For Clean Power" and the "Green 20," Attorneys General Schneiderman and Healey were joined by other state attorneys general and Al Gore to announce their plan to take "progressive action to address climate change" by investigating ExxonMobil.[41]  Attorneys general or staff members from over a dozen other states were in attendance, as was Attorney General Walker of the Virgin Islands.

25.     Expressing dissatisfaction with the supposed "gridlock in Washington" regarding climate change legislation, Attorney General Schneiderman said that the coalition had to work "creatively" and "aggressively" to respond to "th[e] most pressing issue of our time," namely, the need to "preserve our planet and reduce the carbon emissions that threaten all of the people we represent."[42]

26.     Attorney General Healey agreed, opining that "there's nothing we need to worry about more than climate change."[43]  She considered herself to have "a moral obligation to act" to remedy what she described as a threat to "the very existence of our

---

[41]   Ex. M at App 127.
[42]   Ex. B at App. 9–11.
[43]   *Id.* at App. 20.

10

planet," and she vowed to take "quick, aggressive action" to "address climate change and to work for a better future."[44]

27.      Echoing those themes, Attorney General Walker stated that "the American people . . . have to do something transformational" because "[w]e cannot continue to rely on fossil fuel."[45]   In private communications with other members of the Green 20 coalition, Attorney General Walker expressed his hope that the coalition's efforts would "identify[] other potential litigation targets" and "increase our leverage" against ExxonMobil to replicate or improve on an $800 million settlement he had previously obtained against another energy company.[46]

28.      For the Green 20, the public policy debate on climate change was over and dissent was intolerable.  Attorney General Schneiderman declared that he had "heard the scientists" and "kn[e]w what's happening to the planet."[47]  To him, there was "no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up."[48]  Schneiderman has long derided those who do not share his viewpoint on climate policy.   In a September 2014 speech, Schneiderman noted the importance of "challenging those who refuse to acknowledge that climate change is real" and that "it is up to us to do the transformational work needed to enable everyone to clearly see that climate change is real, that all of us are feeling its effects right now, and that we can and must address it together."[49]   And in the same speech, Attorney General

---

[44]   *Id.* at App. 20–21.
[45]   *Id*. at App. 24.
[46]   Ex. N at App. 131, 133–134.
[47]   Ex. B at App. 10.
[48]   *Id.*
[49]   Ex. S5 at App. 530.

Schneiderman revealed his belief that his prosecutorial powers should be used in a "creative" fashion for the political end of "chang[ing] public awareness" on the issue of climate change, noting "we all need to be activists."[50]

29.     According to Attorney General Healey, "[p]art of the problem has been one of public perception," causing "many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts."[51]  She promised that those who "deceived" the public—by disagreeing with her about climate change—"should be, must be, held accountable."[52]  Mr. Gore agreed, denouncing those he accused of "deceiving the American people . . . about the reality of the climate crisis and the dangers it poses to all of us."[53]

30.     What the Attorneys General derided as "confusion," "misunderstand[ing]," and "misapprehen[sion]" is the very speech that the First Amendment safeguards as protected political speech.  It is not the proper role of government to limit the free flow of such ideas, but the Green 20 was unmistakable in its belief that free speech constituted "part of the problem" their actions were intended to address.

31.     The Attorneys General also embraced the renewable energy industry, in which Mr. Gore is a prominent investor and promoter, as the only legitimate response to climate change.  Attorney General Schneiderman said, "We have to change conduct" to "mov[e] more rapidly towards renewables."[54]  Attorney General Healey promised to

---

[50]   *Id.* at 525.
[51]   Ex. B at App. 20.
[52]   *Id.*
[53]   *Id.* at App. 14.
[54]   *Id.* at App. 27–28.

"speed our transition to a clean energy future . . . ."[55]  According to Attorney General Walker, "[w]e have to look at renewable energy.  That's the only solution."[56]  Mr. Gore urged the coalition of state attorneys general to investigate his business competitors for "slow[ing] down this renewable revolution" by "trying to convince people that renewable energy is not a viable option."[57]

32.    The assembled attorneys general had nothing but praise for Mr. Gore, whose financial interests aligned with their political agenda.  Attorney General Schneiderman enthused that "there is no one who has done more for this cause" than Mr. Gore, who recently had been "traveling internationally, raising the alarm," and "training climate change activists."[58]  Equally embracing the public support of Mr. Gore, Attorney General Healey praised him for explaining so "eloquently just how important this is, this commitment that we make," and she thanked him for his "inspiration" and "affirmation."[59]  Virgin Islands Attorney General Walker hailed the former Vice President as one of his "heroes."[60]

33.    In an effort to legitimize what the attorneys general were doing, Mr. Gore cited perceived inaction by the federal government as the justification for action by the Green 20.  He observed that "our democracy's been hacked . . . but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level."[61]  Reading from the same script, Attorney General Schneiderman pledged that the Green 20 would "step into th[e] [legislative]

---

[55]  *Id.* at App. 21.
[56]  *Id.* at App. 24.
[57]  *Id.* at App. 17.
[58]  *Id.* at App. 13.
[59]  *Id.* at App. 20.
[60]  *Id.* at App. 23.
[61]  *Id.* at App. 17.

breach" created by this alleged federal inaction.[62]  He then showed that his subpoena was a tool for achieving his political goals:

> We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action.  So today, we're sending a message that, at least some of us—actually a lot of us—in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.[63]

34.     Attorney General Schneiderman linked the coalition's political efforts to his investigation of ExxonMobil, reminding the audience that he "had served a subpoena on ExxonMobil" to investigate "theories relating to consumer and securities fraud."[64]  He also suggested that ExxonMobil faced a presumption of guilt in his office, arguing that ExxonMobil had been "using the best climate models" to determine "how fast the sea level is rising" and to "drill[] in places in the Arctic where they couldn't drill 20 years ago" while telling "the public for years that there were no 'competent models,' . . . to project climate patterns, including those in the Arctic."[65]   Attorney General Schneiderman went on to suggest there was something illegal in ExxonMobil's alleged support for "organizations that put out propaganda denying that we can predict or measure the effects of fossil fuel on our climate, or even denying that climate change was happening."[66]

35.     Attorney General Healey was equally explicit in her prejudgment of ExxonMobil.  She stated that there was a "troubling disconnect between what Exxon

---

[62]   *Id.* at App. 11.
[63]   *Id.* at App. 12.
[64]   *Id.* at App. 11.
[65]   *Id.*
[66]   *Id.*

knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public."[67]   Those conclusions were announced weeks before she even issued the CID to ExxonMobil.[68]

36.   The political motivations articulated by Attorneys General Schneiderman, Healey, and Walker, Mr. Gore, and the other press conference attendees struck a discordant note with those who rightfully expect government attorneys to conduct themselves in a neutral and unbiased manner.   The overtly political tone of the conference even prompted one reporter to ask whether the press conference and the investigations were "publicity stunt[s]."[69]

37.   Even some members of the coalition were apprehensive about the expressly political focus of its ringleader.   Attorney General Schneiderman's office circulated a draft set of "Principles" for the "Climate Coalition of Attorneys General" that included a "[p]ledge" to "work together" to enforce laws "that require progressive action on climate change."[70]   Recognizing the overtly political nature of that pledge, an employee of the Vermont Attorney General's Office wrote: "We are thinking that use of the term 'progressive' in the pledge might alienate some. How about 'affirmative,' 'aggressive,' 'forceful' or something similar?"[71]

## C.   In Closed-Door Meetings, Private Interests Urge Abusing State Power.

38.   The impropriety of the statements made by Attorneys General Schneiderman and Healey and the other members of the Green 20 at the press conference is likely surpassed by what they said behind closed doors.

---

[67]   *Id.* at App. 20.
[68]   Ex. II at App. 286.
[69]   Ex. B at App. 25.
[70]   Ex. M at App. 127.
[71]   *Id.* at App. 126.

39.     During the morning of the press conference, the attorneys general (or their respective staffs) attended two presentations.  Those presentations were not announced publicly, and they were not open to the press or general public.  The identity of the presenters and the titles of the presentations, however, were later released by the State of Vermont in response to a request by a third party under that state's Freedom of Information Act.

40.     The first presenter was Peter Frumhoff, the Director of Science and Policy for the Union of Concerned Scientists.[72]  His subject was the "imperative of taking action now on climate change."[73]

41.     According to the Union of Concerned Scientists, those who do not share its views about climate change and responsive policy make it "difficult to achieve meaningful solutions to global warming."[74]  It accuses "[m]edia pundits, partisan think tanks, and special interest groups" of being "contrarians," who "downplay and distort the evidence of climate change, demand policies that allow industries to continue polluting, and attempt to undercut existing pollution standards."[75]

42.     Frumhoff has been targeting ExxonMobil since at least 2007.  In that year, Frumhoff contributed to a publication issued by the Union of Concerned Scientists, titled "Smoke, Mirrors, and Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science."[76]  This essay brainstormed strategies for

---

[72]   Ex. O at App. 138.
[73]   Ex. E at App. 70.
[74]   Ex. P at App. 146.
[75]   *Id.* at App. 146–47.
[76]   Ex. Q at App. 160, 163.

"[p]utting the [b]rakes" on ExxonMobil's alleged "[d]isinformation [c]ampaign" on climate change.[77]

43.     Matthew Pawa hosted the second presentation on the topic of "climate change litigation."[78]   Pawa previously sued ExxonMobil and 23 other energy companies for allegedly contributing to global warming and flooding.[79]   Mr. Pawa had hoped the lawsuit would serve as "a potentially powerful means to change corporate behavior."[80] The court rebuffed Mr. Pawa's gambit, however, finding that the regulation of greenhouse gas emissions is "a political rather than a legal issue that needs to be resolved by Congress and the executive branch rather than the courts."[81]

44.     Frumhoff and Pawa have sought for years to initiate and promote litigation against energy companies in the service of their political agenda and for private profit.  In June 2012, a collection of special, private interests gathered in La Jolla, California, to participate in a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies."[82]   Frumhoff and Naomi Oreskes, then a professor at the University of California, San Diego, "conceived" of this workshop and invited Pawa as a featured speaker.[83]   The workshop's goal was to consider "the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation."[84]  During the conference, attendees accused energy companies, including ExxonMobil, of "attempting to manufacture uncertainty about

---

[77]   *Id.* at App. 166.
[78]   Ex. E at App. 70.
[79]   *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012).
[80]   Ex. C at App. 41.
[81]   *Id.*
[82]   *Id.* at App. 30.
[83]   *Id.* at App. 41.
[84]   *Id.* at App. 33.

global warming,"[85] and they discussed a wide variety of legal strategies to combat the industry's alleged "efforts to defeat action on climate change."[86]

45.     The 2012 workshop's attendees discussed at considerable length "Strategies to Win Access to Internal Documents" of energy companies like ExxonMobil.[87]   Many participants noted that "pressure from the courts offers the best current hope for gaining the energy industry's cooperation in converting to renewable energy."[88]   In addition, "lawyers at the workshop" suggested that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[89]   They also saw civil litigation as a vehicle for accomplishing their goals, with one commentator observing, "[e]ven if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties."[90]   The conference's attendees were "nearly unanimous" regarding "the importance of legal actions, both in wresting potentially useful internal documents from the fossil fuel industry and, more broadly, *in maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming.*"[91]

46.     Oreskes, Frumhoff, and Pawa—key architects of the La Jolla strategy—encouraged the Attorneys General to implement their plan of imposing burdens on the energy industry to coerce it to adopt their climate agenda.   In June 2015, Oreskes met with New York Attorney General Eric Schneiderman to discuss the purported "history of

---

[85]   *Id.* at App. 34–35.
[86]   *Id.* at App. 35.
[87]   *Id.* at App. 40–41, 56.
[88]   *Id.* at App. 56–57.
[89]   *Id.* at App. 40.
[90]   *Id.* at App. 42.
[91]   *Id.* at App. 56 (emphasis added).

misinformation" of the energy industry, a theme she has been promoting since at least 2010.[92]  Oreskes and members from Frumhoff's Union of Concerned Scientists attended a similar meeting in Boston with the staff of attorneys general offices from a number of states.[93]  At that meeting, Oreskes noted that there were "factual presentations about climate science, history of climate disinformation and also a presentation by Sharon Eubanks who had led the US Department of [J]ustice prosecution of tobacco industry under the RICO statues."[94]

47.     In July 2015—just a few months before the New York Attorney General commenced his investigation—Frumhoff boasted to fellow activists that he was exploring "state-based approaches to holding fossil fuel companies legally accountable" and anticipated "a strong basis for encouraging state (e.g., AG) action forward."[95]  Even after the press conference, Frumhoff continued to provide support and counsel to the Attorneys General in this unlawful enterprise.[96]

48.     During this time, Pawa implemented another strategy in the La Jolla playbook—encouraging municipalities to commence public nuisance litigation against energy companies like ExxonMobil.  Specifically, in March 2015, Pawa sent a legal memorandum encouraging California to pursue public nuisance litigation against ExxonMobil and other energy companies to NextGen America, an organization founded by California billionaire Tom Steyer to promote his political agenda.[97]  In that memorandum, Pawa claimed "to know that certain fossil fuel companies (most

---

[92]   Ex. S7 at App. 546; Oreskes is the co-author of *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming* (2010).
[93]   *Id.* at App. 544.
[94]   *Id.* at App. 546.
[95]   Ex. S8 at App. 548.
[96]   Ex. S9 at App. 551.
[97]   Ex. S10 at App. 553; Ex. S11 at App. 555.

notoriously ExxonMobil), have engaged in a campaign and conspiracy of deception and denial on global warming."[98]   Acknowledging the ulterior purpose motivating his proposed litigation against energy companies, Pawa wrote, "simply proceeding to the discovery phase of a global warming case would be significant . . . . Just as obtaining such documents gave the Tobacco litigation an unstoppable momentum, here too obtaining industry documents would be a remarkable achievement that would advance the case and the cause."[99]

49.   Consistent with Pawa's memorandum, a number of California municipalities filed lawsuits in July 2017, asserting public nuisance claims against ExxonMobil and other energy companies.[100]   Pawa represents San Francisco and Oakland, and, as public records released in December 2017 show, his firm stands to gain a multi-billion dollar contingency fee as his agreement with the City of San Francisco— released through public records requests—entitles his firm to 23.5% of any net monetary recovery.[101]

50.   It is no surprise that Pawa sent his legal strategy for California to Steyer, who has repeatedly encouraged the federal government and state attorneys general to investigate ExxonMobil.[102]   Steyer also has long bankrolled campaigns promoting the policies favored by the Attorneys General.[103]

51.   Evidence suggests that Attorney General Schneiderman communicated with Steyer about campaign support in connection with his investigation of

---

[98]   Ex. S12 at App. 567.
[99]   *Id.* at App. 573.
[100]   Ex. S13 at App. 577.
[101]   Ex. S14 at App. 587.
[102]   Ex. S16 at App. 611; Ex. S17 at App. 615 (job listing by Fahr LLC, an organization owned by Tom Steyer).
[103]   Ex. S19 at App. 649; *see also* Ex. S20 at App. 653; Ex. S21 at App. 660.

ExxonMobil.[104]   Attorney General Schneiderman's office emailed Steyer's scheduler, Erin Suhr, to follow up "on conversation re: company specific climate change information" a mere five days after it subpoenaed ExxonMobil's climate change research.[105]   In March 2016, Attorney General Schneiderman also allegedly tried to arrange a meeting with Steyer.   The *New York Post* reports that this communication reads, "Eric Schneiderman would like to have a call with Tom regarding support for his race for governor . . . regarding Exxon case."[106]

52.     In January 2016, Pawa and a group of climate activists, including La Jolla participant Sharon Eubanks, met at the Rockefeller Family Fund offices to discuss the "[g]oals of an Exxon campaign."[107]   The goals included:

- To establish in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm.

- To delegitimize [ExxonMobil] as a political actor.

- To force officials to disassociate themselves from Exxon, their money, and their historic opposition to climate progress, for example by refusing campaign donations, refusing to take meetings, calling for a price on carbon, etc.

- To drive divestment from Exxon.

- To drive Exxon & climate into [the] center of [the] 2016 election cycle.[108]

This agenda to restrict and impair ExxonMobil's freedoms of speech and association cannot be legitimate objectives of any bona fide government-directed investigation or litigation.

---

[104]   Ex. S22 at App. 664.
[105]   *Id.* at App. 666.
[106]   Ex. S24 at App. 674.
[107]   Ex. D at App. 67.
[108]   *Id.*; *see also* Ex. U at App. 192–94.

21

53.     At the meeting, the activists also discussed "the main avenues for legal actions & related campaigns," including "AGs," "DOJ," and "Torts."[109]  Among these options, they considered which had the "best prospects" for (i) "successful action," (ii) "getting discovery," and (iii) "creating scandal."[110]

54.     Shortly after this meeting, Pawa attempted to implement the "AGs" plan. At least twice, he emailed the Vermont Attorney General's Office news articles criticizing ExxonMobil for purportedly deceiving the public about the effects of climate change, including an opinion piece written by a member of the Rockefeller family in which she explains why she donated her inherited ExxonMobil stock to support efforts to combat global warming.[111]

55.     After the January 2016 meeting, the Rockefeller Family Fund also continued its efforts to "delegitimize" ExxonMobil.  In March 2016, the Fund announced that it would divest from all fossil fuel holdings, including ExxonMobil.[112]  The Fund singled ExxonMobil out for purportedly "morally reprehensible conduct" and claimed that "the company worked since the 1980s to confuse the public about climate change's march."[113]

56.     Public records also reveal that the Rockefeller Family Fund repeatedly communicated with the New York Attorney General's Office about climate change and its investigation of ExxonMobil before the January 2016 meeting.  In February 2015, the New York Attorney General's Office exchanged a dozen emails with the Fund

---

[109]   Ex. S1 at App. 479.
[110]   *Id.* at App. 480.
[111]   Ex. S25 at App. 677; Ex. S26 at App. 679; Ex. S27 at App 681.
[112]   Ex. S28 at App. 684.
[113]   *Id.*

concerning the "activities of specific companies regarding climate change."[114]   The Fund's persistent lobbying paid off, which prompted the daughter of a Rockefeller Family Fund's director to announce on Twitter the day after Attorney General Schneiderman issued his subpoena to ExxonMobil that she was "[s]o proud" of her father "for helping make this happen #ExxonKnew."[115]   (As her Twitter account shows,[116] the director's daughter worked for Steyer's NextGen, the organization that received Pawa's legal memorandum encouraging government litigation against ExxonMobil and other energy companies in March 2015).[117]

57.   Over a year later, in December 2016, the director of the Rockefeller Family Fund finally admitted, after initially denying the connection, that the Fund had financed the so-called investigative journalism that would later provide a pretext for the Attorneys General's improper investigations of ExxonMobil.[118]   This supposed investigative journalism by *Inside Climate News* and the *Los Angeles Times*—which the Attorneys General have used as pretextual support for their investigations[119]—selectively interpreted documents ExxonMobil had made publicly available in the archives of the University of Texas-Austin.[120]   While the Attorneys General have suggested these documents show ExxonMobil had advance, secret knowledge of climate change decades ago, the documents in fact demonstrate that ExxonMobil's climate research contained

---

[114]   Ex. S29 at App. 688.

[115]   Ex. S30 at App. 695.

[116]   *Id.*

[117]   *See* Paragraph 48.

[118]   Ex. S31 at App. 704.

[119]   Attorney General Healey has essentially admitted that this reporting spurred her investigation and has long cited it to support her claim that the investigation is valid.  *See* ECF No. 43.  Attorney General Schneiderman has not so directly cited this reporting, but it was reported in late 2015 that these articles prompted the New York investigation.  Ex. L at App. 123.

[120]   Ex. S33 at App. 720; Ex. S59 at App. 1293–94 (*InsideClimate News* admitting ExxonMobil's projections were in the "mid-range" of what scientists predicted).

myriad uncertainties and was aligned with the research of scientists at leading institutions at the time, including scientists at the Massachusetts Institute of Technology, the National Academy of Science and the Environmental Protection Agency.[121]

58.     The Rockefeller Family Fund also acknowledged that, before the Attorneys General commenced their investigations, it had "informed [unnamed] state attorneys general of [its] concern" about ExxonMobil's statements on climate change and was "encouraged by [Attorney General] Schneiderman's interest."[122]   On January 8, 2018, *New York Magazine* reported that the Rockefeller Family Fund director met with Attorney General Schneiderman's office in 2015 specifically to discuss ExxonMobil's purported climate deception and liability under the Martin Act.[123]

59.     The investigations by the New York and Massachusetts Attorneys General and the Green 20 press conference represented the culmination of Frumhoff, Pawa, Oreskes, Steyer, the Rockefeller Family Fund, and other's collective efforts to enlist state law enforcement officers to join them in a quest to coerce political opponents to adopt preferred policy responses to climate change and to obtain documents for private lawsuits.

60.     The attorneys general in attendance at the press conference understood that the participation of Frumhoff and Pawa, if reported, could expose the private, financial, and political interests behind the announced investigations.   The day after the conference, a reporter from *The Wall Street Journal* contacted Pawa.[124]   Before

---

[121]   *See* Ex. S60 at App. 1302; Ex. S3 at App. 494 (EPA Report from 1983 noting the possibility of a 5°C increase by 2100); Ex. S4 at App. 519 (NAS report from 1983 stating that "temperature increases of a couple degrees or so" were projected for the next century).
[122]   Ex. S34 at App. 729 (emphasis omitted); *see also* Ex. S35 at App. 740.
[123]   Ex. S63 at App. 1333.
[124]   Ex. F at App. 80.

responding, Pawa dutifully asked Lemuel Srolovic, Chief of Attorney General Schneiderman's Environmental Protection Bureau, "[w]hat should I say if she asks if I attended?"[125]  Mr. Srolovic—the Assistant Attorney General who had sent the New York subpoena to ExxonMobil in November 2015—encouraged Pawa to conceal from the press and the public the closed-door meetings.  He responded, "[m]y ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event."[126]  That same day, Mr. Srolovic followed up with Frumhoff as well and emailed him ExxonMobil's press statement in response to the politically motivated press conference.[127]

61.     The press conference, the closed-door meetings with activists, and the activists' long-standing desire to obtain ExxonMobil's "internal documents" as part of a campaign to put "pressure on the industry," inducing it to support "legislative and regulatory responses to global warming,"[128] form the partisan backdrop against which the New York and Massachusetts investigations must be considered.

**D.    The Attorneys General Attempt to Conceal Their Misuse of Power from the Public.**

62.     Recognizing the need to avoid public scrutiny, Attorneys General Schneiderman, Healey, and fifteen others entered into an agreement pledging to conceal from the public their activities and communications in furtherance of their political agenda.  In April and May 2016, the Green 20 executed a so-called "Climate Change Coalition Common Interest Agreement," which memorialized the twin goals of this illicit

---

[125]   *Id.*
[126]   *Id.*
[127]   Ex. S36 at App. 755.
[128]   Ex. C at App. 40, 56.

enterprise.[129]  The first goal listed in the agreement, "limiting climate change," reflected the coalition's focus on politics, not law enforcement.[130]  The second goal, "ensuring the dissemination of accurate information about climate change," confirmed the coalition's willingness to violate First Amendment rights to carry out its agenda.[131]  They appointed themselves as arbiters of what information is "accurate" as regards climate change and stood ready to use the full arsenal of law enforcement tools at their disposal against those who did not toe their party line.

63.     To conceal communications concerning this unconstitutional enterprise from public disclosure, the signatories agreed to maintain the confidentiality of their communications by pledging that, "unless required by law," the parties "shall . . . refuse to disclose" any "(1) information shared in organizing a meeting of the Parties on March 29, 2016, (2) information shared at and after the March 29 meeting . . . and (3) information shared after the execution of this Agreement."[132]  Under that agreement, a member of the New York Attorney General's staff has been "acting as a general coordinator for the climate change record requests" under each state's public records requests laws.[133]

64.     Attorney General Schneiderman's efforts to conceal records concerning that agreement in response to a public-records request have already resulted in a firm judicial rebuke.  The New York Supreme Court recently awarded attorney's fees and costs against the Attorney General for "lack[ing] a reasonable basis" for refusing to

---

[129]   Ex. V at App. 196–214.
[130]   *Id.* at App. 196.
[131]   *Id.*
[132]   *Id.* at App. 196–97
[133]   Ex. S37 at 758.

produce documents related to the Common Interest Agreement.[134]   Nevertheless, the Attorney General continues to resist requests for communications with the Rockefeller Family Fund related to his investigation of ExxonMobil.[135]   At the same time, Schneiderman has bragged that he "has been winning most legal battles . . . despite #Exxon's ongoing efforts to thwart his investigation."[136]

65.     Another member of the coalition has gone so far as to concede the political motives behind the coalition's selective disclosures.   The Vermont Attorney General's Office admitted that it conducts research into those seeking records about the coalition's activities, and upon learning of the requester's affiliation with "coal or Exxon or whatever," the office "give[s] this some thought . . . before we share information with this entity."[137]

66.     The Vermont Attorney General's office has continued to rebuff efforts to turn over information sought through public records requests, including a request for the former Vermont Attorney General's private email communications with the New York Attorney General about his investigation of ExxonMobil.[138]   Most glaringly, the former Vermont Attorney General failed to appear for a deposition about his private email use concerning this subject.[139]   Even though a Vermont court subsequently ordered the former Attorney General to appear for deposition,[140] the former Attorney General declined to answer a majority of questions when he finally appeared for the deposition.[141]

---

[134]   Ex. S38 at App 764.
[135]   *See* Ex. S39 at App. 772.
[136]   Ex. S40 at App. 794.
[137]   Ex. S41 at App. 804.
[138]   Ex. S42 at App. 812.
[139]   Ex. S43 at App. 818.
[140]   *Id.*
[141]   Ex. S44 at App. 821.

27

67.     The Vermont Attorney General's Office has also resisted efforts to produce emails that were circulated among climate activists and several state attorneys general's offices, including the offices of the New York and Massachusetts Attorneys General.  For example, in one email, a staff member of the New York Attorney General's office circulated to over a dozen other attorneys general's offices an article about the energy industry's purported early knowledge of "CO2's Role in Global Warming."[142]

68.     In December 2017, over the objection of the Vermont Attorney General's Office, a Vermont court ordered the release of these and other public records.  The public records reveal that, within a month of the March 29 press conference, Pawa and Frumhoff continued to press for state-based investigations and litigations against the energy industry.[143]  Mere days after the press conference, Pawa took the lead in mobilizing the coalition of attorneys general and created an email list of "AG Folks" in order to "pass along information that may be of interest to AGs on the issue of our time: climate change."[144]

69.     Initially withheld Vermont public records also reveal a draft agenda for a workshop called "Potential State Causes of Action Against Major Carbon Producers: Scientific, Legal and Historical Perspectives" that was co-hosted by Frumhoff's Union of Concerned Scientists in the month following the press conference.[145]  "[S]enior staff from state attorneys general offices in nearly a dozen states,"[146] including Massachusetts and New York,[147] attended the workshop which sought to "[c]reate a 'safe space' for a frank

---

[142]   Ex. S45 at App. 823.
[143]   *Energy & Envtl. Legal Inst. & Free Market Envtl. Law Clinic* v. *Att'y Gen. of Vt.*, No. 349-6-16 Wbcv (Vt. Super. Ct. Dec. 6, 2017).
[144]   Ex. S46 at App. 830.
[145]   Ex S47 at App. 832.
[146]   Ex S48 at App. 838.
[147]   Ex. S49 at App. 841.

exchange of approaches, ideas, strategies and questions pertaining to potential state causes of action," such as public nuisance claims, "against major carbon producers and the cultural context in which such cases may be brought."[148]  Panelists included several climate activists, including Frumhoff, Oreskes, and Sharon Eubanks—an environmental lawyer who has long supported applying the legal strategy against the tobacco industry to litigation against the energy industry.[149]  During the workshop, Frumhoff led a panel on "the case for state-based investigations and litigation" and participated in a discussion on "sea level rise and coastal flooding" and how to "trac[e] impacts to carbon producers."[150]

**E.     Other State Attorneys General Condemn the Investigations as Unlawful.**

70.     The overtly political nature of the March 29 press conference drew a swift and sharp rebuke from other state attorneys general who criticized the Green 20 for using the power of law enforcement as a tool to muzzle public discourse about climate change. The attorneys general of Alabama and Oklahoma stated that "scientific and political debate" "should not be silenced with threats of criminal prosecution by those who believe that their position is the only correct one and that all dissenting voices must therefore be intimidated and coerced into silence."[151]  They emphasized that "[i]t is inappropriate for State Attorneys General to use the power of their office to attempt to silence core political speech on one of the major policy debates of our time."[152]

71.     The Louisiana Attorney General similarly observed that "[i]t is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust

---

[148]   Ex S47 at App. 832.
[149]   *Id.*
[150]   *Id.*
[151]   Ex. X at App. 225.
[152]   *Id.*

exchange of ideas."[153]   Likewise, the Kansas Attorney General questioned the "unprecedented" and "strictly partisan nature of announcing state 'law enforcement' operations in the presence of a former vice president of the United State[s] who, presumably [as a private citizen], has no role in the enforcement of the 17 states' securities or consumer protection laws."[154]   The West Virginia Attorney General criticized the attorneys general for "abusing the powers of their office" and stated that the desire to "eliminate fossil fuels . . . should not be driving any legal activity" and that it was improper to "use the power of the office of attorney general to silence [] critics."[155]

72.     In addition, on June 15, 2016, attorneys general from thirteen states wrote a letter to their "Fellow Attorneys General," in which they explained that the Green 20's effort "to police the global warming debate through the power of the subpoena is a grave mistake" because "[u]sing law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[156]   The thirteen attorneys further described the Green 20's investigations as "far from routine" because (i) they "target[] a particular type of market participant," namely energy companies; (ii) the Green 20 had aligned itself "with the competitors of [its] investigative targets"; and (iii) "the investigation implicates an ongoing public policy debate."[157]   In conclusion, they asked their fellow attorneys general to "[s]top policing viewpoints."[158]

73.     The actions of Defendants and their Green 20 allies caught the eye of Congress.   The Committee on Science, Space, and Technology of the United States

---

[153]   Ex. Y at App. 227.
[154]   Ex. QQ at App. 435.
[155]   Ex. RR at App. 438–40.
[156]   Ex. SS at App. 444.
[157]   *Id.*
[158]   *Id.* at App. 447.

House of Representatives launched an inquiry into the investigations undertaken by the Green 20.[159]  That committee was "concerned that these efforts [of the Green 20] to silence speech are based on political theater rather than legal or scientific arguments, and that they run counter to an attorney general's duty to serve as the guardian of the legal rights of the citizens and to assert, protect, and defend the rights of the people."[160]  Perceiving a need to provide "oversight" of what it described as "a coordinated attempt to attack the First Amendment rights of American citizens," the Committee requested the production of certain records and information from the attorneys general.[161]  The attorneys general have thus far refused to voluntarily cooperate with the inquiry.[162]

74.  After Attorney General Schneiderman refused to turn over documents requested by the House Committee and criticized its "unfounded claims about the NYOAG's motives,"[163] the House Committee issued subpoenas to Attorney General Schneiderman, Attorney General Healey, and eight environmental organizations in order to "obtain documents related to coordinated efforts to deprive companies, nonprofit organizations, scientists and scholars of their First Amendment rights."[164]  It further criticized the attorneys general for "hav[ing] appointed themselves to decide what is valid and what is invalid regarding climate change."[165]

75.  Several senators urged former United States Attorney General Loretta Lynch to confirm that the Department of Justice is not investigating, and will not investigate, United States citizens or corporations on the basis of their views on climate

---

[159]  Ex. Z at App. 229.
[160]  *Id.* (internal quotation marks omitted).
[161]  *Id.* at App. 232.
[162]  *See, e.g.*, Ex. TT at App. 449; Ex. UU at App. 453.
[163]  Ex. AA at App. 237.
[164]  Ex. BB at App. 240.
[165]  *Id.*

change.[166]  The senators observed that the Green 20's investigations "provide disturbing confirmation that government officials at all levels are threatening to wield the sword of law enforcement to silence debate on climate change."[167]  The letter concluded by asking Attorney General Lynch to explain the steps she is taking "to prevent state law enforcement officers from unconstitutionally harassing private entities or individuals simply for disagreeing with the prevailing climate change orthodoxy."[168]

**F.     The Subpoena and the CID Reflect the Improper Political Objectives of the Green 20 Coalition.**

76.     The twin goals of the Green 20—advancing a political agenda and trammeling constitutional rights in the process—are fully reflected in the subpoenas and the CID themselves.  These instruments purport to investigate easily debunked theories, thereby revealing them as nothing more than thinly veiled pretexts for unlawful state action.

**The New York Subpoenas**

77.     Attorney General Schneiderman is authorized to issue a subpoena only if (i) there is "some factual basis shown to support the subpoena";[169] and (ii) the information sought "bear[s] a reasonable relation to the subject matter under investigation and the public purpose to be served."[170]  Neither standard is met here.

78.     The initial New York subpoena, issued on November 4, 2015, purports to investigate whether ExxonMobil violated New York State Executive Law Article 5, Section 63(12), General Business Law Article 22-A or 23-A and "any related violation,

---

[166]   Ex. DD at App. 248.
[167]   *Id.*
[168]   *Id.*
[169]   *Napatco, Inc.* v. *Lefkowitz*, 43 N.Y.2d 884, 885–86 (1978).
[170]   *Myerson* v. *Lentini Bros. Moving & Storage Co.*, 33 N.Y.2d 250, 256 (1973).

or any matter which the Attorney General deems pertinent thereto."[171]   These statutes
have at most a six-year limitations period.[172]

79.     During the six-year limitations period, however, ExxonMobil made no
statements that could give rise to fraud as alleged in the subpoena.   For more than a
decade, ExxonMobil has publicly acknowledged that climate change presents significant
risks that could affect its business.   For example, ExxonMobil's *2006 Corporate
Citizenship Report* recognized that "the risk to society and ecosystems from rising
greenhouse gas emissions could prove to be significant" and reasoned that "strategies that
address the risk need to be developed and implemented."[173]   In addition, in 2002,
ExxonMobil, along with three other companies, helped launch the Global Climate and
Energy Project at Stanford University, which has a mission of "conduct[ing] fundamental
research on technologies that will permit the development of global energy systems with
significantly lower greenhouse gas emissions."[174]

80.     ExxonMobil has also discussed these risks in its public SEC filings.   For
example, in its 2006 10-K, ExxonMobil stated that "laws and regulations related to . . .
risks of global climate change" "have been, and may in the future" continue to impact its
operations.[175]   Similarly, in its 2015 10-K, ExxonMobil noted that the "risk of climate
change" and "current and pending greenhouse gas regulations" may increase its
"compliance costs."[176]   Long before the six-year statute of limitations period,

---

[171]   Ex. EE at App. 251.
[172]   *See, e.g.*, *State ex rel. Spitzer* v. *Daicel Chem. Indus., Ltd.*, 840 N.Y.S.2d 8, 11–12 (1st Dep't 2007);
        *Podraza* v. *Carriero*, 630 N.Y.S.2d 163, 169 (4th Dep't 1995); *State* v. *Bronxville Glen I Assocs.*, 581
        N.Y.S.2d 189, 190 (1st Dep't 1992).
[173]   Ex. H at App. 103.
[174]   Ex. FF at App. 270.
[175]   Ex. GG at App. 277–78.
[176]   Ex. HH at App. 284.

ExxonMobil disclosed and acknowledged the risks that supposedly gave rise to Attorney General Schneiderman's investigation.

81.     Notwithstanding that six-year limitations period and the absence of any conduct within that timeframe that could give rise to a statutory violation, the document requests in the subpoena span 39 years and extend to nearly every document ExxonMobil has ever created that in any way concerns climate change.  For example, the subpoena demands "[a]ll Documents and Communications" from 1977 to the present, "[c]oncerning any research, analysis, assessment, evaluation, modelling or other consideration performed by You, on Your behalf, or with funding provided by You Concerning the causes of Climate Change."[177]

82.     The subpoena includes 10 other similarly sweeping requests, such as (i) a demand for all documents and communications that ExxonMobil has produced since 1977 relating to "the impacts of Climate Change"; and (ii) exemplars of all "advertisements, flyers, promotional materials, and informational materials of any type" that ExxonMobil has produced in the last 11 years concerning climate change.[178]  Other requests target Attorney General Schneiderman's perceived political opponents in the climate change debate by demanding ExxonMobil's communications with trade associations and industry groups that seek to promote oil and gas interests.[179]

83.     In response to some of these requests, ExxonMobil asserted First Amendment privileges, including in connection with ExxonMobil scientists' participation in non-profit research organizations.

---

[177]  Ex. EE at App. 257–58 (Request No. 1).
[178]  *Id.* at App. 258–59 (Request Nos. 2, 9).
[179]  *Id.* at App. 258 (Request No. 6).

84.     Moreover, almost all of the sweeping demands in the subpoena reach far beyond conduct bearing any connection to the State of New York.  Ten of the eleven document requests make blanket demands for all of ExxonMobil's documents or communications on a broad topic, with no attempt to restrict the scope of production to documents or communications having any connection to New York.[180]  Only two of the requests even mention New York.[181]  And, while the subpoena seeks ExxonMobil's communications with five named organizations, only one of them is based in New York.[182]

85.     After receiving hundreds of thousands of documents from over 100 ExxonMobil custodians in response to its initial subpoena, the New York Attorney General's Office has issued additional subpoenas seeking extensive numbers of documents and testimony from a number of witnesses.  When considering ExxonMobil's challenge to one of those subpoenas, New York Supreme Court Justice Barry Ostrager remarked that the New York Attorney General's request for documents went "way beyond proportionality."[183]

86.     The New York Attorney General's Office further served five testimonial subpoenas for "fact witnesses" on May 8, 2017, as well as a subpoena that purports to compel the production of documents pertaining to oil and gas reserves and the impairment of assets.   Unsatisfied even with the testimony of those witnesses, the New York Attorney General has continued to subpoena additional individuals.  On July 18,

---

[180]   *Id.* at App. 258–59 (Request Nos. 1, 10).
[181]   *Id.* at App. 259 (Request Nos. 9, 11).
[182]   *Id.* at App. 258 (Request No. 6).
[183]   Ex. S50 at App. 897.

2017, the Attorney General's Office issued another testimonial subpoena, and on September 14, 2017 the Office served seven more testimonial subpoenas.

### The Massachusetts CID

87. Attorney General Healey served the CID on ExxonMobil's registered agent in Suffolk County, Massachusetts, on April 19, 2016. According to the CID, there is "a pending investigation concerning [ExxonMobil's] potential violations of [MASS. GEN. LAWS] ch. 93A, § 2."[184] That statute prohibits "unfair or deceptive acts or practices" in "trade or commerce"[185] and has a four-year statute of limitations.[186] The CID specifies two types of transactions under investigation: ExxonMobil's (i) "marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth," and (ii) "marketing and/or sale of securities" to Massachusetts investors.[187] The requested documents pertain largely to information related to climate change in the possession of ExxonMobil in Texas where it is headquartered and maintains its principal place of business.

88. ExxonMobil could not have committed the possible offenses that the CID purports to investigate for at least two reasons. First, at no point during the past five years—more than one year before the limitations period began—has ExxonMobil (i) sold fossil fuel derived products to consumers in Massachusetts, or (ii) owned or operated a single retail store or gas station in the Commonwealth.[188] Second, ExxonMobil has not sold any form of equity to the general public in Massachusetts since at least 2011, which

---

[184] Ex. II at App. 286.
[185] MASS. GEN. LAWS ch. 93A, §2(a).
[186] MASS. GEN. LAWS ch. 260, § 5A.
[187] Ex. II at App. 286.
[188] Any service station that sells fossil fuel derived products under an "Exxon" or "Mobil" banner is owned and operated independently. In addition, distribution facilities in Massachusetts, including Everett Terminal, have not sold products to consumers during the limitations period.

is also well beyond the limitations period.[189]  In the past decade, ExxonMobil has sold debt only to underwriters outside the Commonwealth, and ExxonMobil did not market those offerings to Massachusetts investors.[190]

89.   The CID's focus on events, activities, and records outside of Massachusetts is demonstrated by the items it demands that ExxonMobil search for and produce.  For example, the CID demands documents that relate to or support 11 specific statements.[191]  None of those statements were made in Massachusetts.[192]  The CID also seeks ExxonMobil's communications with 12 named organizations,[193] but only one of these organizations has an office in Massachusetts and ExxonMobil's communications with the other 11 organizations likely occurred outside of Massachusetts.  Finally, the CID requests all documents and communications related to ExxonMobil's publicly issued reports, press releases, and Securities and Exchange Commission ("SEC") filings, which were issued outside of Massachusetts,[194] and all documents and communications related to ExxonMobil's climate change research, which also occurred outside of Massachusetts.[195]

90.   The absence of any factual basis for investigating ExxonMobil's alleged fraud is glaring, particularly in light of the heavy burden imposed by the CID.  Spanning 25 pages and containing 38 broadly worded document requests, the CID unreasonably demands production of essentially any and all communications and documents relating to

---

[189]  Ex. JJ at App. 317.
[190]  *Id.*  This is subject to one exception.  During the limitations period, ExxonMobil has sold short-term, fixed-rate notes, which mature in 270 days or less, to institutional investors in Massachusetts, in specially exempted commercial paper transactions.  *Id.*; *see* Mass. Gen. Laws ch. 110A, § 402(a)(10); *see also* 15 U. S. C. § 77c(a)(3).
[191]  Ex. II at App. 299–300 (Request Nos. 8–11).
[192]  *Id.* (Request Nos. 8–11).
[193]  *Id.* at App. 298 (Request No. 5).
[194]  *Id.* at App. 301–03  (Request Nos. 15–16, 19, 22).
[195]  *Id.* at App. 297–98, 300–03  (Request Nos. 1–4, 14, 17, 22).

climate change that ExxonMobil has produced or received over the last 40 years. For example, the CID requests all documents and communications "concerning Exxon's development, planning, implementation, review, and analysis of research efforts to study $CO_2$ emissions . . . and the effects of these emissions on the Climate" since 1976 and all documents and communications concerning "any research, study, and/or evaluation by ExxonMobil and/or any other fossil fuel company regarding the Climate Change Radiative Forcing Effect of" methane since 2010.[196] It also requests all documents and communications concerning papers and presentations given by ExxonMobil scientists since 1976[197] and demands production of ExxonMobil's climate change related speeches, public reports, press releases, and SEC filings over the last 20 years.[198] Moreover, it fails to reasonably describe several categories of documents by, for example, requesting documents related to ExxonMobil's "awareness," "internal consideration," and "decision making" with respect to certain climate change matters.[199]

91.    The CID's narrower requests, however, are in some instances more troubling than its overly broad ones. They appear to target groups simply because they hold views with which Attorney General Healey disagrees. All 12 organizations with whom ExxonMobil is directed to produce communications have been identified by environmental advocacy groups as opponents of certain policies addressing climate change or "deniers" of the science in support of climate change.[200] The CID also targets

---

[196]   *Id.* at App. 297, 302 (Request Nos. 1, 17).

[197]   *Id.* at App. 297–98. (Request Nos. 2–4).

[198]   *Id.* at App. 299 (Request No. 8 (all documents since April 1, 1997)); *id.* at App. 302–03 (Request No. 22 (all documents since 2006)); *id.* at App. 299–302 (Request Nos. 9–12, 14–16, 19 (all documents since 2010)). The CID also demands the testimony of ExxonMobil officers, directors, or managing agents who can testify about a variety of subjects, including "[a]ll topics covered" in the CID. *Id.* at App. 306   (Schedule B).

[199]   *Id.* at App. 298–99, 302 (Request Nos. 7–8, 18).

[200]   *See, e.g.*, Ex. VV at App. 455–57.

statements that are not in accord with the Green 20's preferred views on climate change. These include statements of pure opinion on policy, such as the suggestion that "[i]ssues such as global poverty [are] more pressing than climate change, and billions of people without access to energy would benefit from oil and gas supplies."[201]

### G. Attorney General Schneiderman Shifts Investigative Theories in a Search for Leverage over ExxonMobil in a Public Policy Debate.

92.     After receiving Attorney General Schneiderman's subpoena, ExxonMobil made a good-faith effort to comply with his request for information about its climate change research in the 1970s and 1980s. ExxonMobil provided his office with well over one million pages of documents, at substantial cost to the Company, with the expectation that a fair and impartial investigation would be conducted. In September 2016, a spokesman for Attorney General Schneiderman stated that ExxonMobil's "historic climate change research" was no longer "the focus of this investigation."[202]

93.     Rather than close the investigation, however, Attorney General Schneiderman simply unveiled another theory. As he explained in a lengthy interview published in *The New York Times*, Attorney General Schneiderman focused instead on the so-called "stranded assets theory." His office intended to examine whether ExxonMobil had overstated its oil and gas reserves and assets by not accounting for "global efforts to address climate change" that might require it in the future "to leave enormous amounts of oil reserves in the ground"—*i.e.*, cause the assets to be "stranded."[203] Without offering—or possessing—any supporting evidence whatsoever,

---

[201]   *See, e.g.*, Ex. II at App. 299–300 (Request No. 9). Further demonstrating that this type of statement is clearly an expression of a policy opinion, an Op-ed appeared in the Wall Street Journal recently making this same argument. Ex. S61 at App. 1311–14.

[202]   Ex. KK at App. 321.

[203]   Ex. MM at App. 351.

Attorney General Schneiderman inappropriately opined that there "may be massive securities fraud" at ExxonMobil based on its estimation of proved reserves and the valuation of its assets.[204]

94.     In a more recent shift in theory, Attorney General Schneiderman has begun a focus on the impairment of long-lived assets.[205]

## H.     An Investigation of ExxonMobil's Reporting of Oil and Gas Reserves and Assets Is a Thinly Veiled Pretext.

95.     Attorney General Schneiderman's decision to investigate ExxonMobil's reserves estimates under a stranded asset theory is particularly egregious because it cannot be reconciled with binding regulations issued by the SEC, which apply strict guidelines to the estimation of proved reserves.

96.     Those regulations prohibit companies like ExxonMobil from considering the impact of future regulations when estimating reserves.  To the contrary, they require ExxonMobil to calculate its proved reserves in light of "*existing* economic conditions, operating methods, and *government regulations*."[206]  The SEC adopted that definition of proved reserves as part of its efforts to provide investors with a "comprehensive understanding of oil and gas reserves, which should help investors evaluate the relative value of oil and gas companies."[207]  The SEC's definition of proved oil and gas reserves thus reflects its reasoned judgment about how best to supply investors with information about the relative value of energy companies, as well as its balancing of competing priorities, such as the agency's desire for comprehensive disclosures, that are not unduly

---

[204]   *Id.*
[205]   Ex. S2 at App. 482.
[206]   17 C.F.R. § 210.4–10(a) (emphasis added).
[207]   *Modernization of Oil & Gas Reporting*, SEC Release No. 78, File No. S7-15-08, 2008 WL 5423153, at *66 (Dec. 31, 2008).

burdensome, and which investors can easily compare.  Attorney General Schneiderman's theory of "massive securities fraud" in ExxonMobil's reported reserves cannot be reconciled with binding SEC regulations about how those reserves must be reported.

97.     The same rationale applies to Attorney General Schneiderman's purported investigation of the impairment of ExxonMobil's assets.   The SEC recognizes as authoritative the accounting standards issued by the Financial Accounting Standards Board ("FASB").[208]   The FASB's rules concerning the impairment of assets require ExxonMobil to "incorporate [its] own assumptions" about future events when deciding whether its assets are impaired.[209]   Contravening those rules, the Attorney General's theory requires that ExxonMobil adopt his assumptions about the likelihood of possible future climate change regulations and then incorporate those assumptions into its determination of whether an asset has been impaired.  Attorney General Schneiderman cannot hold ExxonMobil liable for complying with federal law.

98.     Attorney General Healey's investigation also purports to encompass the same unsound theory of fraud.[210]   The decision to embrace this theory speaks volumes about the pretextual nature of the investigations being conducted by Attorneys General Schneiderman and Healey.   To read the relevant SEC rules is to understand why ExxonMobil may not account for future climate change regulations when calculating its proved reserves.  And to read the applicable accounting standards is to understand why it is impermissible for the Attorneys General to impose their assumptions about the

---

[208]   *See* Commission Statement of Policy Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, 68 Fed. Reg. 23,333–401 (May 1, 2003).

[209]   *See* FASB Accounting Standards Codification 360-10-35-30; *see also* Statement of Financial Accounting Standards No. 144 ¶ 17.

[210]   Ex. NN at App. 367, 372; ECF. No. 43 ("If substantial portions of Exxon's vast fossil fuel reserves are unable to be burned due to carbon dioxide emissions limits put in place to stabilize global average temperature, those assets—valued in the billions—will be stranded, placing shareholder value at risk.").

financial impact of possible future climate change regulations on companies that are required to develop their own independent assumptions. The Attorneys General's claims that they are conducting a bona fide investigation premised on ExxonMobil's supposed failure to account for the Attorneys General's expectations regarding the financial impact of future regulations thus cannot be credited.

99.     Their true objectives are clear: to fish indiscriminately through ExxonMobil's records with the hope of finding some violation of some law that one of them might be empowered to enforce, or otherwise to harass ExxonMobil into endorsing the Green 20's policy views regarding how the United States should respond to climate change.

100.     The desire of Attorneys General Schneiderman and Healey to impose liability on ExxonMobil for complying with SEC disclosure requirements, and the accounting methodologies incorporated in them, would create a direct conflict with federal law. Even if the New York or Massachusetts Attorneys General were to seek only to layer additional disclosure requirements beyond those imposed by the SEC, this would frustrate, and pose an obstacle to, Congress's and the SEC's efforts to create a uniform market for securities and provide consistent metrics by which investors can measure oil and gas companies on a relative basis.

## I.     ExxonMobil Files Suit to Protect Its Rights.

101.     ExxonMobil has challenged members of the Green 20 for violating its constitutional rights. Attorney General Walker issued a subpoena to ExxonMobil on March 15, 2016.[211] ExxonMobil responded by seeking a declaratory judgment that Attorney General Walker's subpoena was illegal and unenforceable because it violated

---

[211]     Ex. WW at App. 459–77.

ExxonMobil's rights under the United States and Texas constitutions.[212]

102.    The Attorneys General of Texas and Alabama intervened in that action in an effort to protect the constitutional rights of their citizens.  They criticized Attorney General Walker for undertaking an investigation "driven by ideology, and not law."[213] The Texas Attorney General called Attorney General Walker's purported investigation "a fishing expedition of the worst kind" and recognized it as "an effort to punish Exxon for daring to hold an opinion on climate change that differs from that of radical environmentalists."[214]   The Alabama Attorney General echoed those sentiments, stating that the pending action in Texas "is more than just a free speech case.  It is a battle over whether a government official has a right to launch a criminal investigation against anyone who doesn't share his radical views."[215]

103.    On June 30, 2016, Attorney General Walker and ExxonMobil entered into a joint stipulation of dismissal, whereby the Attorney General agreed to withdraw his subpoena and ExxonMobil agreed to withdraw its litigation challenging the subpoena.

104.    ExxonMobil commenced this action in the Northern District of Texas on June 15, 2016, seeking a preliminary injunction that would bar Attorney General Healey from enforcing the CID.    In an attempt to defend Attorney General Healey's constitutionally infirm CID, Attorney General Schneiderman, along with other attorneys general, filed an amicus brief on August 8, 2016.[216]  They argued that Attorney General

---

[212]   Ex. LL at App. 323–49.
[213]   Ex. OO at App. 395.
[214]   Ex. CC at App. 244–45.
[215]   Ex. W at App. 216.
[216]   ECF No. 47.

Healey has a "compelling interest in the traditional authority" of her office "to investigate and combat violations of state law."[217]

105.   Recognizing that there was nothing "traditional" about Attorney General Healey's use of state power, attorneys general from eleven states filed an amicus brief in support of ExxonMobil's preliminary injunction motion.[218]  "As chief legal officers" of their respective states, they explained that their investigative power "does not include the right to engage in unrestrained, investigative excursions to promulgate a social ideology, or chill the expression of points of view, in international policy debates."[219]  As a result, they noted that "[u]sing law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech."[220]   They concluded, "Regrettably, history is embroiled with examples where the legitimate exercise of law enforcement is soiled with political ends rather than legal ones. Massachusetts seeks to repeat[] that unfortunate history. That the statements and workings of the 'AG's United for Clean Power' are entirely one-sided, and target only certain participants in the climate change debate, speaks loudly enough."[221]

106.   On November 10, 2016, ExxonMobil filed its First Amended Complaint which (i) joined the Attorney General of New York as a defendant and (ii) added new claims of conspiracy and federal preemption.

107.   The allegations in ExxonMobil's lawsuit against Attorneys General Schneiderman and Healey were sufficiently compelling that Northern District of Texas

---

[217]   *Id.*at 11.
[218]   ECF No. 63-2.
[219]   *Id.* at 3.
[220]   *Id.*
[221]   *Id.* at 11.

Judge Ed Kinkeade ordered discovery on the Attorneys General's bad faith.[222] Explaining that decision, Judge Kinkeade expressed "concern" that "the anticipatory nature of Attorney General Healey's remarks" at the March 29 press conference "about the outcome of the Exxon investigation" and "Attorney General Healey's actions leading up to the issuance of the CID" present the question of whether Attorney General Healey exhibited "bias or prejudgment about what the investigation of Exxon would discover."[223] Judge Kinkeade reaffirmed that conclusion in a subsequent order, where he expressed concern that the investigations conducted by Attorneys General Schneiderman and Healey may be means "to further their personal agendas by using the vast power of the government to silence the voices of all those who disagree with them."[224]

108.   In early 2017, ExxonMobil's lawsuit was transferred to the Southern District of New York—the venue of the March 2016 press conference—with Judge Kinkeade's conclusion that "[t]he merits of each of Exxon's claims involve important issues that should be determined by a court."[225]

109.   In June 2017, attorneys general from twelve states filed another amicus brief in support of ExxonMobil.[226]  While recognizing that they may use their subpoena power "to identify and remedy unlawful conduct," these attorneys general explained that "[t]his power, however, does not include the right to engage in unrestrained, pretextual investigative excursions to promote one side of an international public policy debate, or

---

[222]   ECF No. 73.  In December 2016, this order was stayed pending briefing on the issue of personal jurisdiction.  ECF Nos. 163, 164.  In March 2017, the federal judge transferred the action to the Southern District of New York.  ECF No. 180.  Since then, discovery has been stayed indefinitely.
[223]   ECF No. 73 at 3–5.
[224]   ECF No. 180 at 5.
[225]   *Id.* at 2.
[226]   ECF No. 192-3.

chill the expression of viewpoints in those debates."[227]   They further explained, "Defendants are not using their power in an impartial manner.   Rather, they are embracing one side of a multi-faceted and robust policy debate, and simultaneously seeking to censor opposing viewpoints.  This is bad faith."[228]

## THE INVESTIGATIONS VIOLATE EXXONMOBIL'S RIGHTS

110.   The facts recited above demonstrate the pretextual nature of the stated reasons for the Attorneys General's investigations.  The statements Attorneys General Schneiderman and Healey made at (and after) the press conference, the climate change coalition common interest agreement, and other documents in the public record reveal the improper purpose of the investigations.   The Attorneys General seek to change the political calculus surrounding public discourse about climate policy by (1) targeting speech that the Attorneys General perceive to advance political viewpoints on climate change that differ from their own, and (2) exposing ExxonMobil's documents that may be politically useful to climate activists aligned with the Attorneys General's agenda.

111.   Neither Attorney General Schneiderman nor Attorney General Healey (nor, indeed, any other public official) may use the power of the state to prescribe what shall be orthodox in matters of public concern.  It is improper under the United States and Texas Constitutions for state governments to restrict the range of permissible viewpoints by commencing investigations against those identified with disfavored policy positions. Such viewpoint discrimination violates the First Amendment.

112.   It follows from the political character of the subpoena and the CID and their remarkably broad scope that they also violate the Fourth Amendment.   Their

---

[227]   *Id.* at 8.
[228]   *Id.* at 9.

burdensome demands for irrelevant records violate the Fourth Amendment's reasonableness requirement, as well as its prohibition on fishing expeditions.  Indeed, the evolving justifications for the New York and Massachusetts inquiries confirm that they are investigations driven by the identity of the target, not any good faith belief that a law was broken.

113.   The investigations also fail to meet the requirements of due process. Attorneys General Schneiderman and Healey have publicly declared not only that they believe ExxonMobil and other energy companies pose an existential risk to the planet, but also the improper purpose of their investigations: to pressure ExxonMobil to support polices the Attorneys General favor in the public debate regarding climate change.  Even worse, Attorney General Schneiderman has publicly accused ExxonMobil of engaging in a "massive securities fraud."   Attorney General Healey has also declared, before her investigation even began, that she knew how it would end: with a finding that ExxonMobil violated the law.[229]  The improper political bias that inspired the New York and Massachusetts investigations disqualifies Attorneys General Schneiderman and Healey from serving as the disinterested prosecutors required by the Constitution.

114.   In the rush to fill what Attorney General Schneiderman described as a "[legislative] breach" in Congress regarding climate change, both he and Attorney General Healey have also openly and intentionally infringed on Congress's powers to regulate interstate commerce.  Their investigations seek to regulate speech and conduct that occur almost entirely outside of New York and Massachusetts.  Where a state seeks to regulate and burden out-of-state speech, as the investigations do here, the state

---

[229]   Ex. B at App. 20–21.

improperly encroaches on Congress's exclusive authority to regulate interstate commerce and violates the Dormant Commerce Clause.

115.   The Attorneys General's focus on ExxonMobil's reporting of proved reserves and assets is equally impermissible.  They seek to hold ExxonMobil liable for not taking into account possible future regulations concerning climate change and carbon emissions when estimating proved reserves and reporting assets.  But that theory cannot be reconciled with the SEC's requirement that ExxonMobil calculate its proved reserves based only on "existing" regulations, not future regulations.  This facet of the investigation, therefore, impermissibly conflicts with, and poses an obstacle to, the goals and purposes of federal law.  That conflict is also present in the Attorneys General's investigation of how ExxonMobil determines under binding accounting rules whether an asset has become impaired.

116.   It is equally improper under Texas common law for litigants to misuse legal process for an objective other than the one for which the process is intended.  The Attorneys General are misusing process to apply pressure on perceived political opponents to alter their views on a matter of public concern.  Such conduct constitutes an abuse of process in violation of the common law of Texas.

117.   Participation in a conspiracy in furtherance of either objective (constitutional violations and abuse of process) is unlawful in its own right.

118.   ExxonMobil asserts the claims herein based on the facts available to it in the public record from, among other things, press accounts and freedom of information requests made by third parties.  ExxonMobil anticipates that discovery from the

Attorneys General, as well as third parties, will reveal substantial additional evidence in support of its claims.

## **EXXONMOBIL HAS BEEN INJURED BY THE INVESTIGATIONS**

119.   The climate change investigations have injured, are injuring, and will continue to injure ExxonMobil.

120.   ExxonMobil is an active participant in public discourse about climate change and climate policy.  It has engaged in these discussions for decades, participating in the Intergovernmental Panel on Climate Change since its inception and contributing to every report issued by the organization since 1995.  For more than a decade, ExxonMobil has widely and publicly confirmed that it "recognize[s] that the risk of climate change and its potential impacts on society and ecosystems may prove to be significant."[230] ExxonMobil has also publicly advocated a tax on carbon emissions since 2009.[231]

121.   In conducting its business, ExxonMobil addresses the potential for future climate policy by applying proxy cost of carbon mechanisms, which seek to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels.[232]   This cost, which in some regions may approach $80 per ton by 2040, has been included in ExxonMobil's *Outlook for Energy* for several years.[233]   Further, ExxonMobil requires all of its business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.[234]

---

[230]   Ex. G  at App. 93; *see also* Ex. H at App. 103 ("Because the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant, strategies that address the risk need to be developed and implemented.").
[231]   Ex. T at App. 182.
[232]   *Id.* at App. 190.
[233]   *Id.*
[234]   *Id.*

122.    For the past decade, through its annual *Outlook for Energy* publication,
ExxonMobil has sought to "promote better understanding of the issues shaping the
world's energy future"—including how best to balance and manage concerns regarding
the risks posed by climate change and the ever-growing energy needs of an increasing
global middle class.[235]   In its 2014 *Outlook for Energy*, ExxonMobil expressed its
forward-looking view that energy demand from both traditional and renewable sources is
expected to rise for the foreseeable future.  By the year 2040, ExxonMobil stated that it
expects to see "2 billion more people on the planet," a "130 percent larger global
economy," and "about 35 percent greater demand for energy."[236]   The company
explained that, although renewables "will grow by close to 60 percent," demand for
natural gas and oil will also grow by "65 percent" and "25 percent," respectively.[237]
"The need for energy will continue to grow as economies expand, living standards rise
and the world's population grows," ExxonMobil said.  With respect to climate policy,
ExxonMobil wrote:

> To meet this demand in the most effective way, none of our energy
> options should be arbitrarily denied, dismissed, penalized or promoted.
> And free trade opportunities should be facilitated – not curtailed. . . .  Free
> markets supported by reliable public policies remain essential to creating
> economic opportunities and encouraging the private-sector investments
> that are critical to meeting people's energy needs.[238]

123.    ExxonMobil has also expressed its view on the policy tradeoffs of certain
climate initiatives.  For example, ExxonMobil stated that any plan to reduce carbon-based
emissions "in the range of 80 percent through the year 2040" in an effort to "stabiliz[e]
world temperature increases not to exceed 2 degrees Celsius by 2100" is unlikely to be

---

[235]   Ex. S58 at App. 1229.
[236]   *Id.* at App. 1230.
[237]   *Id.* at App. 1270.
[238]   *Id.* at 1278.

50

achieved because "the transition to lower carbon energy sources will . . . take time."[239] ExxonMobil has stated that "renewable sources, such as solar and wind, despite very rapid growth rates, cannot scale up quickly enough to meet global demand growth while at the same time displacing more traditional sources of energy."[240]  According to ExxonMobil, "[f]actors limiting further penetration of renewables include scalability, geographic dispersion, intermittency (in the case of solar and wind), and cost relative to other sources."[241]  The company further clarified that, accounting for current and future taxes on carbon emissions—which are embedded into energy demand projections that appear in the *Outlook for Energy*—did not change its perspective that the "cost limitations of renewables are likely to persist."[242]

124.    While Attorneys General Schneiderman and Healey and the other members of the Green 20 are entitled to disagree with ExxonMobil's position on the proper policy responses to climate change, no member of that coalition is entitled to target one side of that discussion (or the debate about any other important public issue) to alter its viewpoints through baseless investigations and burdensome subpoenas. ExxonMobil intends—and has a constitutional right—to continue to advance its perspective in the national discussions over how best to respond to climate change and the likely future mix of energy sources.  Its right to do so should not be violated through this exercise of government power.

125.    As a result of the improper and politically motivated investigations launched by Attorneys General Schneiderman and Healey, ExxonMobil has suffered,

---

[239]   Ex. S56 at App. 1150, 1152.
[240]   *Id.* at 1152–53.
[241]   *Id.* at App. 1148–1149.
[242]   *Id.* at 1149.

51

now suffers, and will continue to suffer violations of its rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and under Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.   Attorneys General Schneiderman's and Healey's actions also violate Articles One and Six of the United States Constitution and constitute an unlawful conspiracy and abuse of process under common law.

126.   Acting under the laws, customs, and usages of New York and Massachusetts, Attorneys General Schneiderman and Healey have subjected ExxonMobil, and are causing ExxonMobil to be subjected, to the deprivation of rights, privileges, and immunities secured by the United States Constitution and the Texas Constitution.   ExxonMobil's rights are made enforceable against Attorneys General Schneiderman and Healey, who are acting under the color of law, by Article One, Section Eight of the United States Constitution, and the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution, all within the meaning and contemplation of 42 U.S.C. § 1983, and by Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.

127.   Absent relief, Attorneys General Schneiderman and Healey will continue to deprive ExxonMobil of these rights, privileges, and immunities.

128.   In addition, ExxonMobil is threatened with further imminent injury that will occur if it continues to be targeted for expressing constitutionally protected speech that is disfavored by the Attorneys General.

129.   The subpoena and the CID also threaten ongoing imminent injury to ExxonMobil because they subject ExxonMobil to an unreasonable search in violation of

52

the Fourth Amendment.   Complying with these unreasonably burdensome and unwarranted fishing expeditions would require ExxonMobil to collect, review, and produce millions more documents, and would cost millions of dollars.

130.   If ExxonMobil's request for injunctive relief is not granted, and Attorneys General Schneiderman and Healey are permitted to persist in their investigations, then ExxonMobil will suffer these imminent and irreparable harms.   ExxonMobil has no adequate remedy at law for the violation of its constitutional rights.

## CAUSES OF ACTION

### A.      First Cause of Action: Conspiracy

131.   ExxonMobil repeats and realleges paragraphs 1 through 109 above as if fully set forth herein.

132.   The facts set forth herein demonstrate that, acting under color of state law, Attorneys General Schneiderman and Healey have agreed with each other, and with others known and unknown, to deprive ExxonMobil of rights secured by the law to all, including those guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.

133.   In furtherance of these objectives, Attorneys General Schneiderman and Healey have, among other things, commenced pretextual investigations of ExxonMobil, issued the unlawful subpoena and CID, and entered the common interest agreement described above at paragraphs 62-63.   The investigations were commenced without a good faith basis and with the ulterior motive of coercing ExxonMobil to adopt climate change policies favored by the Attorneys General, in violation of the First, Fourth, and

53

Fourteenth Amendments to the United States Constitution, as well as Sections Eight, Nine, and Nineteen of Article One of the Texas Constitution.

134.    ExxonMobil has been damaged, and has been deprived of its rights under the United States and Texas Constitutions, as a proximate result of the unlawful conspiracy entered into by Attorneys General Schneiderman and Healey.  The conduct of Attorneys General Schneiderman and Healey therefore violates both 42 U.S.C. § 1985 and the Texas common law.

**B.     Second Cause of Action: Violation of ExxonMobil's First and Fourteenth Amendment Rights**

135.    ExxonMobil repeats and realleges paragraphs 1 through 109 above as if fully set forth herein.

136.    The Attorneys General's decision to impose investigative burdens on ExxonMobil over perceived differences in viewpoint on public policy contravenes, and any effort to continue the investigations would further contravene, the rights provided to ExxonMobil by the First Amendment to the United States Constitution, made applicable to the State of New York and the Commonwealth of Massachusetts by the Fourteenth Amendment, and by Section Eight of Article One of the Texas Constitution.

137.    Impermissible viewpoint discrimination motivated the Attorneys General's deployment of state power.  Attorneys General Schneiderman and Healey commenced their investigations of ExxonMobil and issued subpoenas and a CID based on their disagreement with ExxonMobil regarding how the United States should respond to the risks of climate change.  And even if these state actions had not been taken for that illegal purpose, they would still violate the First Amendment, because they burden

ExxonMobil's political speech without being substantially related to any compelling governmental interest.

**C.     Third Cause of Action: Violation of ExxonMobil's Fourth and Fourteenth Amendment Rights**

138.    ExxonMobil repeats and realleges paragraphs 1 through 109 above as if fully set forth herein.

139.    The issuance of the subpoena and the CID contravenes, and any effort to enforce the subpoena would further contravene, the rights provided to ExxonMobil by the Fourth Amendment to the United States Constitution, made applicable to the State of New York and the Commonwealth of Massachusetts by the Fourteenth Amendment, and by Section Nine of Article One of the Texas Constitution, to be secure in its papers and effects against unreasonable searches and seizures.

140.    The Attorneys General's document requests amount to unreasonable searches and seizures because they constitute an abusive fishing expedition into 40 years of ExxonMobil's records, without any legitimate basis for believing that ExxonMobil violated New York or Massachusetts law.   Their overbroad and irrelevant requests impose an undue burden on ExxonMobil and violate the Fourth Amendment's reasonableness requirement, which mandates that a subpoena be limited in scope, relevant in purpose, and specific in directive.

**D.     Fourth Cause of Action: Violation of ExxonMobil's Fourteenth Amendment Rights**

141.    ExxonMobil repeats and realleges paragraphs 1 through 109 above as if fully set forth herein.

142.    The investigations conducted by Attorneys General Schneiderman and Healey contravene the rights provided to ExxonMobil by the Fourteenth Amendment to

the United States Constitution and by Section Nineteen of Article One of the Texas Constitution not to be deprived of life, liberty, or property without due process of law.

143.   The investigations deprive ExxonMobil of due process of law by violating the requirement that a prosecutor be disinterested.  The statements by Attorneys General Schneiderman and Healey at the Green 20 press conference and elsewhere make clear that they are biased against ExxonMobil.

**E.     Fifth Cause of Action: Violation of ExxonMobil's Rights Under the Dormant Commerce Clause**

144.   ExxonMobil repeats and realleges paragraphs 1 through 109 above as if fully set forth herein.

145.   Article I, Section 8 of the United States Constitution grants Congress exclusive authority to regulate interstate commerce and thus prohibits the States from doing so.  The investigations and the issuance of the subpoena and the CID contravene, and any effort to enforce the subpoena and the CID would further contravene, the rights provided to ExxonMobil under the Dormant Commerce Clause.

146.   The investigations effectively regulate ExxonMobil's out-of-state speech while only purporting to investigate ExxonMobil's marketing and/or sale of energy and other fossil fuel derived products to consumers in New York and Massachusetts and its marketing and/or sale of securities to investors in New York and Massachusetts.

147.   The Attorneys General demand documents that relate to (1) statements ExxonMobil made outside New York and Massachusetts, and (2) ExxonMobil's communications with organizations residing outside New York and Massachusetts.  The Attorneys General's document requests therefore have the practical effect of primarily burdening interstate commerce.

**F.      Sixth Cause of Action: Federal Preemption**

148.    ExxonMobil repeats and realleges paragraphs 1 through 109 above as if fully set forth herein.

149.    Article VI, Clause 2 of the United States Constitution provides that the laws of the United States "shall be the supreme law of the land."  Any state law that imposes disclosure requirements inconsistent with federal law is preempted under the Supremacy Clause.

150.    Federal law requires ExxonMobil to calculate and report its proved oil and gas reserves based on "existing economic conditions, operating methods, and government regulations."  This requirement reflects the SEC's reasoned judgment about how best to supply investors with information about the relative value of oil and gas companies, as well as its balancing of competing priorities, such as the agency's desire for comprehensive disclosures, that are not unduly burdensome, and which investors can easily compare.  Similarly, accounting standards recognized as authoritative by the SEC require ExxonMobil to use its own assumptions about future events when determining whether assets are impaired, not the assumptions of the Attorneys General.  Attorneys General Schneiderman and Healey have stated that they seek to impose liability on ExxonMobil for failing to account for what they believe will be the financial impact of as-yet-unknown "carbon dioxide emissions limits put in place to stabilize global average temperature" in estimating and reporting ExxonMobil's proven reserves and valuing its assets.   The Attorneys General therefore would seek to punish ExxonMobil for complying with federal law and the accounting standards embedded therein.

151.    Even if the New York or Massachusetts Attorneys General were to seek only to layer additional disclosure requirements concerning oil and gas reserves and asset

valuations beyond those imposed by the SEC, this would frustrate, and pose an obstacle to, Congress's and the SEC's efforts to create a uniform market for securities and provide consistent metrics by which investors can measure oil and gas companies on a relative basis.

152.    Because these investigations under New York and Massachusetts law create a conflict with, and pose an obstacle to, federal law, the application of New York and Massachusetts law to this case is preempted.

**G.    Seventh Cause of Action: Abuse of Process**

153.    ExxonMobil repeats and realleges paragraphs 1 through 109 above as if fully set forth herein.

154.    Attorneys General Schneiderman and Healey committed an abuse of process under common law by (1) issuing the subpoena and the CID to ExxonMobil without having a good faith basis for conducting an investigation; (2) having an ulterior motive for issuing and serving the subpoena and the CID, namely, an intent to prevent ExxonMobil from exercising its right to express views with which they disagree; and (3) causing injury to ExxonMobil's reputation and violating its constitutional rights.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, ExxonMobil prays that Attorneys General Schneiderman and Healey be summoned to appear and answer and that this Court award the following relief:

1.    A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that investigations of ExxonMobil, as conducted by Attorneys General Schneiderman and Healey, violate ExxonMobil's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution; violate ExxonMobil's rights under Sections Eight,

Nine, and Nineteen of Article One of the Texas Constitution; and violate the Dormant Commerce Clause and the Supremacy Clause of the United States Constitution;

2.      A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the issuance of the subpoena and the CID constitute an abuse of process, in violation of common law;

3.      A preliminary and permanent injunction halting or appropriately limiting the investigations;

4.      Such other injunctive relief to which ExxonMobil is entitled; and

5.      All costs of court together with any and all such other and further relief as this Court may deem proper.

Dated: January 12, 2018


EXXON MOBIL CORPORATION

By: /s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
twells@paulweiss.com
Daniel J. Toal
dtoal@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
janderson@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300
Fax: (202) 223-7420

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
Daniel E. Bolia (*pro hac vice*)
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

Nina Cortell (*pro hac vice*)
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411

Ralph H. Duggins (*pro hac vice*)
rduggins@canteyhanger.com
Philip A. Vickers (*pro hac vice*)
pvickers@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807


*Counsel for Exxon Mobil Corporation*