USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/29/2018___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                   :

EXXON MOBIL CORPORATION,       :
                                     :

                 Plaintiff,       :

                                     :

          -against-        :

                                     :

ERIC TRADD SCHNEIDERMAN, Attorney  :
General of New York, in his official capacity,  :
and MAURA TRACY HEALEY, Attorney   :
General of Massachusetts, in her official   :
capacity,                            :

                  Defendants.   :
------------------------------------------------------------ X

17-CV-2301 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

       Running roughshod over the adage that the best defense is a good offense, Exxon Mobil

Corporation ("Exxon") has sued the Attorneys General of Massachusetts and New York

(collectively "the AGs"),[1] each of whom has an open investigation of Exxon.  The AGs are

investigating whether Exxon misled investors and the public about its knowledge of climate

change and the potential effects that climate change may have on Exxon's business.  Exxon

contends the investigations are being conducted to retaliate against Exxon for its views on

climate change and thus violate Exxon's constitutional rights.  The relief requested by Exxon in

this case is extraordinary:  Exxon has asked two federal courts—first in Texas, now in New

York—to stop state officials from conducting duly-authorized investigations into potential fraud.

---

[1]      The Attorney General of Massachusetts is Maura Tracy Healey ("Healey" and with her office, the
"MAG"); Eric Tradd Schneiderman is the Attorney General of New York ("Schneiderman" and with his office, the
"NYAG").

      Claude Walker, the Attorney General of the Virgin Islands had also opened an investigation of Exxon and
served it with a subpoena.  *See* Declaration of Justin Anderson in Support of Motion for Leave to Amend
("Anderson SAC Decl.") (Dkt. 252) Ex. A (proposed Second Amended Complaint or "SAC") ¶ 101.  Exxon brought
a separate lawsuit against Walker in Texas state court.  *See* SAC ¶ 10.  That lawsuit was dismissed after Walker
withdrew his subpoena.

It has done so on the basis of extremely thin allegations and speculative inferences.  The factual allegations against the AGs boil down to statements made at a single press conference and a collection of meetings with climate-change activists.  Some statements made at the press conference were perhaps hyperbolic, but nothing that was said can fairly be read to constitute declaration of a political vendetta against Exxon.

Healey and Schneiderman have moved to dismiss Exxon's First Amended Complaint (the "Complaint") (Dkt. 100) on numerous grounds:  personal jurisdiction, ripeness, *res judicata*, abstention pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and that the Complaint fails to state a claim.  The AGs have reserved their other defenses, including abstention pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), and qualified immunity, for subsequent motion practice, if necessary.  Exxon has opposed the AGs' motions and cross-moved for leave to amend in order to file the SAC.  The AGs argue that leave to amend should be denied as futile because the SAC also fails to state a claim.

For the reasons given below, the Court concludes that Healey is subject to this Court's jurisdiction and that Exxon's claims against the AGs are ripe for adjudication.  The Complaint and SAC suffer from a more fundamental flaw, however:  Exxon's allegations that the AGs are pursuing bad faith investigations in order to violate Exxon's constitutional rights are implausible and therefore must be dismissed for failure to state a claim.  For the same reason, amendment and filing of the SAC would be futile.  Additionally, Exxon's lawsuit against Healey is precluded by *res judicata*.  The Court does not reach whether abstention would be appropriate pursuant to *Colorado River*.  The motions to dismiss are GRANTED, leave to amend is DENIED, and the Complaint is DISMISSED WITH PREJUDICE.

2

## BACKGROUND

### 1.     The New York Subpoenas and Massachusetts CID

In November 2015, the NYAG served Exxon with a subpoena seeking documents related to its historical knowledge of climate change and its communications with interest groups and shareholders regarding the same.  Compl. ¶¶ 20, 65-68.  The subpoena was issued in connection with an investigation into deceptive and fraudulent acts in violation of New York Executive Law Art. 5 § 63(12) and New York General Business Law Art. 22-A, and the Martin Act, New York General Business Law Art. 23-A, which prohibits fraudulent practices in connection with securities issued or sold in New York.  Declaration of Justin Anderson ("Anderson Decl.") (Dkt. 227) Ex. B (the "Subpoena") at 1; Compl. ¶ 62.  As Schneiderman explained at a press conference discussed in detail below, the NYAG was investigating whether Exxon's historical securities filings were misleading because they failed to disclose Exxon's internal projections regarding the potential costs to Exxon of climate change and likely climate change-related regulations.  Compl. ¶ 36.  Among other things, the Subpoena demanded that Exxon produce documents relevant to:  Exxon's research and internal deliberations concerning climate change since 1977, Exxon's communications concerning climate change with certain oil and gas interests since 2005, Exxon's support for outside organizations regarding climate change since 1977, and Exxon's marketing, advertising, and public relations materials concerning climate change since 1977.  Subpoena at 8-9; Compl. ¶¶ 65-66.  The Subpoena was followed by an August 2016 subpoena served on PricewaterhouseCoopers ("PwC"), Exxon's outside auditor.  Opp'n (Dkt. 228) at 12.  In response, and after some disputes over the scope of the Subpoena, Exxon produced at least 1.4 million pages of documents to the NYAG.  *See infra* at 12.

Approximately one year later, in fall 2016, the NYAG requested additional documents relevant to what Exxon calls the "stranded assets theory."  Compl. ¶¶ 75-76.  Under this theory, Exxon's past disclosures of the value of its oil and gas reserves may have been overstated because Exxon did not account for the potential impact of new regulations designed to reduce harmful emissions on the economics and feasibility of extracting certain oil and gas reserves.  Compl. ¶ 75.  These reserves would be "stranded" because it would no longer be economically feasible for Exxon to extract them.  If Exxon's internal models showed that certain reserves were likely to be stranded, Exxon might have been required to disclose those facts to the market.  Relatedly, according to Exxon, the NYAG is also investigating the possibility that certain of Exxon's assets may be impaired and that Exxon's public disclosures do not account for that impairment.[2]  Compl. ¶ 79.  Exxon has engaged in a "dialogue" with the NYAG regarding these demands.  Compl. ¶ 76.  In May and July, 2017, the NYAG served Exxon with subpoenas for testimony and documents relative to these theories.  SAC ¶ 86.

About six months after the NYAG served its first subpoena on Exxon, the MAG served Exxon with a Civil Investigative Demand (the "CID") to pursue a similar fraud theory.  Compl. ¶ 69.  The CID was issued as part of an investigation into potential violations of Massachusetts General Law ch. 93A § 2, which prohibits "unfair or deceptive acts or practices" in "trade or commerce."  Compl. ¶ 69.  Like the Subpoena, the CID demands internal Exxon documents regarding climate change since the 1970s, Compl. ¶ 72; Anderson Decl. Ex. C (Civil Investigative Demand or the "CID") at 12, and records of communications between Exxon and other energy companies, affiliated interest groups, and conservative policy organizations, CID at

---

[2]       According to Exxon, the NYAG is no longer investigating Exxon's historical knowledge of climate change. SAC ¶ 92.

13, 18; Compl. ¶ 73.  The CID also demands records related to specific reports prepared by

Exxon and statements by Exxon officers regarding climate change.  CID at 14-16.[3]  For example,

the CID demands any documents and communications concerning a paper entitled "*CO2*

*Greenhouse Effect A Technical Review*," which was prepared by Exxon researchers in 1982, and

a 2014 report to shareholders entitled "*Energy and Carbon – Managing the Risks*."  CID at 13,

16.  Broadly, the CID demands "Documents and Communications concerning any public

statement [former CEO Rex W. Tillerson][4] has made about Climate Change or Global Warming

from 2012 to present."  CID at 15.  Like the Subpoena, the CID also demands documents

relevant to Exxon's discussion of climate change in marketing materials and securities filings.

*See* CID at 17-19.

## 2.      Exxon's Lawsuit[5]

Exxon brought this lawsuit on June 15, 2016, two months after receiving the CID and

eight months after receiving the Subpoena.  The Complaint alleges that the CID and the

Subpoena are part of a conspiracy to "silence and intimidate one side of the public policy debate

on how to address climate change."  Compl. at 1.  The overt portion of this campaign is a

coalition of state attorneys general, including Healey and Schneiderman, called the "AGs United

for Clean Power" or "Green 20."  Compl. ¶ 27.  The AGs United for Clean Power held a

conference and press event with former Vice President Al Gore in New York on March 29, 2016,

to announce a plan to take "progressive action to address climate change."  Compl. ¶ 27.

---

[3]        The Court has only summarized the demands in the CID and Subpoena.  Both document demands are
attached to the Complaint.

[4]        Mr. Tillerson left Exxon to serve as Secretary of State of the United States in December 2016.

[5]        At this stage, the Court assumes as true the factual allegations in the Complaint and the SAC.

Schneiderman spoke at the March 29, 2016, press event and said that the conference's purpose was to "com[e] up with creative ways to enforce laws being flouted by the fossil fuel industry and their allies . . . ."  Anderson Decl. Ex. A (Tr. of March 29, 2016, press conference) at 1.  He described climate change as the "most important issue facing all of us," and described the conference as a "collective of states working as creatively, collaboratively and aggressively as possible."[6]  Anderson Decl. Ex. A at 2.  Schneiderman also linked the AGs United for Clean Power conference to inaction at the federal level to address climate change: "[W]e know that in Washington there are good people who want to do the right thing on climate change but everyone . . . is under a relentless assault from well-funded, highly aggressive and morally vacant forces . . . ."[7]  Anderson Decl. Ex. A at 4.

Healey also spoke at the March 29, 2016, press conference and said that "[c]limate change is and has been for many years a matter of extreme urgency. . . .  Part of the problem has been one of public perception, and it appears, certainly, that certain companies, certain industries, may not have told the whole story, leading many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts."  Anderson

---

[6]     Schneiderman went on to explain that his office had recently reached a settlement with Peabody Energy, a coal company, which agreed to restate its financial disclosures to provide clarification regarding Peabody's internal modeling of the cost to its business of government regulation of emissions.  Anderson Decl. Ex. A at 3.  Schneiderman said that the NYAG was pursuing a similar theory against Exxon.  Anderson Decl. Ex. A at 3.  Seemingly anticipating this lawsuit, Schneiderman stated:

> There have been those who have raised the question: aren't you interfering with people's First Amendment rights?  The First Amendment, ladies and gentlemen, does not give you the right to commit fraud.  And we are law enforcement officers, all of us do work, every attorney general does work on fraud cases.  And we are pursuing this as we would any other fraud matter.  You have to tell the truth.  You can't make misrepresentations of the kinds we've seen here.

Anderson Decl. Ex. A at 3-4.  The transcript of the March 29, 2016 conference is quoted extensively in the Complaint.

[7]     According to the SAC, Schneiderman has previously made public statements regarding the "importance of 'challenging those who refuse to acknowledge that climate change is real.'"  SAC ¶ 28 (quoting Anderson SAC Decl. Ex. S5 at 7).

Decl. Ex. A at 12; Compl. ¶ 32.  Referencing Schneiderman's earlier comments regarding

Exxon's disclosures (quoted *supra* n. 6), Healey said "[t]hat's why I, too, have joined in

investigating the practices of [Exxon].  We can all see today the troubling disconnect between

what Exxon knew, what industry folks knew, and what the company and industry chose to share

with investors and with the American public."  Anderson Decl. Ex. A at 12; Compl. ¶ 37.

In a wild stretch of logic, Exxon contends that the AGs' "overtly political tone," Compl.

¶ 38, and comments on public "confusion" relative to climate change show that their intent is to

chill dissenting speech, Compl. ¶ 31; *see also id.* ¶ 31 ("To [Schneiderman], there was 'no

dispute but there is confusion and confusion sowed by those with an interest in profiting from the

confusion and creating misperceptions in the eyes of the American public . . . .").  And, Exxon

alleges, the AGs' comments demonstrate that they have prejudged the outcome of their

investigations, presuming Exxon's guilt from the get-go.  Compl. ¶¶ 36- 37.[8]

The Complaint alleges that the March 29, 2016, conference was the culmination of a

behind-the-scenes push by climate change activists.  Among the activists allegedly involved are

Peter Frumhoff, Director of Science and Policy for the Union of Concerned Scientists, Compl. ¶

42, who previously contributed to a report titled "Smoke, Mirrors, and Hot Air: how

ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science,"

Compl. ¶ 44.  Also allegedly involved is Matthew Pawa, a self-described specialist in "climate

change litigation."  Compl. ¶ 45.  The Complaint describes the development by Pawa, Frumhoff,

and the private Rockefeller Family Fund of a strategy to promote litigation against fossil fuel

producers, including, in particular, Exxon.  Compl. ¶¶ 46-49.  Pawa and Frumhoff allegedly

---

[8]     The Attorneys General involved in the AGs United for Clean Power coalition have entered into a common
interest agreement, which includes a confidentiality provision.  Compl. ¶¶ 52-53.  Exxon contends, *ipse dixit*, that
the AGs' interest in confidentiality is evidence of the coalition's intent to chill protected speech.  Compl. ¶ 53.

made presentations to the AGs United for Clean Power at the March 29, 2016, conference,

Compl. ¶¶ 44-45, but when Pawa was asked for comment by a *Wall Street Journal* reporter, a

member of the NYAG's office requested that he "not confirm" his attendance at the conference.

Compl. ¶ 50.

The SAC adds detail to the Complaint's allegations regarding Pawa and Frumhoff and

the Rockefeller Family Fund.  According to the SAC, Pawa, Frumhoff, and others hatched a

scheme to promote litigation against Exxon at a June 2012 conference in La Jolla, California.

SAC ¶ 44.  These activists saw litigation as a means to uncover internal Exxon documents

regarding climate change and to pressure fossil fuel companies like Exxon to change their stance

on climate change.  SAC ¶ 45.  In January 2016, at a conference at the offices of the Rockefeller

Family Fund, the activists discussed the "'the main avenues for legal actions & related

campaigns,' including 'AGs,' 'DOJ,' and 'Torts,'" and which options "had the 'best prospects'

for (i) 'successful action,' (ii) 'getting discovery,' and (iii) 'creating scandal.'"  SAC ¶ 53

(quoting Anderson SAC Decl. Ex. S1 at 1-2).  Exxon connects this strategy to a few meetings

attended by staff from various state attorneys general, SAC ¶¶ 39, 46, 48, and records of

communications and information-sharing between the activists, the NYAG, and other state

attorneys general, SAC ¶¶ 48, 56-58, 67-69.  For example, there was a conference at Harvard

Law School in April 2016 entitled "Potential State Causes of Action Against Major Carbon

Producers:  Scientific, Legal and Historical Perspectives," which included an hour-long session

on "state causes of action" such as "consumer protection claims" and "public nuisance claims."

Anderson SAC Decl. Ex. S47 at 1-2.[9]

---

[9]     The other two meetings at which Exxon alleges there was commingling of environmental activists and staff from the AGs occurred in June 2015 and on the day of the March 29, 2016, conference.

The Complaint also alleges the document requests themselves demonstrate that the investigations are politically motivated.  Exxon contends that the AGs' legal theories are so flawed—in terms of a factual or jurisdictional basis—that the only rational explanation is that the AGs are motivated by animus towards Exxon, rather than by a good faith belief that Exxon may have violated state law.  It argues, for example, that the statutes cited by the NYAG have six-year statutes of limitations at most, but the Subpoena requests documents dating to 1977.  This is evidence, according to Exxon, of an intent to harass rather than to conduct a good faith investigation of potential violations of law.  Compl. ¶¶ 62-63.  And, according to Exxon, with limited and irrelevant exceptions, it has not sold any products or securities in Massachusetts during the applicable limitations period.  Compl. ¶ 70; *see also* Compl. ¶¶ 68, 71 (alleging the Subpoena and CID seek documents with no connection to Exxon's activities in New York and Massachusetts).  Both the Subpoena and CID demand Exxon's communications with oil and gas interest groups, which, according to Exxon, demonstrates the AGs' political bias because communications with private parties have no relevance to Exxon's public disclosures.  Compl. ¶¶ 66, 73.  Exxon believes that the NYAG's shift in theories—from whether Exxon made misleading disclosures regarding its knowledge of climate change to whether it appropriately disclosed the value of assets likely to be stranded or impaired because of climate change—is evidence of an investigation in search of a crime, further demonstrating the NYAG's improper purpose.  Compl. ¶ 76.  According to Exxon, the stranded assets theory is also inconsistent with SEC guidance regarding disclosure of proved reserves.  Compl. ¶¶ 77-81.

Based on these allegations, Exxon alleges the NYAG and MAG are retaliating against Exxon for its speech relative to climate change and the "policy tradeoffs of certain climate initiatives."  SAC ¶ 123; *see also* SAC ¶¶ 120-124 (elaborating on Exxon's current position

regarding climate change).  Exxon asserts seven causes of action: for conspiracy to deprive

Exxon of its constitutional rights pursuant to 42 U.S.C. § 1985, Compl. ¶¶ 105-08; for violations

of Exxon's free speech rights pursuant to the First Amendment, and right to be free from

unreasonable searches pursuant to the Fourth Amendment, Compl. ¶¶ 109-11, 112-14; for

violations of Exxon's right to due process pursuant to the Fourteenth Amendment, Compl.

¶¶ 115-17; for violations of the Dormant Commerce Clause, Compl. ¶¶ 118-21; preemption of

Massachusetts and New York law to the extent they conflict with applicable SEC regulations,

Compl. ¶¶ 122-26; and common law abuse of process, Compl. ¶¶ 127-28.  As revised in the

SAC, Exxon demands broad relief, including a declaratory judgment that the AGs' investigations

violate Exxon's constitutional rights, SAC at 58, and an injunction "halting or appropriately

limiting the investigations," SAC at 59.[10]

### 3.    Litigation in Massachusetts and New York

One day after filing its federal lawsuit against Healey (but not Schneiderman) in Texas,

Exxon petitioned a Massachusetts Superior Court to set aside the CID and to disqualify Healey

from the investigation.  Opp'n at 10.  Exxon's petition alleged that the CID violates the

Massachusetts constitution's protections for free speech and against unreasonable searches and

seizures, is arbitrary and capricious, and that Exxon is not subject to personal jurisdiction in

Massachusetts.  Declaration of Christophe G. Courchesne ("Courchesne Decl.") (Dkt. 218) Ex. 2

(the "Petition") ¶¶ 16-22.  The Petition relied on substantially the same factual allegations as the

Complaint.  Citing the March 29, 2016, conference and the AGs United for Clean Power

coalition, the Petition alleged that the CID is intended to chill Exxon's free speech.  *See* Petition

---

[10]    The Complaint requested only an injunction prohibiting enforcement of the CID and Subpoena.  *See*
Compl. at 47.  In response to the Court's inquiry at oral argument, Exxon has revised its prayer for relief.

¶¶ 13-14, 61-63; *see also id.* ¶¶ 16-22 (among other things, quoting the same statements by
Healey and Schneiderman at the March 29, 2016, press conference as are quoted in the
Complaint). The Petition included, *verbatim* (or nearly *verbatim*), the same allegations regarding
Pawa and Frumhoff. Petition ¶¶ 28-35. Like the Complaint (and in nearly identical language),
the Petition also alleged that the CID's demand for communications between Exxon and other oil
and gas interests and affiliated organizations demonstrates that the MAG investigation is
politically motivated, and it alleged that Exxon could not have violated Massachusetts law
because it has not sold fuel or securities in Massachusetts during the applicable limitations
period. Petition ¶¶ 40-48. Noting the potential overlap between the Petition and Complaint,
Exxon requested that the Massachusetts Superior Court stay proceedings pending the outcome of
the federal litigation it had commenced the day before in Texas. *See* Petition ¶ 71 ("Staying the
adjudication of this Petition would avoid the possibility of duplication or inconsistent rulings
. . . , and will serve the interests of judicial economy and efficiency and the principles of
comity."). The MAG cross-moved to compel Exxon to comply with the CID. Opp'n at 11.

On January 11, 2017, the Massachusetts Superior Court denied Exxon's petition to set
aside the CID and granted the MAG's petition to compel. Anderson Decl. Ex. OO (the
"Massachusetts Decision").[11] The Superior Court found that Exxon was subject to personal
jurisdiction in Massachusetts by virtue of its control over franchisees operating Exxon-branded
gas stations in the Commonwealth. Mass. Decision at 8. The Superior Court also rejected
Exxon's argument that the CID was arbitrary and capricious because the MAG did not have a

---

[11]     The Court may take judicial notice of the Massachusetts Decision and transcripts of the proceedings before
the Massachusetts Superior Court and the New York Supreme Court. *See Bentley v. Dennison*, 852 F. Supp. 2d 379,
382 n.5 (S.D.N.Y. 2012) ("Judicial notice of public records is appropriate—and does not convert a motion to
dismiss into a motion for summary judgment—because the facts noticed are not subject to reasonable dispute and
are capable of being verified by sources whose accuracy cannot be reasonably questioned.").

"'reasonable belief' of wrongdoing.'"  Mass. Decision at 8-9.  Turning to the viewpoint

discrimination theory that is the core of the Complaint, the Court wrote:

> Exxon also argues that the CID is politically motivated, that Exxon is the victim of
> viewpoint discrimination, and that it is being punished for its views on global warming.
> As discussed above, however, the court finds that the Attorney General [Healey] has
> assayed sufficient grounds – her concerns about Exxon's possible misrepresentations to
> Massachusetts consumers – upon which to issue the CID.  In light of these concerns, the
> court concludes that Exxon has not met its burden of showing that the Attorney General
> is acting arbitrarily or capriciously toward it.

Mass. Decision at 9.  The Superior Court also denied Exxon's motion to disqualify Healey

holding that her comments at the AGs United for Clean Power conference did not show any bias:

"In the Attorney General's comments at the press conference, she identified the basis for her

belief that Exxon failed to disclose relevant information to Massachusetts consumers.  These

remarks do not evidence any actionable bias on the part of the Attorney General: instead it seems

logical that the Attorney General inform her constituents about the basis for her investigations."

Mass. Decision at 12.  Although the Superior Court said it would not consider Exxon's free

speech claim because any misleading or deceptive speech by Exxon "is not entitled to any free

speech protection," it effectively rejected the claim when it found the CID was not issued in bad

faith to chill Exxon's free speech rights.  Mass. Decision at 9 n.2.

Exxon appealed the Superior Court's order on February 8, 2017.  Opp'n at 11 n.42.

Exxon's appeal was transferred to the Massachusetts Supreme Judicial Court, where it remains

pending as of the date of this opinion.  Dkt. 236.

In contrast to its strategy in Massachusetts, Exxon initially complied with both New York

subpoenas and had, by November 2016, produced over 1.4 million pages of responsive

documents.  Compl. ¶¶ 26, 74; Mass. Decision at 11.  Nonetheless, in November 2016,

Schneiderman's office moved to compel compliance with the Subpoena in New York Supreme

Court.[12]  Memorandum of Law in Support of the NYAG's Motion to Dismiss ("NY Mem.")

(Dkt. 220) at 10.  The parties have taken inconsistent positions on whether Exxon has been

compelled to produce documents by the New York Supreme Court.  Until recently, the parties

took the position that Exxon's compliance with the Subpoena was consensual, based on a

compromise refereed by the assigned Supreme Court justice, Barry Ostrager.  *See* NY Mem. at

10-11 (Exxon and the NYAG have appeared four times before the Supreme Court to discuss the

parameters of Exxon's productions); Opp'n at 12, 25 (characterizing the proceedings before

Justice Ostrager as an "unsuccessful attempt to compel ExxonMobil to produce documents

outside the scope of the November 2015 subpoena" and "discovery conferences and letter

writing related to ExxonMobil's technical compliance); *see also* Opp'n at 25 ("Not a single

opinion has issued from the New York state court, other than a ruling on whether the accountant-

client privilege protects materials responsive to the PwC subpoena . . . .").  At oral argument,

however, the NYAG took the position that Justice Ostrager did require Exxon to comply with the

NYAG's initial subpoena and its subsequent requests for documents and testimony.  *See*

November 30, 2017 Hr'g Tr. (Dkt. 244) ("Hr'g Tr.") at 64-65.  The record before Justice

Ostrager supports that position.  For example, at a hearing on November 21, 2016, Justice

Ostrager ordered the parties to agree to a schedule for productions or he would enter a formal

order.  *See* Declaration of Leslie B. Dubeck ("Dubeck Decl.") (Dkt. 221) Ex. 10 (Nov. 21, 2016

Hr'g Tr.) at 24-26.  Justice Ostrager and the parties contemporaneously described the resolution

of the parties' dispute as a court order.  *See* Dubeck Decl. Ex. 13 (Jan. 9, 2017 Hr'g Tr.) at 17-18

("What I've ordered in my judgment will assure that along with a lot of false positives you are

---

[12]     The NYAG also moved to compel compliance with the PwC subpoena.  PwC and Exxon resisted
compliance with the PwC subpoena on the grounds of "accountant-client" privilege.  Justice Ostrager rejected that
argument and ordered PwC to comply.  NY Mem. at 9-10.  That decision is currently pending on appeal before the
New York Supreme Court Appellate Division, First Department.  NY Mem. at 10.

going to get the documents that you really want.").  Follow-on directions were issued by the court at subsequent hearings.  *See* Dubeck Decl. Ex. 15 (March 22, 2017 Hr'g Tr.) at 27-29.  In its supplemental brief in opposition to the motions to dismiss, Exxon has echoed the NYAG's position that its compliance with the Subpoena has been compelled.  *See* Supp. Opp'n (Dkt. 249) at 21.  Although the shifting of positions on a fairly straightforward issue is curious, the Court takes the NYAG's position at oral argument as a concession that Exxon has been compelled by the New York Supreme Court to provide documents and testimony in connection with the Exxon investigation.[13]

**4.      Proceedings in Texas**

This case was initially filed on June 15, 2016, in the Northern District of Texas against Healey.  Exxon moved for a preliminary injunction, Dkt. 8, and Healey cross-moved to dismiss on the grounds that she was not subject to the Texas court's personal jurisdiction, that the case was not ripe, that *Younger* abstention was appropriate, and for improper venue.  Dkts. 41, 42.  Although Exxon did not request discovery, the district judge *sua sponte* ordered jurisdictional discovery to address whether the "bad faith" exception to *Younger* abstention should apply.  Dkt. 73 at 5-6.  On October 17, 2016, Exxon successfully moved to file an amended complaint that added Schneiderman and the New York investigation to the Texas litigation.  Dkt. 74.  As to discovery, the court reversed course on December 12th and 15th, 2016, stayed its prior discovery order, and directed the parties to brief whether the court had personal jurisdiction over the AGs.[14]

---

[13]      Because the SAC (unlike the Complaint) seeks to enjoin the NYAG's investigation writ large—as opposed to only enforcement of the Subpoena—this issue has less significance than it did previously.  There is no dispute that Exxon, and its auditor, PwC, have been compelled to produce documents and testimony in response to the NYAG's other subpoenas.

[14]      In the meantime, the AGs had moved to stay the court's orders while they sought mandamus relief in the Fifth Circuit.  Dkts. 151, 156.

Dkts. 158, 162, 163, 164.  Although no party proposed transferring the case, on March 29, 2017,

Judge Kinkeade *sua sponte* transferred the case to this court on the theory that personal

jurisdiction might be proper in this District.[15]  Dkt. 180.

After a conference with the parties, the Court entered an order requiring the parties to re-

brief the motions to dismiss under Second Circuit law.  Dkts. 216, 219.  At oral argument on

November 30, 2017, the Court ordered the parties to provide supplemental briefing on whether

the Complaint states a claim.  Exxon cross-moved for leave to amend on January 12, 2018.  Dkt.

250.

## DISCUSSION

**1.     Ripeness**

"The ripeness doctrine is drawn both from Article III limitations on judicial power and

from prudential reasons for refusing to exercise jurisdiction."  *N.Y. Civil Liberties Union v.*

*Grandeau*, 528 F.3d 122, 130 (2d Cir. 2008) (Sotomayor, J.) (quoting *Nat'l Park Hospitality*

*Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003)).  The constitutional aspect of ripeness

concerns whether a case presents a case and controversy within the meaning of Article III of the

Constitution.  *See Am. Savings Bank, FSB v. UBS Fin. Servs., Inc.*, 347 F.3d 436, 439 (2d Cir.

2003) (per curiam) (citing *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003)).  The prudential

aspect of ripeness "is a more flexible doctrine of jurisprudence, and constitutes an important

exception to the usual rule that where jurisdiction exists a federal court must exercise it."

*Simmonds*, 326 F.3d at 357.  Prudential ripeness is concerned with whether a case will be better

decided in the future, such that the Court may "enhance the accuracy of [its] decisions and []

---

[15]     Despite transferring this case, Judge Kinkeade believed it was appropriate to express his views on the merits of Exxon's allegations.  *See, e.g.*, Dkt. 180 at 9-11.  Although Exxon seizes on these comments, they are entirely *dicta* and are irrelevant to the motions before this court.

avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination, of, especially, constitutional issues that time may make easier or less controversial." *Id.*

The AGs have moved to dismiss pursuant to the prudential ripeness doctrine. "To determine whether a challenge . . . is ripe for judicial review, we proceed with a two-step inquiry, 'requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Grandeau*, 528 F.3d at 131–32 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The fitness inquiry asks whether the issues for decision will be further clarified over time or "are contingent on future events or may never occur." *Am. Savings Bank, FSB*, 347 F.3d at 440 (quoting *Simmonds*, 326 F.3d at 359) (additional citations omitted). The hardship analysis asks "whether and to what extent the parties will endure hardship if [a] decision is withheld." *Grandeau*, 528 F.3d at 134 (quoting *Simmonds*, 326 F.3d at 359). "Assessing the possible hardship to the parties" requires the Court to "ask whether the challenged action creates a direct and immediate dilemma for the parties," *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999) (citing *Abbott Labs.*, 387 U.S. at 152-53); that is, whether there is "some present detriment" rather than the "mere possibility of future injury," *Simmonds*, 326 F.3d at 360.

The Second Circuit has had occasion to apply the prudential ripeness doctrine to an executive subpoena for documents. In *Schulz v. IRS*, a taxpayer sued in federal court to quash a "series of administrative summonses seeking testimony and documents in connection with an IRS investigation." 395 F.3d 463, 463 (2d Cir. 2005) (per curiam). At the time of the suit, the IRS had not sought to compel production of the documents. *Id.* Because IRS summonses are not self-executing—that is, the IRS must seek judicial intervention to compel production—a

magistrate judge, and then the District Court, concluded that the suit was not ripe. *Id.* at 463-64. The Second Circuit affirmed. The Circuit explained that Schulz's lawsuit was not ripe because "[t]he IRS has not initiated any enforcement procedure against Schulz and, therefore, what amounts to requests do not threaten any injury to [him]. . . . [I]f the IRS should, at a later time, seek to enforce these summonses, then the procedures set forth in [the Internal Revenue Code] will afford Schulz ample opportunity to seek protection from the federal courts." *Id.* at 464. Schulz's lawsuit was unfit for decision (because Schulz might never be compelled to produce documents) and lacking in hardship (because Schulz was not subject to any penalties for non-compliance).[16]

The reasoning in *Schulz* applies equally to review of state action. In *Google, Inc. v. Hood*, the Fifth Circuit concluded that a federal challenge to a Mississippi state subpoena was not ripe because the state's subpoena was not self-executing and required judicial intervention before the recipient could be compelled to produce documents. 822 F.3d 212, 224-25 (5th Cir. 2016). Relying on the same body of law cited in *Schulz*, the Fifth Circuit explained:

> The only real difference is that we have before us a state, not federal, subpoena. But we see no reason why a state's non-self-executing subpoena should be ripe for review when a federal equivalent would not be. If anything, comity should make us less willing to intervene when there is no current consequence for resisting the subpoena and the same challenges raised in the federal suit could be litigated in state court.

*Id.* at 226. This Court agrees that a state's non-self-executing subpoena is not legally distinguishable for these purposes from the federal equivalent.

Unlike in *Schulz* and *Hood*, Exxon has been compelled to comply with the CID, the Subpoena, and other subpoenas issued by the NYAG. *See supra* at 13-14. The Court recognizes

---

[16]    *Schulz* recognized that, under *Ex Parte Young*, a litigant is not required to risk an enforcement action in order to challenge executive action. *See Schulz*, 395 F.3d at 465. An exception exists, however, where executive action is not self-enforcing and an individual may not be penalized for non-compliance until after there has been judicial review. *See id.* at 465 (citing *Reisman v. Caplin*, 375 U.S. 440, 446-47 (1964)).

that the record before Justice Ostrager is open to interpretation, but the NYAG conceded at oral

argument that Exxon has been ordered to produce documents and give testimony. *See* Hr'g Tr.

at 64-65.  While the Subpoena was not self-executing, *see* N.Y. C.P.L.R. § 2308(b)(1) ("if a

person fails to comply with a subpoena which is not returnable in a court, the issuer . . . may

move in the supreme court to compel compliance"), Exxon could be subject to contempt

sanctions for failing to comply with Justice Ostrager's orders. *See* N.Y. Jud. L. § 753(A)(1), (5);

*Matter of McCormick v. Axelrod*, 59 N.Y.2d 574, 583 (1983) (a person or party may be held in

contempt for violating "a lawful order of the court, clearly expressing an unequivocal mandate"

if it is shown the party "had knowledge of the court's order" and the other party has been

prejudiced).  Even if Exxon has not been compelled to comply with the Subpoena itself, the

parties have never questioned that Exxon has been required to comply with the NYAG's

subsequent subpoenas for documents and testimony. *See* Hr'g Tr. at 6; Declaration of Leslie B.

Dubeck ("Dubeck Reply Decl.") (Dkt. 235) Ex. 6 (June 16, 2017 Hr'g Tr.) at 77.  Likewise, the

Superior Court in Massachusetts denied Exxon's motion to quash the CID and ordered Exxon to

produce documents, meaning Exxon is currently subject to a court order to produce responsive

documents.  Exxon faces an immediate sanction for failure to comply with the Superior Court's

order, which was not stayed pending appeal. *See* Mass. Decision at 13.  It is only because of a

stipulation between Healey and Exxon that Exxon has not been forced to comply with the CID.

Because Exxon cannot refuse to respond to the document demands without consequence,

Exxon's claims are ripe.

**2.      Personal Jurisdiction**

Healey has moved to dismiss arguing that this court lacks personal jurisdiction over her.

Exxon bears the burden of establishing personal jurisdiction.  "'Prior to trial, [] when a motion to

dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a *prima facie* showing.'"  *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).  The Court engages in a familiar two-step analysis, first determining whether plaintiffs have made a *prima facie* showing that the defendants would be subject to personal jurisdiction under the laws of the forum state and, if so, then determining whether exercise of jurisdiction would comport with the Due Process Clause of the Fourteenth Amendment.  *Id.*  The Court will construe "all pleadings and affidavits in the light most favorable to the plaintiff" and resolve "all doubts in the plaintiff's favor."  *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citations omitted).  On the other hand, the Court need not accept either party's legal conclusions as true, nor will it draw "argumentative inferences" in either party's favor.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

Exxon alleges that the Court has specific personal jurisdiction over Healey pursuant to N.Y. C.P.L.R. § 302(a)(1) and (a)(2).  That statute confers personal jurisdiction "over any non-domiciliary . . . who in person or through an agent[] transacts any business within the state or contracts anywhere to supply goods or services in the state."  "[T]o invoke jurisdiction under section 302(a)(1), plaintiff must demonstrate that defendant transacted business within New York State, and that that business had some nexus with this cause of action."  *Philipp Bros., Inc. v. Schoen*, 661 F. Supp. 39, 41 (S.D.N.Y. 1987).  Jurisdiction under C.P.L.R. § 302(a)(1) is proper "so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'"  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quoting *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71

(2006)).  "No single event or contact connecting defendant[s] to the forum state need be

demonstrated; rather, the totality of all defendants' contacts with the forum state must indicate

that the exercise of jurisdiction would be proper."  *CutCo Indus, Inc. v. Naughton*, 806 F.2d 361,

365 (2d Cir. 1986).  Although this "is an objective inquiry, it always requires a court to closely

examine the defendant[s'] contacts for their quality."  *Licci v. Lebanese Canadian Bank, SAL*, 20

N.Y.3d 327, 338 (2012).

 Exxon bases personal jurisdiction in this forum on Healey's attendance at the kickoff

conference and press event for the AGs United for Clean Power on March 29, 2016, in New

York.[17]  Whether a single meeting in New York is sufficient to establish personal jurisdiction

under Section 302(a)(1) depends on the significance of the meeting to the claim and the

relationship between the meeting and the wrongful act.  *See Gates v. Pinnance Comm'cns Corp.*,

623 F. Supp. 38, 41-42 (S.D.N.Y. 1985) (whether a single meeting is adequate to establish

jurisdiction depends on the circumstances).  Jurisdiction is potentially appropriate on the basis of

a single meeting when the meeting plays a "significant role in establishing or substantially

furthering the relationship of the parties."  *Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F. Supp. 2d

391, 398 (S.D.N.Y. 2004).

 Read charitably, the Complaint alleges that Healey and several other attorneys general

formalized their conspiracy against Exxon at the March 29, 2016, conference, which they then

announced as the AGs United for Clean Power.  *See* Compl. ¶ 39 (discussing statement of

principles for a coalition of attorneys general circulated in advance of the March 29, 2016,

meeting); Anderson Decl. Ex. A at 1 (quoting Schneiderman as describing the March 29, 2016,

---

[17] The Complaint made no effort to specifically plead personal jurisdiction in New York because it was
originally filed in Texas.  Nonetheless, the allegations are sufficient as currently drafted to plead personal
jurisdiction in this forum.

meeting as a "first of its kind conference of attorneys general dedicated to coming up with creative ways to enforce laws being flouted by the fossil fuel industry").  Email traffic among staffers in advance of the conference and attached to the Complaint confirms that the March 29, 2016, meeting was a kickoff event for the coalition, s*ee* Anderson SAC Decl. Exs. M, N, and the conference included meetings and presentations, allegedly regarding a campaign against Exxon, *see also* Anderson Decl. Ex. F (agenda for March 29, 2016, conference).  Accepted as true, these allegations establish personal jurisdiction under Section 302(a)(1), even on the basis of a single meeting.

The same allegations satisfy the Due Process Clause.  Cases in which jurisdiction is proper under Section 302(a) but minimum contacts are inadequate under the Due Process Clause are "rare."  *Licci ex rel. Licci*, 732 F.3d at 170.  A single in-forum meeting that is part of a conspiracy may be sufficient to establish jurisdiction.  *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (personal jurisdiction "arguably" established by defendant's attendance at a meeting at which an antitrust conspiracy was discussed).  Exxon alleges that the AGs formed a conspiracy to chill Exxon's speech at a meeting in New York, which Healey attended; these allegations satisfy the minimum contacts analysis.

Jurisdiction over Healey is also "reasonable" under the circumstances.  Courts in this Circuit consider five factors to determine whether jurisdiction is reasonable:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (quoting *Asahi*

*Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 113-14 (1987)).  Defending

this action in New York, rather than Massachusetts, is undoubtedly a burden for Healey.  The

litigation could, however, be tailored to minimize disruption to Healey and her staff by, for

example, conducting depositions in Massachusetts.  Moreover, "the conveniences of modern

communication and transportation ease what would have been a serious burden only a few

decades ago." *Foot Locker Retail, Inc. v. SBH, Inc.*, No. 03-CV-5050 (DAB), 2005 WL 91306,

at *6 (S.D.N.Y. Jan. 18, 2005) (quoting *Met. Life Ins. Co.*, 84 F.3d at 574).  The other *Asahi*

factors weigh in favor of jurisdiction.  New York is a convenient forum for Exxon and a

significant aspect of the wrongful conduct alleged in the Complaint occurred in New York.  The

Court is mindful of the affront to state sovereignty posed by haling a state official into federal

court, and a federal court in another state in particular.  But the cases Healey cites for the

proposition that it is unreasonable to exercise jurisdiction over an out-of-state official involved

attempts to base jurisdiction on acts taken in order to enforce court orders.  *See Adams v. Horton*,

No. 13-CV-10, 2015 WL 1015339, at *7 (D. Vt. Mar. 6, 2015).  And courts in this district have

recognized that an out-of-state law enforcement officer's "established relationship with []forum

state officials" and close coordination of activities can be sufficient to establish personal

jurisdiction.  *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 335 (S.D.N.Y. 2013).

Because Exxon has demonstrated that Healey is subject to personal jurisdiction under

New York's long arm statute and that exercising jurisdiction does not offend due process,

Healey's motion to dismiss for lack of personal jurisdiction is denied.

3.   **Preclusion**

Healey contends that the Massachusetts Superior Court's decision to enforce the CID precludes relitigation of the issues and claims in this case.  *See* Mass. Mem. (Dkt. 217) at 8-13. The parties made voluminous submissions to the Superior Court, which heard argument on the motions to compel and to set aside the CID, and Exxon is raising here essentially the same arguments it raised before that court.

a.   Issue Preclusion

The Full Faith and Credit Act requires the Court to give the Massachusetts Decision the same preclusive effect it would have under Massachusetts law.  *See* 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 96 (1980).  Massachusetts law "prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies."  *Heacock v. Heacock*, 402 Mass. 21, 23 n.2 (1988).  "Before precluding the party from relitigating an issue, 'a court must determine that (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party . . . to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication.'"[18]  *Petrillo v. Zoning Bd. of Appeals of Cohasset*, 65 Mass. App. Ct. 453, 457-58 (Mass. App. Ct. 2006) (quoting *Kobrin v. Bd. of Registration in Med.*, 44 Mass. 837, 843 (2005)) (internal citations omitted).

Healey contends the Massachusetts Decision is a final decision that the CID was not issued in bad faith or motivated by bias and that the CID is not overbroad or unreasonable.  *See* Mass. Mem. at 8-9.  These issues were litigated in the Superior Court.  For example, as Healey notes, Exxon explained to the Superior Court that: "Our position is that this is all about bad faith.

---

[18]      There is no dispute that the parties to this case and the Massachusetts proceeding are the same.

This is about regulating speech.  It's about viewpoint discrimination."  Mass. Reply (Dkt. 233) at

4 (quoting Courchesne Decl. (Dkt. 218) Ex. 6 (Dec. 7, 2016 Hr'g Tr.) at 44).  These issues are

also at the heart of Exxon's complaint in this action.  *See* Compl. ¶¶ 109-11.

   Despite the factual overlap between Exxon's arguments in this proceeding and the

Massachusetts proceeding, the Court is not persuaded that Healey is entitled to issue preclusion.

Issue preclusion does not bar relitigation of the same issue if the second proceeding involves a

different or lower standard or burden of proof.  *See Jarosz v. Palmer*, 436 Mass. 526, 531 (2002)

("The determination of an issue in a prior proceeding has no preclusive effect where 'the party

against whom preclusion is sought had a significantly heavier burden of persuasion with respect

to the issue in the initial action than in the subsequent action.'" (quoting Restatement (Second) of

Judgments § 28(4) (1982))); *see also Tuper v. N. Adams Ambulance Serv., Inc.*, 428 Mass. 132,

135-36 (1998) (issue preclusion inapplicable to redetermination of factual issues applying a

different standard).  Applying this rule, the Second Circuit has held that a subpoena enforcement

proceeding does not preclude relitigation of the same issues in a subsequent civil action.  *See*

*Sprecher v. Graber*, 716 F.2d 968, 972 (2d Cir. 1983).

   The Superior Court was empowered to set aside the CID for "good cause."  *See* Mass.

Gen. L. ch. 93A § 6(7); *In re Yankee Milk, Inc.*, 372 Mass. 353, 358-59 (1977) (movant has the

burden of showing "good cause" to modify or set aside a CID).  The good cause standard vests

considerable discretion in the superior court.  A motion to set aside a CID is "analogous to a

motion for a protective order pursuant to Mass. R. Civ. P. 26(c)."  *Atty. Gen. v. Bodimetric*

*Profiles*, 404 Mass. 152, 154 (1989).  Massachusetts Rule 26(c), in turn, affords a "broad

measure of discretion" to a trial judge.  *Kimball v. Liberty Mut. Ins. Co.*, 1999 Mass. App. Div.

298, 1999 WL 1260846, at *3 (Mass App. Ct. Dec. 22, 1999); James W. Smith & Hiller B.

Zobel, Mass. Practice Series Rules Practice § 26.7 (2d ed.) (noting the "equity-oriented cast of a

protective order").  And Massachusetts courts have made clear that a party seeking to set aside a

CID has a "heavy burden" to do so.  *See CUNA Mut. Ins. Soc. v. Atty. Gen.*, 380 Mass. 539, 544

(1980); *see also* Smith & Zobel, Mass. Practice Series L. of ch. 93A § 5.9 ("the trial judge's

discretion is limited by the policy that the provisions of 93A are to be construed liberally in favor

of the government").  A deferential abuse of discretion standard of review applies on appeal.  *See*

*Hudson v. Comm'nr of Corr.*, 46 Mass. App. Ct. 538, 549 (Mass. App. Ct. 1999).[19]  This

discretionary standard is more difficult to meet than the preponderance standard that applies to

this action.  This case is indistinguishable from *Sprecher*, and the Court finds that issue

preclusion does not apply.

     b.    Claim Preclusion

     Alternatively, Healey contends that each of Exxon's claims is precluded under the

doctrine of *res judicata*.  According to Healey, the Massachusetts Decision is a "final" judgment

under Massachusetts law, and each of Exxon's claims is either the "same" claim as presented in

Massachusetts, or could have been litigated in that forum:  Exxon's claims under the First,

Fourth, and Fourteenth Amendments are federal analogs to state constitutional claims that were

litigated in the Superior Court, and Exxon's remaining claims (for common law abuse of process,

preemption, and violations of the dormant commerce clause) each could have been raised by

Exxon in Massachusetts.  Memorandum of Law in Support of the MAG's Motion to Dismiss

("Mass. Mem.") (Dkt. 217) at 11-13.

---

[19]    Healey relies heavily on *Temple of the Lost Sheep, Inc. v. Abrams*, 930 F.2d 178 (2d Cir. 1991), in which the Second Circuit held that a state court's adjudication of state constitutional claims precluded relitigation of the same issues in a subsequent civil rights action in federal court.  *Id.* at 184-85.  *Temple of the Lost Sheep* is factually similar to this case, but there does not appear to have been any dispute in that case that the burden and standard of proof were the same in both proceedings.  That is not the case here.

*Res judicata*, or claim preclusion, bars re-litigation of claims that were or could have been litigated in a previous proceeding.  There are three requirements under Massachusetts law:[20] "'(1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits.'"  *Petrillo*, 65 Mass. App. Ct. at 457 (quoting *Kobrin*, 444 Mass. at 843) (additional citations omitted).  Unlike issue preclusion, claim preclusion does not require that the parties have actually litigated the claim in question so long as the claim could have been litigated in the first proceeding.  *See U.S. Nat'l Ass'n v. McDermott*, 87 Mass. App. Ct. 1103, 2015 WL 539311, at *2 (Mass. App. Ct. Jan. 30, 2015).  This reflects the purpose of claim preclusion, which is to ensure that "all legal theories supporting a claim be presented when the opportunity is available, not preserved for presentation through piecemeal litigation."  *Day v. Kerkorian*, 61 Mass. App. Ct. 804, 811 (Mass. App. Ct. 2004); *see also Heacock*, 402 Mass. at 23 ("The doctrine is a ramification of the policy considerations that underlie the rule against splitting a cause of action.").

The *res judicata* effect of a decision declining to set aside and compelling compliance with a CID is apparently a novel question under Massachusetts law.  Neither party has cited any Massachusetts decision (or federal decision, for that matter) that addresses the *claim* preclusive effect of a CID enforcement proceeding on a subsequent civil action to prohibit enforcement of the CID and to declare the CID unlawful, and the Court's independent research has revealed none.  Nonetheless, applying basic principles of claim preclusion, the Court concludes that the claims in this case could have and should have been raised in the Massachusetts proceeding; accordingly, claim preclusion applies.

---

[20]     "To determine the effect of a state court judgment, federal courts . . . are required to apply the preclusion law of the rendering state."  *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 87 (2d Cir. 2000); *see also supra* at 23.

The parties agree that the parties to this case are the same as the parties to the Massachusetts proceeding, satisfying the first requirement of claim preclusion.  The Court finds that the second requirement (a final judgment) and the third requirement (identity of claims) are also satisfied.

Massachusetts law does not require "a final judgment in the 'strict sense.'"  *Jarosz*, 436 Mass. at 533.  Rather, following the approach of the Restatement (Second) of Judgments, Massachusetts courts evaluate whether a decision is final by considering whether "the parties were fully heard, the judge's decision is supported by a reasoned opinion, and the earlier opinion was subject to review or was in fact reviewed."  *Tausevich v. Bd. of Appeals of Stoughton*, 402 Mass. 146, 149 (1988) (citing Restatement (Second) of Judgments § 13 cmt. g (1982)).

The Massachusetts Decision satisfies each of these prerequisites.  There is no serious question that the parties were fully heard.  The briefing in the Superior Court ran over two hundred pages (not including exhibits), and Exxon alleged in its petition substantially the same facts that it alleges in this action, including that Healey's comments at the March 29, 2016, press conference demonstrated bias, that the AGs United for Clean Power have adopted the playbook of several left-wing activists, and that the CID's demands are so overreaching in relation to any legitimate investigatory purpose that they must be politically motivated.  *See supra* at 8-9.  The Massachusetts Decision is a reasoned decision rejecting these claims on the grounds that the "the Attorney General [Healey] has assayed sufficient grounds – her concerns about Exxon's possible misrepresentations to Massachusetts consumers – upon which to issue the CID."  Mass. Decision at 9.  Because the Superior Court also granted the MAG's cross-petition to enforce the CID, the Massachusetts Decision was appealable (and is, in fact, pending on appeal).  *See CUNA Mut. Ins. Soc.*, 380 Mass. at 540-41.

The Court also agrees with Healey that this case and the Massachusetts proceeding involve the same "claim" for purposes of *res judicata*. A claim is the same for purposes of *res judicata* if it is transactionally related to the claims in the prior proceeding. *Boyd v. Jamaica Plain Coop. Bank*, 7 Mass. App. Ct. 153, 163 (Mass. App. Ct. 1979). The Second Circuit has explained that claims are "transactionally related" if the "transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first." *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997) (quoting *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)) (additional citations omitted); *see also Boyd*, 7 Mass. App. Ct. at 163. The alleged "facts" in this lawsuit are the same as were alleged in the Massachusetts proceeding. In both proceedings Exxon argues that Healey's investigation is not a good faith investigation but is an overt act in a conspiracy to chill its ability to exercise its First Amendment rights. In both proceedings Exxon points to the CID, which it alleges was served in bad faith, and to Healey's attendance at the March 29, 2016 presentations, the AGs United for Clean Power, and Healey's participation in the March 29, 2016 press conference. As the Court has noted, the allegations in the Petition track closely the complaint in this proceeding. Exxon itself acknowledged the overlap at argument before the Superior Court: "as we've argued [in the Texas district court]. . . . Our position is that this is all about bad faith. This is about regulating speech. It's about viewpoint discrimination." Courchesne Decl. Ex. 6 at 43-44.

It is irrelevant that the precise causes of action asserted in this proceeding were not raised in the Massachusetts proceeding. Claim preclusion applies to transactionally-related claims that could have been raised but were not: "A judgment in the first action 'extinguishes . . . all rights

of a plaintiff to remedies against the defendant with respect to all or any part of the transactions out of which the action arose.'"  *McDermott*, 2015 WL 5399311, at \*2 (quoting *Massaro v. Walsh*, 71 Mass. App. Ct. 562, 565 (Mass. App. Ct. 2008)) (additional citations omitted).  Thus, it is not necessary for purposes of claim preclusion that a claim have the same (or similar) elements or even that it arise under the same body of law; what is required is satisfaction of the transactional-relationship standard.  *See Commonwealth Dev., LLC v. HNW Digital, Inc.*, No. 20054055F, 2007 WL 1056801, at \*2 (Mass. Super. March 21, 2007) ("The statement of a different form of liability is not a different cause of action, provided it grows out of the same transaction, act or agreement, and seeks redress for the same wrong." (quoting *Mackintosh v. Chambers*, 285 Mass. 594, 596 (1934))); *Wright Mach. Corp. v. Seaman-Andwall Corp.*, 364 Mass. 683, 688 (1974) ("a party cannot avoid this rule by seeking an alternative remedy or by raising the claim from a different posture or in a different procedural form"); Restatement (Second) of Judgments § 24 cmt. c (claims may be the same even where "several legal theories . . . would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief").  And there is no dispute that Exxon could have raised its federal constitutional claims in the Massachusetts proceeding.  *See In re Yankee Milk, Inc.*, 372 Mass. at 361 n.8 ("demands which invade any constitutional rights of the investigated party are unreasonable").

Recognizing that the elements of claim preclusion appear satisfied, Exxon argues that the procedural differences between the Massachusetts proceeding and this civil case are so substantial that preclusion should not apply.  As the Court explained above, issue preclusion does not apply because Exxon faces a less demanding burden in this case than it faced in the

Massachusetts proceeding.  But Exxon cites to no case applying the same reasoning to claim

preclusion.  To the contrary:

> This principle does not translate to the realm of claim preclusion. . . .  The purpose of
> claim preclusion, unlike issue preclusion, is to prevent the waste of resources and the
> harassment to the defendant that stem from the piecemeal litigation of claims.  . . .  And
> applying claim preclusion when there are varying burdens of proof does not raise any
> problem analogous to the problem of applying issue preclusion . . . .

*O'Shea v. Amoco Oil. Co.*, 886 F.2d 584, 594 (3d Cir. 1989); *see also United States v. Cunan*,

156 F.3d 110, 116 (1st Cir. 1998) ("The relevant test simply asks whether the same parties

pursued a remedy that arose from the same 'transaction' . . . [m]inor variations in the

proceedings . . . are insufficient to establish separate causes of action.").

The cases cited by Exxon are distinguishable because they involve proceedings in which

a party sought relief that was not available in a prior proceeding.  Under those circumstances

Massachusetts law (like the Restatement) permits relitigation.  *See Heacock*, 402 Mass. at 24; *see

also Kelso v. Kelso*, 86 Mass. App. Ct. 226, 233-33 (2014).  For example, in *Heacock*, the court

concluded that a divorce proceeding was not preclusive of a subsequent tort claim for damages

because the divorce court lacked authority to hear the tort action or award damages.  The tort

plaintiff in *Heacock* filed her claims before the divorce proceedings were initiated and could not

have sought a divorce in the superior court or brought her tort claims in probate court; she did

not choose to split her claims.  Even assuming, as Exxon argues, that the Massachusetts

proceeding was a limited one, Exxon has not explained why it was forced to bring its federal

claims in Texas and its state claims in Massachusetts.  There is no dispute that the Superior Court

could have considered Exxon's federal constitutional claims (unlike the probate court in

*Heacock*) and the relief Exxon requests here is essentially identical to the relief it requested in

state court—an injunction to quash the CID.  Unlike the tort plaintiff in *Heacock*, Exxon made a

tactical choice to split its claims.  Exxon cites no case that has applied *Heacock* to a situation analogous to this case, and the Court's independent research has revealed none.[21]

Muddying the differences between issue and claim preclusion, Exxon also argues that claim preclusion does not apply because the opportunity to litigate in this case is greater than the opportunity it had in the Massachusetts proceeding.  *See* Opp'n at 35 (quoting *Sprecher*, 716 F.2d at 972).  As discussed above, under *Sprecher*, issue preclusion may not apply where there are differences in the burden of proof or the opportunity to develop evidence.  *See supra* at 24-25.  The same considerations do not apply to claim preclusion.  *See O'Shea*, 886 F.2d at 594; 18 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4422 (3d ed.) ("Issue preclusion, *although not claim preclusion*, may be defeated by shifts in the burden of persuasion or by changes in the degree of persuasion required.") (emphasis added).  Claim preclusion is primarily concerned with whether a party has improperly split its claim, forcing the defendant to litigate twice a controversy that could have been litigated once.  Exxon did not seek discovery in Massachusetts, so this Court cannot say that discovery would not have been available.  Had discovery been Exxon's goal, it could have raised its Section 1983 claims in state court.  Exxon's lack of discovery in state court was the result of its own tactical decisions; those tactical decisions do not render inapplicable established law of *res judicata*.

Exxon's remaining arguments are unpersuasive, and the Court rejects them.  Notwithstanding Exxon's desire for a federal forum, there is nothing unique about Section 1983 claims that requires a federal lawsuit.  The federal courts system presumes that state courts are

---

[21]     The SAC also seeks an injunction against the entire Massachusetts investigation.  Although Exxon argues that injunctive relief was not available in the Massachusetts proceeding, Opp'n at 28-29, in fact, Exxon asked for injunctive relief in that proceeding in the form of an order to disqualify Healey and her office and to appoint a new, independent investigator to oversee (and potentially discontinue) the Massachusetts investigation.  *See* Petition at 24.  Exxon has not cited to any case for the proposition that the Massachusetts court could have enjoined Healey from carrying out the investigation but could not have enjoined the investigation itself.

competent to adjudicate federal rights, and the potential for preclusion is a necessary consequence of that.  *See, e.g.*, *Temple of the Lost Sheep, Inc.*, 930 F.2d at 185.  Finally, preclusion does not raise any due process concerns under the circumstances.  As the Supreme Court has explained, the "full and fair opportunity" to litigate standard requires that a prior proceeding satisfy the constitutional minima of due process.  *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481-82 (1982); *Pactiv Corp. v. Dow Chem. Co.*, 449 F.3d 1227, 1233 (2d Cir. 2006) ("*Kremer* only requires that the prior judgment be denied preclusive effect when there has been a due process violation." (citing 18 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4415 (3d ed.))).  Exxon has not pointed to any limitation in the Massachusetts proceeding that falls below the constitutional standard.  As Exxon's briefing to that court demonstrates, it had a full opportunity to be heard.[22]

The MAG's motion to dismiss on claim preclusion grounds is GRANTED.

### 3.   Failure to State a Claim

The NYAG and MAG have also moved to dismiss on the grounds that the Complaint fails to state a claim.  The AGs argue that Exxon's allegations that their investigations have an improper purpose are implausible.  Improper motive is admittedly difficult to plead.  Nevertheless, Exxon must allege facts from which the Court may plausibly infer that the AGs know their investigations lack merit but have nonetheless proceeded against Exxon for ulterior

---

[22]   If the result in this case seems harsh, it stems from Exxon's strategic decision to litigate on multiple fronts.  As explained above, Exxon's premise is that it is entitled to a federal forum to hear its federal claims.  But there is no such right; state courts are competent to hear federal claims.  *See In re Yankee Milk, Inc.*, 372 Mass. at 361 (constitutional claims may be raised in a proceeding to quash a CID).  Moreover, having chosen to avail itself of a state forum, and to litigate state law cognate claims in that forum, Exxon cannot now be heard to complain that it has lost the opportunity to raise transactionally-related federal claims.  The principles of *res judicata* are intended to prevent exactly this sort of gamesmanship and claim splitting.

reasons.[23]  But this issue is at the heart of Exxon's case, and each of the constitutional torts it has asserted requires a plausible inference that the AGs acted not based on a good faith belief that Exxon may have violated state laws, but to retaliate against Exxon for, or to deter Exxon from, speech that is protected by the First Amendment.  At oral argument on November 30, 2017, the Court directed the parties to brief whether the Complaint states a claim.  For the reasons that follow, the Court finds that Exxon has not plausibly alleged that either attorney general is proceeding in bad faith, motivated by a desire to impinge on Exxon's constitutional rights.

In evaluating a motion to dismiss for failure to state a claim, the Court must "'accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.'"  *Meyer v. JinkoSolar Holdings Co.,* 761 F.3d 245, 249 (2d Cir. 2014) (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109, 119 (2d Cir. 2013) (alterations omitted)).  Nonetheless, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "Plausibility" is not certainty.  *Iqbal* does not require the complaint to allege "facts which can have no conceivable other explanation, no matter how improbable that explanation may be."  *Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 360 (2d Cir. 2013).  But "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, and "[courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Brown v. Daikin Am. Inc.,* 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Twombly,* 550 U.S. at 555 (other internal quotations marks and citations omitted)).

---

[23]     That is not to suggest that a special standard applies to Exxon's claims.  As discussed below, the familiar plausibility standard governs.

In the interest of efficiency and judicial economy, the Court has evaluated the allegations in the Complaint together with the allegations in the proposed SAC.  Rule 15(a) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave" to a party to amend its complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  But "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007) (additional citations omitted)).  And "a proposed amendment to a complaint is futile when it 'could not withstand a motion to dismiss.'"  *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164-65 (2d Cir. 2015) (quoting *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

a.    Constitutional Torts

Although none of the parties has identified the elements of Exxon's First, Fourth, and Fourteenth Amendment claims, or their state law cognates, they appear to agree that allegations of an improper motive are essential to each.[24]  As to Exxon's First Amendment claim, "[i]t has long been established that certain adverse governmental action taken in retaliation against the

---

[24]    The parties appear to agree that Exxon must also plead that the Subpoena and CID are not supported by an objective, reasonable suspicion.  *See* NY Supp. Mem. (Dkt. 247) at 7; Supp. Opp'n at 24 ("All ExxonMobil need do is plead that Attorney General Schneiderman's investigation is objectively unjustifiable."); *see also Hartman v. Moore*, 547 U.S. 250, 265-66 (2006) (Section 1983 plaintiff must "plead and prove" absence of probable cause).  Because *Hartman* and related Second Circuit cases address summary judgment and the qualified immunity analysis, they are not precisely on point, as Exxon points out.  The Court need not resolve this dispute because the NYAG and MAG have not moved to dismiss on the grounds that the document demands are supported by reasonable suspicion (although they have argued just that in state court proceedings in both Massachusetts and New York).  Nonetheless, the objective basis (or lack thereof) for the Subpoena and CID is relevant to whether Exxon's allegations of improper purpose are plausible; the fact that a search (or subpoena) is supported by a flimsy justification makes it more likely that it was motivated by an improper purpose, and, conversely, solid justification for a search or subpoena makes it less likely law enforcement has an improper purpose.  *Hartman* itself recognized the interplay between these two ostensibly separate inquires.  *See Hartman*, 547 U.S. at 260-61.

exercise of free speech violates the First Amendment."[25]  *Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2d Cir. 1992).  Exxon's theory of a Fourth Amendment violation is also based on the AGs' alleged improper purpose.  *See* Supp. Opp'n at 30 (The NYAG and MAG investigations violate the Fourth Amendment because they "are not 'conducted pursuant to a legitimate purpose.'" (quoting *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 471 (2d Cir. 1996)); *but see Blue v. Koren*, 72 F.3d 1075, 1081 (2d Cir. 1995) ("motive is irrelevant" to a Fourth Amendment claim, "because a Fourth Amendment claim must be based on a showing that the search in question was objectively unreasonable.").  Due process is also offended by "government harassment in retaliation for the exercise of a constitutional right."  *Blue*, 72 F.3d at 1081; *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987) (Fourteenth Amendment prohibits pursuing a criminal investigation "influenced by improper motives.").[26]

        The centerpiece of Exxon's allegations is the press conference held by the AGs, former Vice President Al Gore, and others in New York on March 29, 2016.  According to Exxon, the AGs' statements at the press conference evince their intent to discriminate against other viewpoints regarding climate change.  *See* SAC ¶¶ 28 ("For the Green 20, the public policy debate on climate change was over and dissent was intolerable."), 133 ("The investigations were commenced without a good faith basis and with the ulterior motive of coercing ExxonMobil to adopt climate change policies favored by the [AGs].").  And—according to Exxon—the AGs "linked" the CID and Subpoena to "the coalition's political efforts."  SAC ¶ 34.  Exxon's

---

[25]     These cases concern enforcement actions, but the Court assumes for purposes of the present motions that the same principles apply at the investigatory stage.

[26]     The Court need not address the AGs' argument that Exxon has failed to allege an actual impact from the investigations on its protected speech.  *See* NY Supp. Mem. at 4-5.  It is worth noting, however, that the Second Circuit has made clear that a plaintiff asserting a First Amendment retaliation claim may rely on a harm other than chilled speech.  *See Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  Here, Exxon contends it has been forced to expend significant time and money complying with the AGs' allegedly pretextual document demands.

narrative of events is the result of cherry-picking snippets from the transcript of the press

conference, a complete transcript of which is attached to the Complaint.  Read in context, the

NYAG's comments suggest only that he believes that an investigation is justified in light of

news reports regarding Exxon's internal understanding of the science of climate change.  The

NYAG's statements regarding Exxon speak for themselves, and so the Court quotes them in full:

- After describing a settlement with Peabody Energy, Schneiderman said:  "And the same week we announced [the Peabody settlement], we announced that we had served a subpoena on ExxonMobil pursuing that and other theories relating to consumer and securities fraud.  So we know, because of what's already out there in the public, that there are companies using the best climate science. . . .  And yet, they have told the public for years that there were no 'competent models,' was the specific term used by an Exxon executive not so long ago . . . .  And we know that they paid millions of dollars to support organizations that put out propaganda denying that we can predict or measure the effects of fossil fuel on our climate, or even denying that climate change was happening." Anderson SAC Decl. Ex. B (Tr. of March 29, 2016, press conference) at 3.

- Next, Schneiderman said, "There have been those who have raised the question: aren't you interfering with people's First Amendment rights?  The First Amendment, ladies and gentlemen, does not give you the right to commit fraud.  And we are law enforcements [sic] officers . . . .  And we are pursuing this as we would any other fraud matter.  You have to tell the truth.  You can't make misrepresentations of the kinds we've seen here." Anderson SAC Decl. Ex. B at 4.

- In response to a reporter's question whether the Exxon investigation was a publicity stunt, Schneiderman said "[i]t's certainly not a publicity stunt.  I think the charges that have been thrown around – look, we know for many decades that there has been an effort to influence our particular subpoena was that the public report that had come out, Exxon said were cherry picked documents and took things out of context.  We believe they should welcome our investigation because, unlike journalists, we will get every document and we will be able to put them in context."  Anderson SAC Decl. Ex. B at 17.

- Continuing, Schneiderman said, "It's too early to say.  We started the investigation.  We received a lot of documents already.  We're reviewing them.  We're not prejudging anything . . . .  It's too early to say what we're going to find with Exxon but we intend to work as aggressively as possible, but also as carefully as possible."  Anderson SAC Decl. Ex. B at 17-18.

- In a response to a question about possible damages, Schneiderman said: "Again, it's early to say but certainly financial damages are one important aspect of this but, and it is tremendously important and [sic] taxpayers – its been discussed by my colleagues –

we're already paying billions and billions of dollars to deal with the consequences of climate change and that will be one aspect of – early foreseeing, it's far too early to say." Anderson SAC Decl. Ex. B at 19.

It is not possible to infer an improper purpose from any of these comments; none of which supports Exxon's allegation that the NYAG is pursuing an investigation even though the NYAG does not believe that Exxon may have committed fraud.

Perhaps recognizing this, Exxon relies instead on other portions of the press conference in which the NYAG described climate change as a settled issue and, in Exxon's words, "derided" arguments regarding the cause of climate change or the appropriate policy response.  *See* Supp. Opp'n at 17; SAC ¶ 28 (Quoting Schneiderman as saying there is "no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up."). The Complaint and the SAC set up a false equivalence between Schneiderman's belief that climate change is a settled issue and Exxon's inference that the NYAG is pursuing its investigation in order to retaliate against Exxon for its political speech.  The fact that Schneiderman believes climate change is real—so does Exxon apparently—and advocates for particular policy responses does not mean the NYAG does not also have reason to believe that Exxon may have committed fraud.  The latter depends on the separate question of what the NYAG believes Exxon knew, when it knew it, and whether what it knew differs from what it has publicly said.  To the extent Schneiderman's statements regarding climate change generally are relevant at all,[27] they tend to suggest that he believes that Exxon has an "interest in profiting from confusion" and has created "misperceptions in the eyes of the American public," i.e., that

---

[27]    Schneiderman also discussed at the press conference opposition to the Obama Administration's Clean Power Plan and an amicus brief filed by the AGs in the then-recent Supreme Court case *Friedrichs v. California Teachers Association*, 136 S. Ct. 1083 (2016).

Exxon has made false statements.  Schneiderman can be accused of hyperbole—he is a politician, after all—but asserting that one's political opponent is sowing "confusion" is a rather tame accusation in the present, overheated political climate.  Moreover, pursuing an investigation because of a belief that a company has "sowed confusion" on an issue that is important to that company's bottom line would only be in bad faith if the investigator had concluded that the company actually believed the facts it was using to sow confusion.  Nowhere does the Complaint or SAC allege that the NYAG knows or believes that Exxon was itself confused about the causes or risks of climate change.

Healey said even less at the press conference, and the discussion above applies equally to her.  Healey referenced Exxon only once in her relatively brief remarks (they occupy less than two pages of the appendix to the SAC, *see* Anderson SAC Decl. Ex. B at 12).  Regarding Exxon, she said:

- "Climate change is and has been for many years a matter of extreme urgency, but, unfortunately, it is only recently that this problem has begun to be met with equally urgent action.  Part of the problem has been one of public perception, and it appears, certainly, that certain companies, certain industries, may not have told the whole story . . . .  Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable.  That's why I, too, have joined in investigating the practices of ExxonMobil.  We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public."

Anderson SAC Decl. Ex. B at 12.  Like Schneiderman's statements, Healey's statement that Exxon "may not have told the whole story" in no way suggests that Healey knows or believes that Exxon, in fact, "told the whole story" but wants to retaliate against it for its truthful statements because it disagrees politically.  To the contrary, Healey's statement suggests that she believes Exxon may have made false statements to its investors and the public and may have committed fraud.  *Cf.* Mass. Decision at 12 ("In [Healey's] comments at the press conference,

38

she identified the basis for her belief that Exxon may have violated [Massachusetts law].  In

particular, she expressed concern that Exxon failed to disclose relevant information to its

Massachusetts consumers.  These remarks do not evidence any actionable bias on the part of

[Healy]: instead it seems logical that [Healey] inform her constituents about the basis for her

investigations.").  The SAC appears to acknowledge as much by also alleging that the AGs have

prejudged their investigation and concluded that Exxon is guilty.  *See* SAC ¶¶ 34, 143.

        The SAC presents this press conference as the culmination of a campaign by climate

change activists to encourage elected officials to exert pressure on the fossil fuel industry.  *See*

SAC ¶¶ 38-61.  The relevance of these allegations depends on two inferences: first, that the

activists have an improper purpose—that is, that they know state investigations of Exxon will be

frivolous, but they see such investigations as politically useful; and second, that this Court can

infer from the existence of meetings between the AGs and the activists, that the AGs share the

activists' improper purpose.  The Complaint and SAC do not plausibly allege facts to permit the

Court to draw either inference.

        According to the SAC, Exxon's political opponents, led primarily by Matthew Pawa and

Peter Frumhoff, have, since a 2012 meeting in La Jolla, California, sought to use litigation to

gain access to Exxon's internal documents regarding climate change and to "maintain[] pressure

on the industry that could eventually lead to its support for legislative and regulatory responses

to global warming."  SAC ¶¶ 45.  The SAC alleges additional meetings among private actors in

July 2015 and January 2016.  SAC ¶¶ 47, 52.  There are no allegations that either the NYAG or

the MAG attended the La Jolla conference or the conferences in July 2015 and January 2016, so

these allegations have limited relevance to the AGs' motives in issuing the CID and Subpoena.

Moreover, the SAC does not include any factual allegations to suggest that Pawa and Frumhoff

and their confederates do not believe that Exxon has committed fraud.  At best (for Exxon) the

meetings are evidence that the activists recognize that the discovery process could reveal

documents that would benefit their public relations campaign by showing that Exxon has made

public statements about climate change that are inconsistent with its internal documents on the

subject.  This evidence falls short of an inference that the activists—to say nothing of the AGs—

do not believe that there is a reasonable basis to investigate Exxon for fraud.

Exxon attempts to provide the missing link between the activists and the AGs by pointing

to a series of workshops, meetings, and communications between and among Pawa and

Frumhoff and other climate change activists and the AGs or their staffs.  For example, Exxon

alleges that the NYAG has communicated with Tom Steyer, a billionaire and climate-change

activist, regarding campaign contributions and Exxon.  *See* SAC ¶ 51.  The NYAG has discussed

"the activities of specific companies regarding climate change" with the Rockefeller Family

Fund, a private philanthropic organization that has funded investigative journalism regarding

Exxon's historical knowledge of climate change.  SAC ¶¶ 52-57.  And Frumhoff and Pawa made

presentations to the AGs shortly before the press conference on March 29, 2016.  SAC ¶¶ 40, 43.

Frumhoff's presentation was entitled the "imperative of taking action now on climate change"

and Pawa's presentation was on "climate change litigation."  SAC ¶¶ 39-43.  The SAC includes

no other information about these presentations or their content; the content of the NYAG's

communications with Tom Steyer; or the content of the NYAG's discussions with the

Rockefeller Family Fund.  It is pure speculation to suggest that the content of the presentations

was to encourage baseless investigations of Exxon.  But even if the climate activists did

encourage the AGs to investigate Exxon as a means to uncover internal documents or to pressure

it to change its policy positions without a good faith belief that Exxon had engaged in

wrongdoing, another logical leap is required to infer the NYAG and MAG agreed to do so without having a good faith belief that their investigations of Exxon were justified.

Next, the SAC—but not the Complaint—alleges that the CID and Subpoena were precipitated by investigative journalism funded by the Rockefeller Family Fund. *See* SAC ¶ 57. According to Exxon these articles have been used "as pretextual support" for the AGs' investigations. SAC ¶ 57. The only basis for Exxon's allegation that these articles are a pretext is that, according to Exxon, the documents cited in the articles "demonstrate that [Exxon]'s climate research contained myriad uncertainties and was aligned with the research of scientists at leading institutions at the time." SAC ¶ 57. Assuming the truth of Exxon's characterization of the documents, they appear to support the AGs' legal theory that Exxon's internal research was consistent with the scientific consensus but that Exxon made statements to the market and the public that suggested otherwise. In any event, Exxon has included no *factual* allegations that tend to show that the AGs do not believe that the articles based on Exxon's documents have raised legitimate concerns that should be run to ground. Absent such factual allegations, the Court is in no position to infer that duly authorized state investigations are pretextual.

The Complaint and SAC also allege that a common-interest agreement among the Green 20 is evidence of concealment of their "political agenda."[28] SAC ¶ 62. Exxon's attempt to transform a mine-run common-interest agreement into evidence of an improper motive is not plausible. The common-interest agreement covers a number of potential areas of litigation related to climate change, including: "conducting investigations of representations made by companies to investors, consumers, and the public regarding fossil fuels, renewable energy and

---

[28]     The common interest agreement is attached to the SAC. *See* Anderson SAC Decl. Ex. V.

climate change," "taking legal actions to compel or defend federal measures to limit greenhouse

gas emissions," and "taking legal action to obtain compliance with federal and state laws

governing the construction and operation of fossil fuel and renewable energy infrastructure."

Anderson SAC Decl. Ex. V at 19.  The preamble to the agreement, quoted by Exxon, states that

the AGs share an interest in "ensuring the dissemination of accurate information about climate

change."  *See* SAC ¶ 62.  Although that would appear to be an admirable goal of a public official

with which few would quarrel,[29] according to Exxon, this statement confirms the "coalition's

willingness to violate First Amendment rights to carry out its agenda."  SAC ¶ 62.  It is unclear

how that is so.  Nothing in the common interest agreement defines "accurate information about

climate change" in a way that suggests that the AGs have agreed to punish protected speech.

Ensuring that "accurate information" reaches the market and the public is consistent with a *bona*

*fide* investigation—not retaliation.  As the Court has explained, and Exxon has agreed, false

statements to the market or the public are not protected speech.  *See* Hr'g Tr. at 34:16-35:1

("[The COURT]: But you don't have the right to lie in your securities filings.  That's what they

are investigating.  If they are wrong, then they don't have a case.  If they are right, then Exxon

should be held to account.  Do you agree with that?  [EXXON]: I agree that that is the fact that

. . . they can conduct an investigation into fraud.  No one is disputing the ability to conduct an

investigation into fraud.").  Alternatively, Exxon points to the reticence of the AGs (and the

Vermont attorney general, also a signatory) to produce the common-interest agreement as

---

[29]      As public officials the AGs "have an obligation to speak out about matters of public concern."  *Goldstein v.*
*Galvin*, 719 F.3d 16, 30 (1st Cir. 2013).  If Exxon's inference were reasonable, it would put elected attorneys
general in a straight-jacket relative to their public comments.  For example, could a pharmaceutical company that
sells opiate-based pain killers enjoin an investigation of it if the prosecutor stated publicly that the public should
have accurate information about the risks of opiate use?  "Accurate information" is the lifeblood of our
democracy—not a goal that suggests skullduggery.

evidence they have something to hide.  *See* SAC ¶¶ 63, 69.  This inference is speculative.  FOIA and FOIL disputes are commonplace, and they do not give rise to an inference that something sinister is afoot.[30]

Exxon also points to the document requests themselves as circumstantial evidence of an improper motive.  According to Exxon, the facts that the document requests seek documents from periods outside the statutes of limitations and demand communications between Exxon and outside groups demonstrate that the AGs' investigations are pretextual and retaliatory.  *See* SAC ¶¶ 77-86 (the Subpoena), 87-91 (the CID).  Despite arguing to this Court that the document requests are so frivolous that they are evidence of pretext, Exxon did not dispute the validity of the Subpoena requests in New York Supreme Court; it challenged only the extent to which the Subpoena required it to produce general accounting documents.[31]  *See* Dubeck Decl. Ex. 9 (Exxon's N.Y. Supreme Court brief) at 5-6 (disputing whether accounting related documents are called for by subpoena for climate change-related records); Dubeck Decl. Ex. 10 (Nov. 21, 2016 Hr'g Tr.) at 13 (arguing that accounting related documents are beyond the scope of the Subpoena).  The Massachusetts Superior Court ruled on this issue and found that the CID was supported by a reasonable basis, and the CID demands substantially the same records as the Subpoena.  *See* **Mass. Decision at 8.**  The fact that the demands seek historical documents from

---

[30]     The SAC also describes criticism of the AGs by another group of attorneys general and the House Committee on Science, Space, and Technology.  *See* SAC ¶¶ 70-75.  These allegations have no relevance to whether the AGs have acted with an improper motive.  Indeed, if the fact that elected Republicans criticize investigations conducted by elected Democrats (and vice versa) were to be evidence that the criticized investigations are improperly motivated political hit jobs, law enforcement at the state level will be drawn to a screeching halt by what amounts to a heckler's veto.

[31]     Exxon's attempt to argue relevance in this Court but not in the New York Supreme Court reviewing the Subpoena smacks of a "have your cake and eat it too" approach.  The legal jiu-jitsu necessary to pursue this strategy would be impressive had it not raised serious risks of federal meddling in state investigations and led to a sprawling litigation involving four different judges, at least three lawsuits, innumerable motions and a huge waste of the AGs' time and money.

periods outside the statutes of limitations is not evidence of pretext:  if the AGs are investigating whether Exxon made material misrepresentations in the past six years (the statute of limitations applicable to the Martin Act and New York General Business Law Art. 22-A), Exxon's historic knowledge is relevant, whether it was gained five years ago or twenty-five years ago.  Evidence that Exxon made material misrepresentations before the limitations period is relevant to Exxon's present-day intent and could be evidence of a continuing scheme that persisted into the limitations period.  Exxon's communications with outside groups are also potentially relevant.  It could be relevant, for example, if Exxon shared internal documents concerning climate-science or knowingly helped climate-change deniers craft a messaging strategy that was consistent with Exxon's political desire to avoid regulations harmful to its economic interests but inconsistent with its internal understanding of climate change.[32]

Last, and along the same lines, Exxon argues that the NYAG's shifting investigative theory and attempt to explore a stranded-assets theory is evidence of pretext.  It is to be expected that Exxon disagrees with the merits of the NYAG's investigation, and, more specifically, believes the NYAG's theory may be preempted.  *See* SAC ¶¶ 95-97; Supp. Opp'n at 39-42.  But if every time a questionable legal theory were pursued in an *investigation*—not even in an enforcement proceeding—the target could run into federal court and enjoin the state investigation on pretext grounds, the role of the states in our federal system would be seriously compromised.  The fact that the NYAG's theories have shifted over time (presumably, at least in

---

[32]     Exxon also points to the fact that the Subpoena and CID appear untethered to bad acts in New York and Massachusetts.  SAC ¶¶ 84, 89.  But the Superior Court held that the CID was within the MAG's jurisdiction, *see* Mass. Decision at 4-5, and Exxon has not disputed the NYAG's jurisdiction in New York Supreme Court.

part, in response to facts learned as it receives material from Exxon) is too slim a reed to support Exxon's allegations of an improper motive.[33]

In sum, whether viewed separately or in the aggregate, Exxon's allegations fall well short of plausibly alleging that the NYAG and MAG are motivated by an improper purpose.  The Complaint and SAC do not allege any direct evidence of an improper motive, and the circumstantial evidence put forth by Exxon fails to tie the AGs to any improper motive, if it exists, harbored by activists like Pawa and Frumhoff.  This issue is fatal to Exxon's claims for violations of the First, Fourth, and Fourteenth Amendments, its claims under Texas law,[34] and its claim for conspiracy pursuant to Section 1985.[35]  Accordingly, Exxon's constitutional tort and state law cognate claims are DISMISSED and leave to amend is denied.

b.  Dormant Commerce Clause

The Supreme Court has upheld state "blue sky" laws such as the Martin Act against challenges that they violate the dormant commerce clause.  *See Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982); *Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 598 (S.D.N.Y. 2015) ("For over a century it has been established that state Blue Sky laws do not

---

[33]     Exxon also takes issue with the fact that someone in the NYAG's office asked Pawa not to confirm to the press that he had met with the NYAG prior to the March 29, 2016, press conference. SAC ¶ 60.  While interesting, that fact, either alone or with the other facts alleged by Exxon, does not suggest that the AGs do not have a good faith basis for their investigations.

[34]     For the same reason, Exxon has not plausibly alleged *ultra vires* action for purposes of the Eleventh Amendment.  *See Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986).  Accordingly, the Eleventh Amendment also bars Exxon's state law claims.

[35]     Exxon's claim under Section 1985 fails for the additional reason that Exxon has not alleged that it is a member of a "class" against which the AGs have discriminated.  *See Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) ("[T]he term class "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.  Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with."  (quoting *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993))).

violate the Dormant Commerce Clause because they 'only regulate [] transactions occurring within the regulating States.'" (quoting *Edgar*, 457 U.S. at 641)). The Martin Act regulates "the issuance, exchange, purchase, sale, promotion, negotiation, [or] advertisement" of securities "within or from" New York. N.Y. G.B.L. § 352(1). According to Exxon, the Subpoena and CID nonetheless impermissibly regulate interstate commerce because they are intended to "regulate" the market for political speech. *See* Supp. Opp'n at 37. As Exxon concedes, the Subpoena and CID do not, on their face, regulate speech. *See* Supp. Opp'n at 36-38. Thus, Exxon's dormant commerce clause claim appears to rest on the theory that the Subpoena and CID are *sub silentio* regulations because they have an improper purpose. The Court rejects this argument for the reasons already given. Even if an improper purpose were not essential to Exxon's dormant commerce clause claim, it has failed to allege plausibly essential elements of such a claim. Neither the Complaint nor the SAC explains how the document demands discriminate against out-of-state businesses, *see United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255-56 (2d Cir. 2001) (dormant commerce clause prohibits discrimination against out-of-state businesses), unduly burden interstate political speech in particular, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (facially neutral regulations that unduly burden interstate commerce clause may violate the dormant commerce clause), or have the "practical effect of 'extraterritorial control of commerce occurring entirely outside the boundaries of the state in question," *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004)). Exxon's dormant commerce clause claim is DISMISSED.

c.        Preemption

Exxon's preemption claim fairs no better.  Ordinarily, an action to enforce or quash a subpoena is not the proper forum in which to assert a preemption defense.  *See Constr. Prods. Research, Inc.*, 73 F.3d at 470 ("[A]t the subpoena enforcement stage, courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers."); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001) ("Following *Endicott,* courts of appeals have consistently deferred to agency determinations of their own investigative authority, and have generally refused to entertain challenges to agency authority in proceedings to enforce compulsory process.").  Agencies—and by extension, state officers like the AGs—are afforded latitude to conduct their investigations without interference and anticipatory jurisdictional challenges.  A narrow exception has been recognized, however, when the subpoena "exceeds an express statutory limitation on the agency's investigative powers," *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 369 (7th Cir. 1983), or when there is a "patent lack of jurisdiction," *Ken Roberts Co.*, 276 F.3d at 587.  The cases cited by Exxon in support of its argument fall into this category, but they are inapposite.  *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) (ERISA preempts entirely any state law regulating employee benefit plans); *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 536 (2009) (state attorneys general may not enforce the federal Fair Housing Act).

Exxon contends that SEC regulations regarding the reporting of estimated and proved reserves preempts any inquiry into the AGs' "stranded assets" theory.  *See* Supp. Opp'n at 40-42.  But Exxon has pointed to no provision of the SEC regulations that purports to prohibit the AGs from requesting documents that relate to the accounting for reserves.  Unlike in *Gobeille* and *Cuomo*, Exxon has not argued that the AGs lack authority to inquire into anything to do with the

reporting of reserves.  Moreover, Exxon's internal documents regarding reporting of reserves may be relevant to any number of theories, including, for example, whether Exxon understood the science of climate change in fundamentally different ways than it told its investors and the public.  In short, Exxon's preemption claim is DISMISSED.

## CONCLUSION

For the reasons given above, the motions to dismiss are GRANTED.[36]  Exxon's motion for leave to amend is DENIED as futile.  The Complaint is DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to close the open motions at docket entries 196, 216, 219, 222, and 250 and terminate the case.

**SO ORDERED.**

Date:  **March 29, 2018**
       **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**

---

[36]      The Court does not reach whether abstention is appropriate pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).  *Colorado River* abstention applies when "parallel state-court litigation could result in 'comprehensive disposition of litigation' and abstention would conserve judicial resources."  *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Colorado River*, 424 U.S. at 817-18).  The proceedings in this Court, Massachusetts and the New York Supreme Court are plainly parallel.  *See Niagara Mohawk Power Corp.*, 673 F.3d at 100 ("Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." (quoting *Dittmer*, 146 F.3d at 118)).  In Massachusetts in particular, Exxon has relied on substantially the same facts as are alleged in the Complaint to assert state-law analogs to the federal claims in this case.  *See* Petition ¶ 63 (the CID is "impermissible viewpoint discrimination"); Courchesne Decl. Ex. 6 at 43-44 ("our position is that this is all about bad faith.  This is about regulating speech.  It's about viewpoint discrimination"); Compl. ¶ 111 ("The subpoena and the CID are impermissible viewpoint-based restrictions on speech, and they burden [Exxon's] political speech.").  Nonetheless, the Second Circuit's more recent discussions of *Colorado River* abstention suggest that this case may not fall within the heartland of the doctrine.  There is no other court in which all of Exxon's claims against the NYAG and MAG could be consolidated.  *See Woodford*, 239 F.3d at 523-24 ("The classic example [of *Colorado River* abstention] arises where all of the potentially liable defendants are parties in one lawsuit but in the other lawsuit one defendant seeks a declaration of nonliability and the other liable defendants are not parties.").  And, unlike in *Woodford*, there is no risk that a judgment in this action would not be preclusive in a subsequent proceeding; neither party has argued that they would not be bound by this court's determination.  *See Woodford*, 239 F.3d at 525-26; *De Cisneros v. Younger*, 871 F.2d 205, 308 (2d Cir. 1989) (abstention appropriate where district court "feared a scenario under which [Plaintiff] would prove [Defendant's] liability in federal court—and then be able to use the judgment preclusively in state court—but that the inverse would not be true.").